```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2

 3    GLENN COX, Individually and
      as Class Representative
 4
                     Plaintiff              Civil Action No.
 5                                           1:14-cv-1576-LMM-JSA
           -vs-
 6
      MIDLAND FUNDING, LLC and
 7    FREDERICK J. HANNA & ASSOCIATES, P.C.

 8                     Defendants

 9
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10                      D E P O S I T I O N   O F

11                      CATHRINE REINECKE

12                      JANUARY 23, 2015

13    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

14    APPEARANCES:

15         THE KOVAL FIRM, LLC
           Atlanta, Georgia
16         BY:  STEVEN HOWARD KOVAL, ESQ.

17         ADDLETON LTD. CO.
           Macon, Georgia
18         BY:  DAVID F. ADDLETON, ESQ. (by telephone)

19         HURT STOLZ, LLC
           Athens, Georgia
20         BY:  JAMES W. HURT, JR., ESQ. (by telephone)

21              Counsel on behalf of the Plaintiff

22         BEDARD LAW GROUP, P.C.
           Duluth, Georgia
23         BY:  MICHAEL K. CHAPMAN, ESQ.
                JOHN H. BEDARD, JR., ESQ. (by telephone)
24
                Counsel on behalf of Frederick J. Hanna &
25              Associaties, P.C.
```

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

FEB 0 4 2015

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

ORIGINAL

1
2

APPEARANCES:

3
       BURR & FORMAN, LLP
       Atlanta, Georgia
       BY:   RACHEL R. FRIEDMAN, ESQ.

4
5
       Counsel on behalf of Midland Funding, LLC

6
       BURR & FORMAN, LLP
       Atlanta, Georgia
       BY:   JOSHUA H. THREADCRAFT, ESQ.

7
8
       Counsel on behalf of Citibank, N.A.

9

10
                     I N D E X

11
WITNESS              EXAMINATION BY              PAGE

12
Ms. Reinecke         Mr. Chapman                   5
                     Ms. Friedman                 97
13
                     Mr. Koval                   101
                     Mr. Chapman                 134
14
                     Mr. Friedman                137
                     Mr. Koval                   138
15
                     Mr. Threadcraft             139
                     Mr. Koval                   141

16
17
                   E X H I B I T S

18
NUMBER               DESCRIPTION                 PAGE

19
   1                 Subpoena                      4
   2                 Bates Stamped Documents 1-334
20
                       Citi Production             4
   A                 Response to Subpoena          4

21
22
              (Original transcript and exhibits provided to
              Mr. Chapman.)

23
24
                        * * * * *

25

1    The deposition of CATHRINE REINECKE was taken at this

2    time and place, that is, at the offices of Prairie Reporting,

3    Sioux Falls, South Dakota, on the 23rd day of January, 2015,

4    commencing at 10:03 a.m.; said deposition taken before Stacy

5    L. Wiebesiek, RPR, a Notary Public with and for the State of

6    South Dakota.

7

8                      CATHRINE REINECKE

9        called as a witness, being first duly sworn, deposed and

10       said as follows:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Exhibits 1 and 2 were marked for identification.)

2              MR. CHAPMAN:  My name is Michael Chapman.  I

3      am an attorney with Bedard Law Group in Atlanta,

4      Georgia, or just outside Atlanta, Georgia, and we

5      represent one of the defendants in this matter,

6      Frederick J. Hanna & Associates, P.C.  I'm trying to

7      talk loud.  Can everybody hear me okay?

8              MR. KOVAL:  On the phone.

9              MR. BEDARD:  Yeah.

10             MR. HUNT:  Yes, I hear you fine.  This is

11     Jimmy.

12             MR. CHAPMAN:  All right.  Thank you, Jimmy.

13             MR. THREADCRAFT:  And before you go any

14     farther, this is Joshua Threadcraft, and I'm

15     defending this deposition.  We received a subpoena

16     for the deposition.  We served a response to that

17     with objections, and so I would like to mark that as

18     an exhibit to the deposition.  It doesn't really

19     matter what number.

20             MR. CHAPMAN:  Can we make it A?

21             MR. THREADCRAFT:  That's fine.

22             MR. CHAPMAN:  And then the other ones will

23     have numbers.  Will that work?

24             (Exhibit A was marked for identification.)

25             MR. THREADCRAFT:  Yes.  And I'll just say, we

1        have endeavored to provide a witness to provide

2        answers to the categories.  We believe they're

3        extremely broad, not described with reasonable

4        particularly, but putting that aside, we asserted

5        objections.  We have a witness here to testify.  We

6        are working in good faith to provide a response to

7        this.  So with that being said, proceed.

8                MR. CHAPMAN:  Okay.  This is the deposition

9        of a representative of Citibank, N.A., pursuant to

10       service of a subpoena to testify to deposition in a

11       civil action pursuant to Rule 45 of the Federal

12       Rules of Civil Procedure.  This deposition is for

13       all purposes permitted under the Federal Rules of

14       Civil Procedure and the local civil practice rules

15       of the United States District Court for the Northern

16       District of Georgia.

17                              EXAMINATION

18   BY MR. CHAPMAN:

19   Q    Ma'am, will you please state your name for the

20   record.

21   A    Cathrine Reinecke.

22                MR. THREADCRAFT:  And are we doing the usual

23       stipulations, all objections except as to form

24       reserved?

25                MR. CHAPMAN:  It depends on what you wish to

```
 1              do there.  Do you want to just --
 2                     MR. THREADCRAFT:  I don't care.
 3                     MR. CHAPMAN:  Do you want to do form only?
 4                     MR. THREADCRAFT:  It doesn't matter to me,
 5              with the exception of form, and I guess privilege
 6              too.
 7                     MR. CHAPMAN:  Form and privilege, okay.
 8                     MR. THREADCRAFT:  All reserved.
 9                     MR. CHAPMAN:  Yep.
10                     MR. THREADCRAFT:  Is that good with you,
11              Steve?
12                     MR. KOVAL:  My only concern is -- I mean,
13              let's just comply with the rules because I don't
14              know how quickly Michael is going to want to use the
15              deposition, and since we've got everybody here, I
16              think it would probably be better if there was an
17              objection that is necessary to state, that it be
18              stated.
19                     MR. THREADCRAFT:  All right.
20                     MR. KOVAL:  Does that make sense?
21                     MR. THREADCRAFT:  I think so.
22                     MR. KOVAL:  I mean, just because of the
23              nature of this thing.
24                     MR. CHAPMAN:  Okay.
25              BY MR. CHAPMAN:
```

| 1 | Q | Ma'am, have you ever had a deposition taken before? |
| 2 | A | Yes. |
| 3 | Q | And when was the last time you had a deposition |
| 4 | taken? | |
| 5 | A | I don't remember. |
| 6 | Q | Was it in 2015? |
| 7 | A | No, it's been a couple years, but I don't remember |
| 8 | exactly. | |
| 9 | Q | Would you say it's in the last five years? |
| 10 | A | No, I think it's probably longer than that. |
| 11 | Q | And what's your full name for the record? |
| 12 | A | Cathrine Reinecke. |
| 13 | Q | And your date of birth? |
| 14 | A | May 29, '65. |
| 15 | Q | What's your home address? |
| 16 | A | 5509 South -- |

17                MR. THREADCRAFT:  Hold on a second.  Why is

18           that important?

19                MR. CHAPMAN:  Well, it's important because if

20           she's not employed with Citibank, N.A. at some

21           point, we may need to reach her in this case.

22                MR. THREADCRAFT:  I'll say this on the

23           record, just because I don't want her personal home

24           address out there, you can contact me.

25                MR. CHAPMAN:  Okay.  So are you instructing

```
 1                    her not to answer or --
 2                         MR. THREADCRAFT:  Well, can we do it off the
 3              record?
 4                         MR. CHAPMAN:  That's fine.
 5                         MR. THREADCRAFT:  Yeah, let's do that off
 6              record.
 7                         (Discussion off the record.)
 8                         MR. CHAPMAN:  Okay.  Are we back on the
 9              record now?
10                         THE COURT REPORTER:  Yes.
11              BY MR. CHAPMAN:
12              Q    What's your work address?
13              A    701 East 60th Street North, Sioux Falls, South
14       Dakota.
15              Q    Who is your present employer?
16              A    I'm employed by Citigroup Management Corp.
17              Q    Is Citigroup Management Corp. related to Citibank,
18       N.A.?
19              A    They're affiliates.
20              Q    Are you able to describe what that affiliation is?
21              A    No.
22              Q    Do you understand, if I were to ask you is -- is
23       Citigroup Management Corp. a subsidiary of Citibank, N.A.,
24       would you know what that means?
25                         MR. THREADCRAFT:  I'm going to object to the
```

1    extent that it calls for a legal conclusion, and I

2    understand that this is just preliminary information

3    that you're asking of the witness, not testimony on

4    behalf of Citibank, right?

5              MR. CHAPMAN:  Well, the subpoena was for

6    Citibank, N.A., so I need to establish that.

7              MR. THREADCRAFT:  Okay.  And what category is

8    this?  What topic?

9              MR. CHAPMAN:  This is for all topics.

10             MR. THREADCRAFT:  Well, she is being produced

11   on behalf of Citibank, N.A. to provide testimony

12   with respect to the topics that are listed in your

13   subpoena, if that helps with the question.

14             MR. CHAPMAN:  Let me ask her that question

15   then and then handle it that way.

16             MR. KOVAL:  Michael, if I could -- just so

17   we're clear, you haven't introduced the subpoena

18   yet, have you?

19             MR. CHAPMAN:  No.  In fact, I haven't even

20   gotten to the preliminaries about what we're going

21   to do today.

22             MR. KOVAL:  I just want to make sure that

23   we're all clear that it's the most recent subpoena.

24             MR. CHAPMAN:  And we're going to get there.

25   BY MR. CHAPMAN:

1     Q    Ma'am, are you here today to testify on behalf of

2     Citibank, N.A. in regard to a subpoena that was served on

3     Citibank, N.A.?

4     A    Yes.

5     Q    What is your highest level of education?

6     A    I have an associate's degree.

7     Q    Where did you obtain that degree?

8     A    Kilian Community College.

9     Q    And where is that?

10    A    Here in Sioux Falls.

11    Q    And when did you obtain the associate's degree?

12    A    I don't remember the year.

13    Q    Was it in the last five years?

14    A    No.

15    Q    Was it in the last ten years?

16    A    No.

17    Q    Was it in the last 15 years?

18    A    No.

19    Q    The last 20 years?

20    A    No.

21    Q    Last 25 years?

22    A    Yes.

23    Q    So around 1990 or so; would that be fair to say?

24    A    Around there, yes.

25    Q    What was the associate's degree in?

1      A      Paralegal.

2      Q      Do you have any other certificates or

3    accreditations, degrees, in addition to the associate's

4    degree?

5      A      Yes.

6      Q      And what are those?

7      A      I'm a certified legal assistant by the National

8    Association of Legal Assistants.

9      Q      When did you achieve that?

10      A      Around 1995.

11      Q      Now, I know you've had your deposition taken before.

12    You indicated that a few minutes ago, but I'm just going to go

13    through some quick ground rules just to refresh your memory as

14    to what it is we're going to be doing here today.  I'm going

15    to be asking you a series of questions that I'm going to be

16    requiring you to answer.

17           If at any time you don't understand my question, I

18    need you to say so because if you answer the question, I'm

19    going to assume that you understood it.  So if I need to

20    rephrase the question in a way for you to understand it,

21    please don't hesitate to ask me to do that.  This is not a

22    marathon.  If you need to take a break at any time, simply say

23    so, we'll stop.  My only caveat to that is if there's a

24    question already pending, I'm going to ask you to answer that

25    question before we stop.

1    In addition, I know you're represented by counsel
2  here today. It's not my intention to ask any questions that
3  are believed to be protected by the attorney-client privilege
4  or any other known privileges. If I do inadvertently wade
5  into those waters, I would expect that your attorney will
6  probably object, and then we can take it from there.

7    It's also important that we verbalize our answers.
8  We all have a tendency to say uh-huh instead of yes or huh-uh
9  instead of no and nod our heads to mean no or up and down to
10  say yes. As you can see, this is being transcribed so it's
11  going to be very important that you verbalize your answers so
12  that we can read the transcript back and know exactly what
13  your answer was.

14    The other thing is you may know exactly what I'm
15  asking you before I finish my question. If you can, just wait
16  until I finish the question before you answer so we're not
17  talking over one another. I'm going to try to extend the same
18  courtesy to you as well. Do you have any questions about this
19  process today?

20    A    No.

21    Q    I am handing you a document that is identified as
22  Exhibit 1. If you wish to take a couple minutes to look
23  through that document, feel free. Just let me know when
24  you're ready.

25                    MR. KOVAL: Off the record.

```
1                        (Discussion off the record.)

2         BY MR. CHAPMAN:

3         Q     And you can just let me know when you're finished.

4         A     Okay.

5         Q     Ma'am, have you seen that document that's in front

6    of you before today?

7         A     All but the proof of service.

8         Q     And I believe we've already established that you're

9    here today to testify on behalf of Citibank, N.A. with respect

10   to that document, that subpoena that's identified as Exhibit

11   1.   Would that be correct?

12        A     Yes.

13                    MR. THREADCRAFT:  Subject to the response

14              that was served by Citibank.

15                    MR. KOVAL:  You're referring to -- you marked

16              Exhibit A, didn't you?

17                    MR. THREADCRAFT:  Exhibit A, yeah.

18        BY MR. CHAPMAN:

19        Q     To the best of your knowledge -- and let me back up

20   real quick.  I'm going to be referring throughout this

21   deposition to Citibank.  What I mean by that is Citibank,

22   N.A.  I know there's obviously other Citibank entities.  So

23   for the sake of this deposition, unless I state otherwise, do

24   you understand if I say Citibank, I'm referring to Citibank,

25   N.A.?
```

1     A     Yes.

2     Q     Was Citibank served with that subpoena that's

3     identified in Exhibit 1?

4     A     Yes.

5     Q     How did you receive that document?

6     A     Kelly Umstott works for me.  She's the person who

7     was served, and she gave it to me.

8     Q     Kelly -- can you spell her last name for me, please?

9     A     U-M-S-T-O-T-T.

10    Q     What is her position?

11    A     She is a legal support specialist.

12    Q     Does she work in the same office as you?

13    A     Yes.

14    Q     Who selected you to appear today for purposes of

15    this deposition?

16              MR. THREADCRAFT:  I'm going to object.  Well,

17         go ahead.  That's fine.

18              THE WITNESS:  In-house counsel.

19    BY MR. CHAPMAN:

20    Q     Do you recall the identity of the counsel that

21    selected this for you?

22              MR. THREADCRAFT:  Let's go off the record for

23         a second.

24              (Discussion off the record.)

25              MR. THREADCRAFT:  All right.  Let's go back

1           on.

2      BY MR. CHAPMAN:

3      Q      Do you recall the name of that individual?

4      A      Yes.

5      Q      What is his or her name?

6      A      Andrew Moritz.

7      Q      Is that M-O-R --

8      A      R-I-T-Z.

9      Q      M-O-R-I-T-Z; is that correct?

10     A      Correct.

11     Q      When you look at that Exhibit 1, and you flip back

12     to the page at the top that says, subpoena to testify at

13     deposition, Exhibit A, do you see that page?

14     A      Yes.

15     Q      And do you see where there's 12 separate paragraphs

16     spread over three pages, three subsequent pages?

17     A      Yes.

18     Q      Do you have knowledge today as to testify to the

19     topics contained within these 12 paragraphs?

20     A      Yes.

21     Q      When we look at the page that says subpoena to

22     testify at deposition, Exhibit A, which is contained in

23     Exhibit 1, do you see below where it says, deposition topics,

24     there's a word that says note, and then there's some bolded

25     text there?

1       A       Yes.

2       Q       Does Citibank's records reflect that Glenn M. Cox is

3       a customer of Citibank?

4       A       He was.

5       Q       And did he have a credit card account with Citibank?

6       A       Yes.

7       Q       And do Citibank's records reflect that that account

8       number was 634570600?

9       A       I would have to looked at the records we produced to

10      verify the number.

11      Q       Do Citibank's records reflect that the Glenn Cox

12      account was originated in May of 1992?

13      A       Again, I would need to look at the records that were

14      produced to verify the date.

15      Q       And with respect to the last known address of

16      Mr. Cox that's indicated here on this deposition -- this

17      Exhibit A to the subpoena to testify at deposition, are you

18      able to tell from -- do Citibank's records reflect that that

19      was the last known address for Mr. Cox?

20      A       I would need to look at the records that were

21      produced to verify that.

22      Q       I've asked you a couple questions now about the

23      specific account, and the response was you would need to look

24      at certain records to verify the information.  Can you tell me

25      what records you would need to review?

1      A    I would look at the screen prints and the billing

2    statements to verify the account number, address and contract

3    date.

4      Q    Okay.  Thank you.  I believe your testimony earlier,

5    and you can correct me if I'm wrong, is you are employed by

6    Citigroup Management Corporation; is that correct?

7      A    Yes.

8      Q    What is your current position?

9      A    I am a manager of the subpoena compliance and

10   restraining orders unit, and I am a vice president of

11   Citibank, N.A.

12      Q    And how long have you held that position?

13               MR. THREADCRAFT:  Which one?

14   BY MR. CHAPMAN:

15      Q    Well, is this -- is manager of subpoena compliance

16   unit and vice president of Citibank, is that one title, or is

17   that multiple titles?

18      A    Two titles.

19      Q    Two titles, okay.  So let's take these apart.  How

20   long have you been the manager of the subpoena compliance

21   unit?

22      A    I don't remember the date.  It would have been in

23   the late '90s.

24      Q    Would you say that you have been the manager of the

25   subpoena compliance unit for 20 years?

1    A    Yes.

2    Q    More than 20 years?

3    A    It's possible.

4    Q    More than 25 years?

5    A    I don't believe so.

6    Q    What are your duties as the manager of the subpoena

7  compliance unit?

8    A    I manage the legal services intake unit, and I

9  manage the staff that process subpoenas and restraining orders

10 for the Citi consumer businesses.

11   Q    And who do you report to?

12   A    I report to in-house counsel.

13   Q    Would that be Andrew Moritz?

14   A    No.

15   Q    Who is your immediate supervisor?

16            MR. THREADCRAFT:  Why is that important?

17            MR. CHAPMAN:  Well, it could be very

18       important for a number of reasons, for the reasons

19       that we just discussed a few minutes ago.

20            MR. THREADCRAFT:  Which are what, why she was

21       designated to provide this testimony?

22            MR. CHAPMAN:  It could be that.  It could be

23       if there's knowledge that she doesn't have that

24       somebody else may have.

25            MR. THREADCRAFT:  I just don't -- I mean, I'm

1       letting you ask the question.  I'm not sure who

2       she -- what that has to do with --

3               MR. CHAPMAN:  Well, I mean, you can object to

4       it.  I mean, I think we're entitled to the answer to

5       the question as to who her boss it.

6               MR. THREADCRAFT:  All right.  That's fine.

7               THE WITNESS:  John Preston Turner.

8       BY MR. CHAPMAN:

9       Q    Is Mr. Turner located -- is his office located at

10      the same location as yours?

11      A    No.

12      Q    Do you know where his office is located?

13      A    Yes.

14      Q    Where would that be?

15      A    Baltimore, Maryland.

16      Q    Now, with respect to your position as vice president

17      of Citibank, how long have you maintained that position?

18      A    It would have been sometime late 2011, I believe.

19      Q    And what are your duties as the vice president of

20      Citibank?

21               MR. THREADCRAFT:  Currently?

22      BY MR. CHAPMAN:

23      Q    Currently, yes.

24      A    I manage the subpoena compliance and restraining

25      orders unit for the consumer businesses.

1   Q And with respect to your role as vice president of

2 Citibank, do you report to Mr. Turner as well?

3   A Yes.

4   Q Other than manager of subpoena compliance unit and

5 the vice president of Citibank, have you held any other

6 positions with the company?

7   A Yes.

8   Q What are those?

9      MR. THREADCRAFT:  And I'm just trying to be

10    helpful here.  When you say Citibank, you mean

11    Citibank, N.A. or Citibank and its predecessor

12    entity?  Because I want to make sure it's clear for

13    the record.

14  BY MR. CHAPMAN:

15   Q I'm asking, have you been employed with any other

16 Citibank entity other than your current entity?

17   A Yes.

18   Q Okay.  What would that be?

19   A Citibank (South Dakota), N.A.

20   Q When was that?

21   A From December 23rd, 1986 through June 30, 2011, I

22 believe.

23   Q And what duties did you have with Citibank (South

24 Dakota)?

25   A I worked as an administrative assistant.  I worked

```
 1    as a legal secretary, and I worked as a paralegal before
 2    becoming a manager.
 3         Q    New, at some point you became employed by the
 4    current entity you're employed with.  Are you able to tell me
 5    how that came to be?
 6         A    Yes.
 7         Q    And what are the circumstances surrounding that?
 8         A    The legal department within which I worked became --
 9    was migrated into a -- what we call a global function, and so
10    at that time, they changed our employer from Citibank (South
11    Dakota), N.A. to Citigroup Management Corp.
12                   MR. KOVAL:  Off the record for one second.
13                   (Discussion off the record.)
14    BY MR. CHAPMAN:
15         Q    Ma'am, did you review any documents ahead of this
16    deposition today?
17         A    Yes.
18         Q    What documents were those?
19                   MR. THREADCRAFT:  Go ahead.  Well, I'll tell
20                   you what.  I want to be careful here because what
21                   she did with counsel, I think would be covered by
22                   the attorney-client privilege and the work product
23                   doctrine so -- I think I understand where you're
24                   going.  I don't think you're trying to get there.
25                   MR. CHAPMAN:  Yeah, I have no intention of
```

1       asking anything about the content of any

2       communication between the deponent and counsel.  I'm

3       just asking if she looked at documents, and if the

4       testimony was yes, what she looked at.

5               MR. THREADCRAFT:  Well, and I think if those

6       documents were provided by counsel, that would be

7       covered by the privilege.  I want to let you ask

8       your questions.  I just want to be -- you know, not

9       have any violation of the attorney-client privilege

10      so, you know, I'm not sure how to best handle that

11      situation.

12              MR. CHAPMAN:  Okay.  Well, here's what I can

13      do --

14              MR. THREADCRAFT:  We can go off the record

15      for this.

16              MR. CHAPMAN:  I don't think we need to go off

17      the record.  I'm going to hand you a very large

18      exhibit that's identified as Exhibit 2, and those

19      documents are Bates stamped 000001 through 000334.

20      And if you want to take a moment to take a look at

21      those, let me know when you're done.

22              MR. THREADCRAFT:  Do you want her, just to be

23      clear, to look at every single document?

24              MR. CHAPMAN:  Well, it's up to her.  You'll

25      see by the nature of the question I'm about to ask,

1           if she wants to go back and look at them, she

2       certainly can.

3               MR. THREADCRAFT:  Okay.  Look at all of them.

4       What's your next question?  Maybe if she looks

5       through it, that will help advise her.

6               MR. CHAPMAN:  Well, the question, is -- are

7       we off the record?

8               MR. THREADCRAFT:  That's fine.

9               (Discussion off the record.)

10      BY MR. CHAPMAN:

11      Q    Before you is a large exhibit that we've identified

12  as Exhibit 2, and that contains a number of pages Bates --

13  I'm going to leave out the zeroes to proceed the page numbers

14  if that's okay with everybody.  For instance, the batch of

15  documents in front of you says Bates 000001 through 000334.

16  Do you see that?

17      A    Yes.

18      Q    If I just refer to these as, for instance, documents

19  1 through 334, will you understand what I'm referring to?

20      A    Yes.

21      Q    Have you seen those documents before today?

22      A    Yes.

23      Q    And did you review those documents in preparation

24  for this deposition?

25      A    Yes.

```
 1        Q    Did Citibank produce those documents?
 2        A    Yes.  Most of them.  Yes, we produced them.
 3                  MR. THREADCRAFT:  Is your question, did I
 4             send them to the attorney?  I can go ahead and say,
 5             yes, based on my review of these documents, those
 6             are the -- if that's what your question was.
 7        BY MR. CHAPMAN:
 8        Q    Yes, that's what the question was.
 9        A    Yes.
10        Q    And those were produced in response to the subpoena;
11   is that correct?
12                  MR. THREADCRAFT:  Well, she didn't -- just
13             for clarity, I'm the one that produced them so we
14             produced the Bates stamped documents in response to
15             the subpoena, but she didn't actually produce them
16             so she wouldn't have actual knowledge of what we
17             did, besides what we told her.
18        BY MR. CHAPMAN:
19        Q    Let's just flip back to Exhibit 1 real quick, which
20   is the subpoena, and I just neglected to clarify something.
21   If you flip to the page that says subpoena to testify at
22   deposition, Exhibit A, do you see that?
23        A    Yes.
24        Q    And we talked about there's some bold text that has
25   some -- what are purported to be identifiers of the Glenn Cox
```

1    account.  Do you see that?

2        A    Yes.

3        Q    Throughout this deposition, when I'm referring to

4    the Glenn Cox account, I'm probably just going to refer to it

5    as either the credit card account or the account.  So do you

6    understand from here on out when I say the credit card account

7    or the account, this is the account that I'm referring to?

8        A    Yes.

9        Q    Does Citibank issue credit card accounts?

10       A    Yes.

11       Q    And to the best of your knowledge, are those credit

12   card accounts typically governed by written terms and

13   conditions?

14       A    Yes.

15       Q    And to your knowledge, do those written terms and

16   conditions change from time to time?

17       A    Yes.

18       Q    To the best of your knowledge, is it Citibank's

19   policy to provide its customers with copies of the terms and

20   conditions of the credit card accounts?

21       A    Yes.

22       Q    And are those terms and conditions -- are those

23   usually -- do those usually have a name to them, such as like

24   cardmember agreement or cardholder agreement or something like

25   that?

1       A     Yes.

2       Q     What do you typically call those terms and

3   conditions documents?

4       A     Card agreement.

5       Q     So throughout this proceeding this morning, when we

6   talk about terms and conditions or cardholder agreements or

7   cardmember agreements, I'm just going to call them card

8   agreements.  Would you understand that that's what I'm

9   referring to at that point?

10      A     Yes.

11      Q     Is it Citibank's policy to notify a consumer when

12  there is a change or modification to the card agreement?

13      A     Yes.

14      Q     Are these modifications or changes typically placed

15  in writing?

16      A     Yes.

17      Q     Are these changes to the card agreements typically

18  sent to consumers?

19      A     Yes.

20      Q     Would this be by physical mail?

21            MR. THREADCRAFT:  I'm going to object to the

22          form of the question.

23  BY MR. CHAPMAN:

24      Q     I can rephrase that better.  What method does

25  Citibank typically provide its consumers or its customers

1    with modifications to their card agreements?

2                    MR. THREADCRAFT:  Are you asking her

3            individually?

4                    MR. CHAPMAN:  I'm asking her just if she

5            knows, yeah.

6                    MR. THREADCRAFT:  Individually, okay.

7                    THE WITNESS:  By mail.

8        BY MR. CHAPMAN:

9        Q    And I believe we established -- and we can back up

10   if we didn't establish this already -- that when consumers

11   originate an account, they receive a card agreement; is that

12   correct?

13                   MR. THREADCRAFT:  I'm going to object to the

14           form as to what you mean by originate an account

15           but --

16       BY MR. CHAPMAN:

17       Q    Well, you testified that Citibank originates credit

18   card accounts.  Would that be accurate?

19       A    Yes.

20       Q    When Citibank originates a credit card account, is

21   it its policy and practice to provide the consumer with a card

22   agreement that governs the terms and conditions of that credit

23   card account?

24                   MR. THREADCRAFT:  I'm going to object to the

25           form of the question.

1      BY MR. CHAPMAN:

2          Q    Do you understand the question?  I can rephrase it

3      if you don't understand the question.

4                    MR. THREADCRAFT:  I'm objecting to the form

5                    of the question.  I can tell you why if you want me

6                    to.

7      BY MR. CHAPMAN:

8          Q    Well, if she understand it, she can answer it.  If

9      she wants me to rephrase it, I'll rephrase it.

10         A    Yes.

11         Q    Yes is the answer, or, yes, you want me to rephrase

12     it?

13         A    I believe I understand the question.

14         Q    And your answer to that question is yes?

15         A    Correct.

16         Q    Are these card agreements sent by mail to Citibank's

17     customers?

18         A    Yes.

19         Q    I would like to direct your attention to pages

20     160 -- let's see here.  I tell you what.  Let me just change

21     the order here a little bit.  Let's take a look at pages 80 to

22     93 of Exhibit 2.

23         A    Okay.

24                    MR. KOVAL:  I'm sorry.  Again, the page

25                    numbers?

```
 1          BY MR. CHAPMAN:
 2             Q    80 to 93.  And you can let me know when you've
 3      finished reviewing that document.
 4             A    Okay.
 5             Q    Have you seen this document before, the document
 6      that's identified as pages 80 to 93.
 7             A    Yes.
 8             Q    What is this document?
 9             A    This is a printout of the de-archived notes from the
10      account.
11                       MR. KOVAL:  I'm sorry.  What was the
12                  word you said in front of archived?
13                       THE WITNESS:  De-archived.
14                       MR. KOVAL:  De-archived?
15                       MR. CHAPMAN:  D, as in dog; is that right?
16                       MR. KOVAL:  You mean de like D-E?
17                       THE WITNESS:  D-E.
18          BY MR. CHAPMAN:
19             Q    D-E, okay.  Is this document something that's made
20      and kept in the ordinary course of Citibank's regularly
21      conducted business activity?
22             A    Yes.
23             Q    And is this document something that's routinely made
24      and kept in the course of Citibank's business?
25             A    Yes.
```

1    Q    And do the entries contained in this document, were

2    these made at or near the time of the events or transactions

3    that are reflected in this document?

4    A    Yes.

5    Q    And was this document either made or transmitted by

6    someone at Citibank with knowledge as to the transactions

7    within this document?

8    A    Yes.

9    Q    You had identified this document as the de-archived

10   notes of the account; is that correct?

11   A    Yes.

12   Q    And when we talk about the account, are we talking

13   about the Glenn Cox account?

14   A    Yes.

15   Q    Does this document contain any identifiers that

16   would allow you to identify the account number associated with

17   Glenn Cox?

18   A    Yes.

19   Q    And where would that be?

20   A    On the top line after his name.

21   Q    Would that be where it reads 7099634570600?

22   A    Yes.

23   Q    And do all of the pages of this document that we're

24   looking at, pages 80 through 93, are these connected to, or do

25   they involve the Glenn Cox account?

1      A      Yes.

2      Q      Does this document enable you to identify the last

3   known address of Glenn Cox?

4      A      No.

5      Q      Does this document enable you to identify the date

6   that the account was originated or opened?

7      A      No.

8      Q      Now, we've identified this document as the

9   de-archived notes of the account.  Can you tell me what that

10  means?

11     A      These are notes that are no longer on our current

12  account system.  They were purged.  And in order to retrieve

13  them, we had to run a report and pull them out of the archived

14  note file.

15     Q      Are you familiar with the purging of documents

16  policy of Citibank?

17                  MR. THREADCRAFT:  You're asking her

18             individually?

19           BY MR. CHAPMAN:

20     Q      Yes, if she knows.

21     A      No.

22                  MR. THREADCRAFT:  And when I say

23             individually, I mean, like not as a spokesperson

24             for Citi.

25           BY MR. CHAPMAN:

1       Q    Right.  Does this document, and I'm referring to
2   pages 80 to 93.  Does this reflect activity related to the
3   Glenn Cox's account?
4       A    Yes.
5       Q    Does this document reflect all activity related to
6   the Glenn Cox account?
7       A    No.
8       Q    For the -- the answer is no?  Okay.  How far back in
9   time does this document, pages 80 to 93, reflect transactions
10  on the Glenn Cox account?
11      A    Back to 7-1-06.
12      Q    Are you able to tell from this document, pages 80 to
13  93, whether there were transactions on the account prior to
14  7-1-2006?
15      A    No.
16      Q    Do you know whether there were transactions on the
17  Glenn Cox account prior to 7-1-06?
18      A    Can you define transactions?
19      Q    Sure.  Any activity related to his credit card
20  account.
21      A    So not just charges but inquiries or --
22      Q    Right.
23      A    Can you restate the question?
24      Q    Sure.  Do you know whether -- I think I can phrase
25  this in a way that is probably better for you.  Do you know

1   whether, from this document, pages 80 to 93, whether there are
2   any -- whether there are any -- there's any activity on the
3   Glenn Cox account prior to the first entry on this document?
4       A    No.
5                MR. THREADCRAFT:  Object to form, asked and
6           answered.
7                MR. KOVAL:  I couldn't hear your objection.
8                MR. THREADCRAFT:  Asked and answered.
9       BY MR. CHAPMAN:
10      Q    So for the period -- I'm sorry.  Let me back up.
11   What is the last date of any transaction reflected in this
12   document, pages 80 to 93?  And when I say last date, I'm
13   referring to the most current date.
14      A    Oh, the most current date, okay.  January 6, 2012.
15      Q    So does this document, pages 83 to 93, reflect all
16   of the activity associated with the Glenn Cox account for the
17   period of July 1st, 2006 through January 6, 2012?
18                MR. THREADCRAFT:  Object to the form.
19                THE WITNESS:  No.
20      BY MR. CHAPMAN:
21      Q    Tell me what activities would not be reflected in
22   this document, pages 83 to 93, for this time period that
23   we've established as 7-1-06 to 1-6-2012.
24      A    Some examples would be purchases, payments, interest
25   charges, late fees.

1    Q    How would you describe the types of entries that are
2    on -- that are contained on this document, pages 80 to 93?
3    What kinds of things are on this document?
4        A    I would call them account notes.
5        Q    Do these account notes reflect when credit card
6    agreements or -- I'm sorry.  What was the phrase we used to
7    talk about them?  Card agreements.  Does this document, pages
8    80 to 93, reflect when card agreements would have been sent to
9    Mr. Cox?
10       A    It reflects when change in terms notices were sent.
11       Q    Can you show me on this document, where we can find
12   a reflection of a change in term notice?
13       A    Yes.
14       Q    Okay.  Where would that be?  And if you would like,
15   you can use the page numbers there at the bottom of the page.
16                  MR. THREADCRAFT:  He means the Bates stamp
17           numbers.
18       BY MR. CHAPMAN:
19       Q    Yeah.
20       A    Page 88.  The first entry from May 2nd, '08 shows a
21   change in terms.
22                  MR. KOVAL:  Just hold on one second, please.
23           Okay.  I'm sorry.  Are you talking about the entry
24           of --
25                  THE WITNESS:  The top of the page.

1          MR. KOVAL:  The top of the page.  Okay.  The

2     very first entry?

3          THE WITNESS:  Yes.

4          MR. KOVAL:  Okay.  Thank you.

5     BY MR. CHAPMAN:

6     Q    Would that be the entry that starts with CM-819 in

7     the upper left corner?

8     A    Yes.

9     Q    And that's the June 2010 archived 0001 memo; is that

10    correct?

11    A    I don't know what you're referring to.

12    Q    Well, I'm looking at page 88.  Do you see where

13    there's some words that are bold?

14    A    Oh, yes.  Sorry.

15    Q    Is that -- what are those that are in bold?  What do

16    those mean?

17    A    That is an indication that notes were archived on --

18    from that -- in that month and year.

19    Q    Okay.  And then below that -- below the one we're

20    looking at, which says FDR ARCHIV 061910, on page 88 -- do you

21    see that?

22              MR. THREADCRAFT:  I'm sorry.  Say that again.

23              MR. CHAPMAN:  All right.  We're looking at

24         page 88.

25              MR. THREADCRAFT:  Right.

1      BY MR. CHAPMAN:

2      Q    And you see the bolded line that says FDR, and then

3      ARCHIV 061910.  Do you see that?

4      A    Yes.

5      Q    And then below it there's CM-819, correct?

6      A    Yes.

7      Q    This is the line that you're referring to -- the

8      entry that you're referring to that indicates that a

9      modification was sent; is that accurate?

10     A    Actually, a couple lines down where it says,

11     2008/05/02, ADD CMS, OPL, CIT.

12     Q    Okay.  Do you know, for instance, above that it says

13     account number; is that right?

14     A    Yes.

15     Q    And that's the account number that we've identified

16     as the Glenn Cox account; is that accurate?

17     A    It is.

18     Q    And what does ADD mean?

19     A    I don't know.

20     Q    Do you know what CMS means?

21     A    No.

22     Q    Do you see the line underneath the word text?  It

23     reads OPL CIT - June 2008 - statement insert, and then there's

24     some more language beyond that.

25     A    Yes.

1      Q    Do you know what those -- what that string of text

2  means?

3      A    Yes.

4      Q    What does that mean?

5      A    Oil private label change in terms June 2008,

6  statement insert segment one, and the form code for the change

7  in terms is CTCIT508.

8      Q    Does this document, and I'm referring to the entire

9  document, 80 through 93, contain any other entries that would

10  indicate a modification in the terms of the card agreement?

11      A    I don't see any, no.

12      Q    If there were any further or additional

13  modifications to the terms and conditions of the card

14  agreement, would it be reflected in this document that's Bates

15  pages 80 to 93?

16              MR. THREADCRAFT:  Object to the form.

17              THE WITNESS:  It could be.

18      BY MR. CHAPMAN:

19      Q    So we're not able to tell, would that be correct,

20  from this particular document, pages 80 to 93, whether there

21  were any further changes in conditions to the Glenn Cox

22  account?  Would that be accurate?

23              MR. THREADCRAFT:  Object to the form.

24              THE WITNESS:  It's not the only document I

25              would rely on.

1      BY MR. CHAPMAN:

2          Q    What other document would you rely on to find out

3      if there were any subsequent changes to the terms and

4      conditions of the card agreement?

5          A    The document Bates stamped 94 through 97, and I

6      would also look at the billing statements that are marked as

7      169 through 334.

8          Q    Okay.  Well, then let's take a look at pages 94 to

9      97.  Do you see that document?

10         A    Yes.

11         Q    Have you seen that document before?

12         A    Yes.

13         Q    What is this document?

14         A    These are the more recent account notes for the

15     Glenn Cox account.

16         Q    Is this document, and I'm referring to pages 94 to

17     97, a document that is made and kept in the course of

18     Citibank's regularly conducted business activity?

19         A    Yes.

20         Q    And is this document, pages 94 to 97, a document

21     that is routinely made and kept in the course of Citibank's

22     business?

23         A    Yes.

24         Q    And does this document, pages 94 to 97, does this

25     reflect entries that are made at or near the time of the

1  events or the transactions that are referenced within this
2  document?

3      A    Yes.

4      Q    And was this document, pages 94 to 97, was this made
5  by or was this transmitted by someone with knowledge in the
6  regular course of Citibank's business?

7      A    Yes.

8      Q    So you indicated these are more recent notes than
9  the documents that we just looked at, which were Bates stamped
10 80 to 93; would that be accurate?

11     A    They are more recent notes.  There might be some
12 that are duplicate or a crossover in time frame with the
13 document we were looking at previously.

14     Q    Is the document that we have here as pages 94 to 97,
15 was this created on a different system than the documents we
16 looked at as pages 80 to 93?

17     A    Yes.

18     Q    Do you know the reason why these account notes were
19 created on two different systems?

20                  MR. THREADCRAFT:  Are you asking her

21            personally?

22         BY MR. CHAPMAN:

23     Q    Yes, if she knows.

24     A    Yes.

25     Q    And why was that?

1      A      The current system, which houses the notes that are

2  shown on page 94 through 97, has a space capacity, and at some

3  point, when it gets full, then older certain note types are

4  archived to a different system, and so to retrieve the older

5  notes, we have to de-archive them from the other system.

6      Q      Okay.  When we look at pages 94 to 97, are you able

7  to tell me what the earliest entry is on this document, in

8  other words, the farthest back in time this document would

9  reflect activity?

10      A      Yes.

11      Q      And what date is that?

12      A      July 28, '08.

13      Q      Now, what would be the most current activity

14  reflected on this document, pages 94 to 97?

15      A      8-22-14.

16      Q      If we were to take Bates pages 83 to 93, and Bates

17  pages 94 to 97 together, and look at them as one document,

18  would these two documents combined show all of the

19  transactions on the Glenn Cox account for the time period of

20  July 1st, 2006 to August 22nd, 2014?

21                  MR. THREADCRAFT:  Object to the form.

22                  THE WITNESS:  No.

23      BY MR. CHAPMAN:

24      Q      If we took both of these documents together, and

25  specifically I'm referring to Bates pages 83 to 93 and Bates

1    pages 94 to 97, would they reflect all changes to the terms

2    and conditions of the Glenn Cox account?

3                    MR. THREADCRAFT:  Object to the form.

4                    THE WITNESS:  No.

5                    MR. KOVAL:  It's -- at least I'm showing on

6            my watch, it's about two after 11:00.  We've been

7            going about an hour.  If we could just take a five

8            or ten-minute break.

9                    MR. THREADCRAFT:  Yeah, I like to go every

10           hour.  I don't want to interrupt your --

11                   MR. CHAPMAN:  That's fine.  I don't think I'm

12           in a question.

13                   MR. THREADCRAFT:  And I didn't want to

14           destroy your line of thought.

15                   (A recess was taken.)

16       BY MR. CHAPMAN:

17       Q    I just want to clear up, I think there was some

18   confusion as to exactly what documents we were talking about

19   the last few minutes here so in an effort to clean this up

20   some, I'm going to try to be very clear.  If we look at Bates

21   pages 80 through 97, you do see those documents?

22       A    Yes.

23       Q    Taken together, would pages 80 through 97 reflect

24   all changes to the terms and conditions of the Glenn Cox

25   account for the period of July 1st, 2006 through the period of

```
 1   January 6th, 2012?

 2        A    Yes.

 3        Q    And we talked about on page 88, that there was a

 4   change in terms of conditions that's identified as CTCIT508;

 5   would that be correct?

 6        A    Yes.

 7        Q    And that would be the form -- that would be the name

 8   of the form that contained -- the name of the form that's on

 9   the document that contains those changes to the terms and

10   conditions; is that right?

11                  MR. THREADCRAFT:  Object to the form.

12                  THE WITNESS:  Yes.

13        BY MR. CHAPMAN:

14        Q    Okay.  Well, let me just -- let me just try to

15   clean this up a little bit.  When it says CTCIT508, what does

16   that mean?

17        A    It's a form code.

18        Q    And what is your understanding of what a form code

19   is?

20        A    It's a form code that identifies the change in terms

21   sent or noted on an account.

22        Q    Do you know whether a document containing the --

23   containing the word or the letter CTCIT508 would have been

24   sent to Mr. Cox?

25        A    Yes.
```

1    Q    And would that document be in the form of a card
2    agreement?
3                  MR. THREADCRAFT:  Object to the form.
4                  THE WITNESS:  Yes.
5        BY MR. CHAPMAN:
6        Q    And so if I had a card agreement from Citibank and
7    on that document I saw CTCIT508, would I be able to identify
8    it as this particular modification that we're talking about
9    on page 88?
10       A    I don't know if you'd be able to do that.
11       Q    Are the documents that contain CTCIT508, do those
12   all contain the same terms and conditions?
13       A    Yes.
14       Q    And so for instance if I had a card agreement that
15   contained CTCIT508 here in front of me, and the person to my
16   right had a document that had CTCIT508 on the document, and
17   these were both documents that were issued by Citibank, would
18   they be the same document?
19                 MR. THREADCRAFT:  Object to the form.
20       BY MR. CHAPMAN:
21       Q    Would they contain the same text?
22                 MR. THREADCRAFT:  The same objection.
23                 THE WITNESS:  They should unless, you know,
24           they're different drafts or something.
25       BY MR. CHAPMAN:

1    Q    Is there any way to tell if one document with
2  CTCIT508 is different from another one, just by this form
3  code?
4    A    I would have to look at the documents.
5    Q    Is there any identifier in this entry contained on
6  page 88 that we're looking at that would indicate to you the
7  specific CTCIT508 that's associated with the Glenn Cox
8  account?
9    A    It would also have to match the date it was sent.
10   Q    Where would we find that?
11   A    Well, this -- I would look at the notes -- these
12  notes in conjunction with the billing statement and the change
13  in terms.
14   Q    If we're looking at this document, what specifically
15  would you be looking at on this page 88, to indicate the
16  specific form of CTCIT508 that we're talking about today?
17   A    Well, because the note is dated 5-2-08, and it says
18  it was a statement insert, I would go to the statements and
19  verify the exact statement date with which it was enclosed,
20  and then I would go to the form CTCIT508 and verify that the
21  date was, you know, either April or May of '08, that would
22  have been the form that would have gone to the customer.
23   Q    When we look at page 88, let's go down a few lines.
24  Do you see the bold text that says FDR ARCHIV 051510 and then
25  0546 --

1    A    Yes.

2    Q    -- and May 2010?

3    A    Uh-huh.

4    Q    This one also says ADD in that entry; is that right?

5    A    Yes.

6    Q    What does that mean?

7    A    I don't know what the ADD means.

8    Q    Does it reflect that there was a change in terms and

9    conditions on the account?

10              MR. THREADCRAFT:  Object to the form.

11              THE WITNESS:  The letters ADD?  I don't

12         believe so, no.

13    BY MR. CHAPMAN:

14    Q    So are you able to tell, from looking at pages 80

15    to 97, whether there were any modifications or changes to the

16    Glenn Cox credit card account after the change that we

17    identified on page 88?

18    A    I'm sorry.  Can you restate the question?

19    Q    We've been talking about changes to the terms and

20    conditions of Glenn Cox's credit card agreement that occurred

21    on or about May 2nd, 2008; would that be correct?

22    A    Yes.

23    Q    When we look at pages 80 through 97, are you able to

24    tell from looking at these documents, whether there were any

25    changes or modifications after that date?

1     A     Yes.

2         Q     And when would the next one have occurred?

3     A     There weren't any.

4         Q     There weren't any.  Okay.  If there were any changes

5    to the terms and conditions after May of 2008, would it be

6    reflected in these documents or identified in documents 80

7    through 97?

8     A     Yes.

9                  MR. THREADCRAFT:  Object to the form.

10    BY MR. CHAPMAN:

11        Q     When we look at Bates 94 to 97, does this document

12   contain any information that would enable you to identify the

13   last known address of Glenn Cox?

14    A     Yes.

15        Q     And where would that be found?

16    A     Page 96.  Oh, I'm sorry.  Each page has the address

17   on it after his name.

18        Q     And what is the last known address that's reflected

19   in these documents?

20    A     2994 Kodiak Court, Marietta, Georgia.

21        Q     Is there any entry on pages 94 to 97 that would

22   indicate the date that the Glenn Cox account was originated or

23   otherwise opened?

24    A     No.

25        Q     Do you know whether the Glenn Cox account was

1    charged off at some point in time by Citibank?

2                    MR. THREADCRAFT:  Object to the form.

3                    THE WITNESS:  Yes.

4        BY MR. CHAPMAN:

5        Q    Do you know when the account was charged off?

6                    MR. THREADCRAFT:  Object to the form.

7                    THE WITNESS:  I can find it in these

8            documents.

9        BY MR. CHAPMAN:

10       Q    Are you referring to pages 94 to 97 to find that

11   date?

12       A    No.

13       Q    Where would you look to find that information?

14   Would it be somewhere in the stack of documents that is in

15   front of you that's identified as pages 1 through --

16   through -- I want to say 334?  Yes?

17       A    What were the numbers again?

18       Q    Pages 1 to 334.

19       A    Yes.

20       Q    Where would you find that information?

21       A    I would find it on two places.  Page 137.

22       Q    137.

23       A    And 166.

24       Q    Okay.  Let's go back to that one.  When we get

25   there -- let's take a look at pages 164 through 168.

1      A      Okay.

2          Q      Have you seen these documents before?

3      A      Yes.

4          Q      What would you call this batch of documents, 164 to

5      168?

6      A      These are screen prints from the system that houses

7      the Glenn Cox account showing information related to his

8      account.

9          Q      Is the document reflected in pages 164 to 168, is

10     this a document that's kept in the ordinary course of

11     Citibank's regularly conducted business activity?

12     A      Yes.

13         Q      And is this document, 164 to 168, is this a document

14     that's routinely made and kept in the course of Citibank's

15     business?

16     A      Yes.

17         Q      And was this document, pages 164 to 168 -- does this

18     document, rather, reflect entries that were made at or near

19     the time of the entries that are reflected in this document?

20     A      Yes.

21         Q      And was this document made by or transmitted by

22     someone with knowledge as to the contents of this document in

23     the regular course of Citibank's business?

24     A      Yes.

25         Q      So this document, 164 to 168, contains, you

1  communicated, information about the Glenn Cox account; is that
2  correct?

3      A    Yes.

4      Q    What kind of information is contained in this
5  document?

6      A    Well, there's a lot of information about his account
7  in these documents, including the account number, name,
8  address, account opening date, you know, many other things.

9      Q    Where would we find the account open date on this
10  document?

11      A    On page 164 in the top section, the third line down
12  in the middle says, open date 05-92.

13      Q    Would that reflect an open date of May 1992?

14      A    Yes.

15      Q    Does this document, and I'm referring to pages 164
16  to 168, reflect activity on the Glenn Cox account?

17                  MR. THREADCRAFT:  Object to the form.

18                  THE WITNESS:  Yes.

19      BY MR. CHAPMAN:

20      Q    What type of activities does this document reflect?
21  And I'm referring to 164 to 168.

22      A    It will show things like the last payment date, the
23  charge-off date, last sale date, lots of information.

24      Q    What's the last sale date?  What does that mean?

25      A    The last purchase made on the account.

1    Q    Where would we find that on this document?

2    A    On page 164 in the second section on the left

3    towards the bottom it says, DT last sale 05-06-08.

4              MR. KOVAL:  I'm sorry.  I'm not seeing that.

5         What page?

6              THE WITNESS:  164.

7              MR. KOVAL:  Yes.  Center?

8              THE WITNESS:  On the left.

9              MR. KOVAL:  On the left, okay.

10             THE WITNESS:  Next section down.  Go down.

11             MR. THREADCRAFT:  She's pointing to it.

12             MR. KOVAL:  Oh, thank you.  I'm sorry.  I see

13        it.  Thank you.

14   BY MR. CHAPMAN:

15   Q    So just for clarification, DT last sale 01-06-08

16   reflects the date that the last charge was made on the

17   account; would that be accurate to say?

18   A    Yes.

19   Q    Where do we find the charge-off date?

20   A    Page 166 at the very bottom, in the middle column

21   right above where it says page 3, it says, charge-off date.

22             MR. KOVAL:  Can you point, if you don't mind?

23        What page is that?

24             THE WITNESS:  166.

25             MR. KOVAL:  Thanks.

1        BY MR. CHAPMAN:

2        Q     And this reflects a charge-off date of December

3    1st, 2006.  Would that be correct?

4        A     No.  It's the year, the month, the day.

5        Q     Oh, I see.  Well, it may be easier if you would tell

6    us what date that reflects.

7        A     I'm just going to verify.  It's January 6, 2012.

8        Q     And I believe you indicated a few minutes ago, if

9    not -- I'll tell you what -- I'll just ask you the question

10   again.  Does this document, page 164 to 168, reflect the date

11   of the last payment on the Glenn Cox account?

12       A     Yes.

13       Q     Where would we find that?

14       A     On page 164, at the top, the middle column, it says

15   LST PMT DT 6-08-11.

16       Q     And would that reflect the last payment on the

17   account being June 8th, 2011?

18       A     Yes.

19       Q     Does this document, pages 164 to 167, does it

20   reflect when modifications to the card agreement would have

21   been made?

22       A     No.

23       Q     I would like to direct your attention to a large

24   batch of documents within this Exhibit 2.  They're going to be

25   pages 169 to 334.

```
 1        A     Okay.

 2        Q     Do you know what these documents are?

 3        A     Yes.

 4        Q     What are they?

 5        A     These are --

 6                    MR. THREADCRAFT:  Do you want to

 7              look through them all?

 8                    MR. CHAPMAN:  Yeah.  Do you want to -- if you

 9              want to scratch that last question, I'll just start

10              over.

11                    MR. THREADCRAFT:  Okay.  Do you want her to

12              look through them all?  Does she need to do that to

13              answer the question?

14                    MR. CHAPMAN:  It would probably help to

15              determine whether we can do this quickly or slowly.

16                    MR. THREADCRAFT:  Sure.

17                    THE WITNESS:  Yes.

18        BY MR. CHAPMAN:

19        Q     Before you are documents Bates pages 169 to 334 of

20   Exhibit 2; would that be correct?

21        A     Yes.

22        Q     Have you ever seen these documents, 169 to 334,

23   before?

24        A     Yes.

25        Q     Do you know what these documents are?
```

1      A      Yes.

2      Q      What are they?

3      A      These are the account statements for Glenn Cox's

4  CITGO account.

5      Q      Are you able to tell, from looking at pages 169 to

6  334, whether certain of these documents were not originated by

7  Citibank?

8      A      Yes.

9      Q      Which ones were not originated by Citibank, to the

10  best of your knowledge?  And if it helps, just to give me a

11  page range.  If it's possible to do it that way, it may be

12  quicker.

13      A      These statements were all generated by Citibank

14  while it owned the account.

15      Q      Okay.

16                  MR. THREADCRAFT:  Just to be clear, when we

17              say Citibank, just to clarify that -- let's go off

18              the record for a second.

19                  MR. KOVAL:  Let's keep this on the record.

20                  MR. THREADCRAFT:  Okay.  When you say

21              Citibank, what do you mean by Citibank, I guess is

22              the question?

23                  MR. CHAPMAN:  Well, is this Citibank, N.A.,

24              which -- I mean, what -- I need to know what

25              Citibank, I guess.  What we have here is a stack of

1           what we've identified as statements, and so I'm

2           going to lay -- try to lay a business records

3           foundation, but it's my understanding -- the witness

4           hasn't said this -- is that some of these she may

5           not be able to testify that they're the business

6           records of Citibank, but if you -- we can try and

7           see where we are.

8                MR. THREADCRAFT:  Well, what I was trying

9           to -- rather than just object, I'm trying to be

10          helpful to everybody here, and so I was asking about

11          the use of the word Citibank, and you said Citibank,

12          N.A.

13               MR. CHAPMAN:  Right.

14               MR. THREADCRAFT:  Okay.  So --

15               THE WITNESS:  Can you restate the question?

16     BY MR. CHAPMAN:

17     Q    In fact, let's try it this way.  Let's look at

18     pages 169 to 334.  Are these documents that are kept in the

19     course of Citibank's regularly conducted business activity?

20     A    Yes.

21     Q    And these documents, 169 to 334, are these documents

22     that are routinely made and kept in the course of Citibank's

23     business?

24     A    Yes.

25     Q    And do these documents, 169 to 334, do these reflect

1  entries that were made at or near the time of the events or
2  transactions that are reflected within these documents?
3      A    Yes.
4      Q    And were these documents, pages 169 to 334, were
5  these made by or transmitted by someone with knowledge in the
6  regular course of Citibank's business?
7      A    Yes.
8      Q    To the best of your knowledge, are these documents,
9  169 to 334, in chronological order?  And that's not a trick
10 question where I've taken one and moved it out of order.  Are
11 you able just to tell generally whether you believe these are
12 chronological from the earliest date --
13     A    Yes.
14     Q    -- to the most current?  Yes.  So would it be your
15 testimony that pages 169 through 334 reflect the credit card
16 account statements on the Glenn Cox account from the closing
17 date of 11-1-2003 through the closing date of January 5th,
18 2012?
19     A    Yes.
20     Q    When we talked about the modification to the terms
21 and conditions of the credit card account that we identified
22 on page 88 as CTCIT508, do you see that?
23     A    Yes.
24     Q    Would there be a reflection on one or more of these
25 documents that are on pages 169 to 334 of that change?

1      A     Yes.

2      Q     Where would we find that?

3      A     On page 223.

4      Q     And I'm looking at Bates page 223.  Is this the

5    document that shows a closing date of 5-1-08?

6      A     Yes.

7      Q     Okay.  And tell me where on this page we find the

8    reference to the change.

9      A     On the top, under the first box that says, please

10   see the enclosed notice of change in terms for your import --

11   or important -- important information.  Sorry.

12     Q     But the actual document that contains those changes

13   is not -- is not part of pages 169 to 334; is that correct?

14     A     That's correct.

15     Q     When we look at pages 169 to 334, is there any other

16   reflection on any of these credit card account statements of a

17   change in terms and conditions?

18     A     I'll have to look through them all.  There's one on

19   page 189.

20     Q     Okay.  Let me know if you find any others.

21     A     And the one we talked about already on page 223.

22     Q     Okay.  Any others?

23     A     I don't see any others.

24     Q     Let's take a look at Bates 2 -- I'll tell you what,

25   let's -- globally speaking, taking a look at pages 169 to 334,

1   do you recognize these documents as being associated with the

2   Glenn Cox account?

3        A    Yes.

4        Q    Do you recognize the account number associated with

5   the Glenn Cox account on these documents?

6        A    Yes.

7        Q    And do you recognize the address that's associated

8   with the last known address of Glenn Cox on these documents?

9        A    Yes.

10       Q    Okay.  Let's take a look at page 189.  Where is my

11   stack?  With page 189 in front of you, I would like you to

12   also separate pages 1 to 13 and -- actually, if you could,

13   separate 1 to 66.

14            MR. KOVAL:  Say it again, Michael.

15       BY MR. CHAPMAN:

16       Q    Here is what you need to separate, pages 1 to 66,

17   and pages 68 to 79.

18            MR. KOVAL:  What was the last one?

19            MR. CHAPMAN:  68 to 79.

20            THE WITNESS:  Okay.

21       BY MR. CHAPMAN:

22       Q    So let's just set page 189 aside for the moment,

23   and let's take a look at this batch of documents that we just

24   separated, pages 1 to 66 and 68 to 69.  Do you see those?

25       A    Yes.

1           MS. FRIEDMAN:  Do you mean 79?

2      BY MR. CHAPMAN:

3      Q    Yes.  What did I say, 69?  I'm sorry.  1 to 66, 68

4      to 79.  Have you ever seen these documents before?

5      A    Yes.

6      Q    Do you know what they are?

7      A    Yes.

8      Q    What are these?

9      A    Card agreements and change in terms.

10     Q    Can you explain, to the best of your knowledge, what

11     Citibank's process is for sending cardmember agreements and

12     changes in terms to card agreements to consumers?

13          MR. THREADCRAFT:  Are you asking her

14          individually?

15     BY MR. CHAPMAN:

16     Q    Yes.

17     A    Well, generally, you get a card agreement with your

18     plastic when your account is opened, and then as terms are

19     changed over time, you would get a change in terms notice.

20     And there may be occasion when, with a change in terms, you

21     will get another full card agreement.

22     Q    And I know we talked about this to some extent

23     already, probably to a large extent already, but does Citibank

24     have a process for keeping track of which agreement version is

25     sent to consumers and when they are sent to consumers?

1                    MR. THREADCRAFT:  I'm going to object to the

2           form.  Do you want me to help you or --

3                    MR. CHAPMAN:  Yeah, go ahead.

4                    MR. THREADCRAFT:  Time period at issue?

5      BY MR. CHAPMAN:

6      Q    All right.  Well, let's say from 2002 to the

7      present date.  Is there a process that Citibank uses for

8      keeping track of which agreement version is sent to consumers

9      and when they're sent to consumers?

10     A    Yes.

11     Q    And does that process have a name?

12     A    Not that I'm aware of.

13     Q    Is that process reflected in any documents?

14                   MR. THREADCRAFT:  And just to be clear, these

15          questions are asking her individual knowledge,

16          right?

17                   MR. CHAPMAN:  Uh-huh.

18                   MR. THREADCRAFT:  Yes.

19                   THE WITNESS:  I don't know.

20     BY MR. CHAPMAN:

21     Q    Is this process reflected on any system, such as a

22     computer system?

23     A    I don't know.

24     Q    We talked about account notes a little while ago.

25     Other than those account notes, which I believe we indicated

1   would show when credit card agreements and modifications were
2   sent for the specific time period that was reflected in those
3   agreements, is there any other system of documentation or
4   reference that you're aware of that would contain that
5   information?

6        A    Yes.

7        Q    What would that be?

8        A    I would look at the account notes in conjunction
9   with the billing statements.

10       Q    And when you're talking about billing statements,
11  are you talking about documents such as what we just looked
12  at, such as pages 169 through 334?

13       A    Yes.

14       Q    With respect to these documents that we've
15  separated, pages 1 to 66 and 68 to 79, are these documents
16  that are made and kept in the ordinary course of Citibank's
17  regularly conducted business?

18                 MR. THREADCRAFT:  I'm sorry.  Can you repeat
19            that question?

20       BY MR. CHAPMAN:

21       Q    Sure.  Documents 1 through 66 and pages 68 through
22  79, are these documents that are made and kept in the course
23  of Citibank's regularly conducted business activity?

24       A    Not all of them.

25       Q    Are certain of these documents not kept in the

1    ordinary course of Citibank's regularly conducted business

2    activity?

3                    MR. THREADCRAFT:  Object to the form.

4                    THE WITNESS:  Some of them are not Citibank

5           documents.

6    BY MR. CHAPMAN:

7    Q    Okay.  Can you identify which ones those are?

8    A    Yes.  Pages 1 through 26.

9    Q    So pages 1 through 26 are not Citibank documents,

10   correct?

11                   MR. THREADCRAFT:  Object to the form.

12   BY MR. CHAPMAN:

13   Q    Is that true, to the best of your knowledge?

14                   MR. THREADCRAFT:  The same objection.

15                   THE WITNESS:  Citibank didn't create these

16          documents.

17   BY MR. CHAPMAN:

18   Q    Do you know who did create these documents?  And

19   I'm referring to pages 1 to 26.

20   A    I don't know the individual who created them.

21   Q    Look at the top of page 1.  Do you see where it

22   says, Associates National Bank, and then in parentheses it

23   says Delaware?

24   A    Yes.

25   Q    And then page 5 also says at the top Associates

1    National Bank, in parentheses, Delaware?

2        A    Yes.

3        Q    And then page 9 also says Associates National Bank,

4    in parentheses, Delaware.  Do you see that?

5        A    Yes.

6        Q    And page 13 says the same thing, correct, Associates

7    National Bank (Delaware)?

8        A    Correct.

9        Q    And below where it says Associates National Bank

10   (Delaware) on pages 1, pages 5, pages 9 and pages 13, it says

11   cardmember agreement below it; is that accurate?

12       A    Yes.

13       Q    Do you know what Associates National Bank (Delaware)

14   is?

15       A    Yes.

16       Q    What is it?

17       A    It was a national bank that Citi acquired.

18       Q    Do you know what Citibank entity acquired Associates

19   National Bank?

20       A    Yes.

21       Q    Which one was that?

22       A    Citigroup acquired Associates First Capital, which

23   Associates National Bank (Delaware) was a part.

24       Q    Do you know when this occurred?

25       A    Yes.

```
1        Q    When was that?

2        A    September 2000.

3        Q    In September of 2002, did Citibank acquire the

4   credit card accounts that were owned by Associates National

5   Bank?

6                  MR. THREADCRAFT:  Object to the form of the

7             question.

8   BY MR. CHAPMAN:

9        Q    Do you understand the question?

10                 MR. THREADCRAFT:  Do you want me to help you?

11                 MR. CHAPMAN:  It might be better because --

12                 MR. THREADCRAFT:  I'm going to do the same

13            thing for you, Steve.

14                 MR. KOVAL:  Yeah, I understand that, but I

15            don't want you testifying for the --

16                 MR. THREADCRAFT:  No, I'm talking about what

17            the question was, not what the witness said.

18                 MR. KOVAL:  Okay.  Go ahead.

19                 MR. THREADCRAFT:  I think you said September

20            of 2002, and I think you --

21                 MR. KOVAL:  Yeah.

22                 MR. THREADCRAFT:  I'm here to help everybody

23            and --

24                 THE WITNESS:  Can you restate the question?

25                 MR. THREADCRAFT:  I thought you said Citibank
```

```
 1                    too, but go ahead.

 2         BY MR. CHAPMAN:

 3         Q    You indicated, I believe, that Citigroup acquired

 4    Associates National Bank in September 2002.  Would that be --

 5         A    2000.

 6                    MR. THREADCRAFT:  Wait.  I'm going to object

 7              to the form of the question.

 8         BY MR. CHAPMAN:

 9         Q    All right.  Let's just take it apart piece by

10    piece.

11                    MR. KOVAL:  Well, this might be helpful to go

12              off the record for just one second.

13                    (Discussion off the record.)

14         BY MR. CHAPMAN:

15         Q    Okay.  So in September 2000, is it your testimony

16    that Citigroup acquired First Capital Associates?

17                    MR. THREADCRAFT:  I'm going to object to the

18              form just because you used the wrong name.  I'm not

19              trying to be difficult, but do you want her to just

20              tell you?

21         BY MR. CHAPMAN:

22         Q    Let's go back.  In September of 2002, who acquired

23    who with respect to this account, this cardmember agreement?

24         A    Citigroup acquired Associates First Capital, of

25    which Associates National Bank (Delaware) was a part of that
```

1    entity.

2        Q    Okay.  And is the entity that made that acquisition

3    still called Citigroup?

4                    MR. THREADCRAFT:  You're asking her if she

5                knows individually?

6                    THE WITNESS:  I don't know.

7        BY MR. CHAPMAN:

8        Q    Do you know whether at the time of the acquisition

9    of Associates First National Bank, whether these documents

10   we've identified as documents 1 through 26 became the

11   property of Citigroup?

12                   MR. THREADCRAFT:  I'm going to object to the

13               form of the question.  I think I understand what

14               you're saying.  And then you're asking her for her

15               individual knowledge; is that right?

16                   MR. CHAPMAN:  Yep.

17                   MR. THREADCRAFT:  Okay.  Go ahead.

18                   THE WITNESS:  No, that's not the entity it

19               acquired.

20       BY MR. CHAPMAN:

21       Q    What was the entity that it acquired?

22       A    Associates First Capital.

23       Q    And what is the relationship between Associates

24   First Capital and Associates National Bank (Delaware)?

25       A    Associates National Bank (Delaware) was a subsidiary

1    of Associates First Capital.

2         Q    At the time of the acquisition of Associates First

3    Capital, did the documents that are reflected in pages 1

4    through 26 become the property of Citigroup?

5                        MR. THREADCRAFT:  You're asking for her

6              individual knowledge?

7                        MR. CHAPMAN:  Yes.

8                        THE WITNESS:  I don't know.

9    BY MR. CHAPMAN:

10        Q    Are you able to tell me whether the documents that

11   are identified as 1 through 26 are cardmember agreements that

12   are associated with the Glenn Cox account?

13        A    No.

14        Q    No, you don't know, or, no, they're not?

15        A    I don't know.

16        Q    So if I were to ask you, for instance on Bates

17   page 1, where at the top it says 5/01, do you see that?

18        A    Yes.

19        Q    Would you have any knowledge as to what that means

20   or how it got there?

21        A    I wrote it there.

22        Q    You wrote there.  What does that mean?

23        A    That I believe this to be the May '01 version of the

24   card agreement of Associates National Bank (Delaware).

25        Q    And if we look at the document that starts on Bates

1    page 5 and runs to Bates page 8, that also says 5/01 at the

2    top; is that correct?

3         A    Yes.

4         Q    Are the documents that are pages 1 through 4 and 5

5    through 7, are they duplicates?

6         A    They are.

7         Q    I meant 5 through 8.  They're duplicates.

8              MR. KOVAL:  So 1 through 4 and 5 through 8

9              are duplicates?

10             MR. CHAPMAN:  Yes.

11   BY MR. CHAPMAN:

12        Q    And so if we look at pages 9 through 16 -- I'm

13   sorry -- 9 through 12 and 13 through 16, are those

14   duplicates?

15        A    Yes.

16        Q    So if we look at page 9, it says 9/01 at the top; is

17   that right?

18        A    Yes.

19        Q    Did you write that?

20        A    I did.

21        Q    And why did you write that there?

22        A    I believed it to be the Associates National Bank

23   (Delaware) agreement in place in 9/01.

24        Q    So if we go back to pages 1 through 4, what is

25   the -- what is your basis for believing that this is the

1   Associates National Bank cardmember agreement for May of 2001?

2        A    I don't remember.  I wrote that on there many years

3   ago.

4        Q    Do you have any knowledge as to why it was produced

5   with the Glenn Cox documents that we're looking at today?

6        A    Yes.

7        Q    Why is that?

8        A    We believed it to be a sample or exemplar of the

9   Associates National Bank (Delaware) cardmember agreement that

10  may have applied to Mr. Cox's account.

11       Q    And if we look at pages 9 to 12, would that be the

12  same reason why you associated it with the Glenn Cox

13  documents?

14       A    Yes.

15                 MR. CHAPMAN:  All right.  What time is it?

16            Do we need to stop?

17                 MR. KOVAL:  I think we should.

18                 (A recess was taken.)

19       BY MR. CHAPMAN:

20       Q    Before we broke, we looked at the documents that

21  were labeled Bates 1 through 16, and if I could just draw

22  your attention back to those just for a minute, these are the

23  documents that we identified as containing the words

24  Associates National Bank (Delaware) at the top; is that

25  right?

1    A    Yes.

2    Q    And largely due to my fault, I think there was a lot

3    of confusion about this ownership issue and the change of

4    hands.  To the best of your ability, can you explain the

5    ownership history of the Glenn Cox account?

6            MR. KOVAL:  I object to the form of the

7            question.

8            THE WITNESS:  Okay.  In September of 2000

9            Citigroup acquired Associates First Capital, of

10           which Associates National Bank (Delaware) was a part

11           of that.  Associates National Bank (Delaware) merged

12           with Citibank (South Dakota) in January 7, '02.  And

13           then Citibank (South Dakota) merged into Citibank,

14           N.A. July 1st, 2011 so the account -- when Citibank

15           got it, it came from Associates National Bank to

16           Citibank.

17   BY MR. CHAPMAN:

18   Q    Do you know who originated this account?

19   A    No.

20   Q    Is it a fair statement to say that the First -- the

21   First National Bank credit card accounts became in possession

22   of Citibank, N.A. at some point?

23           MR. THREADCRAFT:  Object to the form.

24           THE WITNESS:  We never acquired any accounts

25           from First National Bank.

```
 1        BY MR. CHAPMAN:
 2        Q    Okay.  But somebody acquired some accounts from
 3   them; is that right?
 4                  MR. KOVAL:  Object to the form of the
 5             question.
 6                  THE WITNESS:  No, that entity was not
 7             involved at all.  I think you've got the wrong name.
 8        BY MR. CHAPMAN:
 9        Q    Is Citibank, N.A. the current owner of the
10   Associates National Bank (Delaware) credit card accounts?
11                  MR. THREADCRAFT:  Object to the form.
12                  THE WITNESS:  I don't understand the
13             question.
14        BY MR. CHAPMAN:
15        Q    Does Citibank, N.A. own the credit card accounts
16   that were associated with or were owned by Associates
17   National Bank (Delaware)?
18                  MR. THREADCRAFT:  Object to the form.  I
19             objected to the form of the question.  You can
20             answer, if you understand it.
21                  THE WITNESS:  I don't know whether Citibank
22             acquired all of the accounts that Associates
23             National Bank (Delaware) ever issued.
24        BY MR. CHAPMAN:
25        Q    Do you know whether at any time Citibank, N.A.
```

1    acquired the Glenn Cox account?

2         A    Yes.

3         Q    When?

4         A    When Citibank (South Dakota), N.A. merged into

5    Citibank, N.A. on July 1, 2011.

6         Q    Let's take a look at documents 27 to 66.

7                   MR. KOVAL:   I'm sorry, Michael.  Say that

8              again, please.

9                   MR. CHAPMAN:   27 to 66.

10                  MR. KOVAL:   27 through 66.

11                  MR. CHAPMAN:   And 68 through 79.

12   BY MR. CHAPMAN:

13        Q    And you can tell me when you're ready.

14        A    What was the second set of numbers?

15        Q    27 to 66.

16        A    Yep.

17        Q    68 to 79.

18        A    Okay.  I've got them.

19        Q    Have you ever seen these documents before?  And I'm

20   referring to pages 27 to 66 and 68 to 79.

21        A    Yes.

22        Q    Do you know what these documents are?

23        A    Yes.

24        Q    What are these documents?

25        A    They are various card agreements and change in terms

1   of Citibank.

2        Q    Are these documents, and I'm referring to pages 27

3   to 66 and 68 to 79, are these documents that are made and kept

4   in the course of Citibank's regularly conducted business

5   activity?

6        A    Yes.

7        Q    Are these documents that I'm referring to, 27 to 66

8   and 68 to 79, are these documents that are routinely made and

9   kept in the course of Citibank's business?

10       A    Yes.

11       Q    Do these documents, and I'm referring to pages 27 to

12  66 and 68 to 79, do they contain entries that were made at or

13  near the time of the events that are described within those

14  documents?

15       A    Yes.

16       Q    And were these documents, and I'm referring to 27 to

17  66 and 68 -- these documents I'm referring to, 27 to 66 and 68

18  to 79, were these made or transmitted by somebody with

19  knowledge in the regular course of Citibank's business?

20       A    Yes.

21       Q    I would like to take a look at documents,

22  specifically, 27 to 30.

23       A    Okay.

24       Q    And then there's documents 31 to 34.  Are you able

25  to tell me whether 27 to 30 and 31 to 34 are duplicates?

1        MR. THREADCRAFT:  Just to be clear, are you

2     wanting her to read each line on each piece of

3     paper?

4        MR. CHAPMAN:  Well, I think they're just

5     duplicates, but rather than ask questions about

6     them, if she can just say, yeah, they're duplicates.

7        MR. THREADCRAFT:  Well, if you're asking her

8     to read each line on each piece of paper, I can

9     certainly do that.  Hold on one second.  Never mind.

10     Withdraw the objection.  Go ahead.  You can answer.

11   BY MR. CHAPMAN:

12     Q    All right.  Let's just go back.  Documents 27 to 30

13   and 31 to 34, are these two sets of documents duplicates of

14   one another?

15     A    Yes.

16     Q    And let's take a look at 35 to 38 and 39 to 42.  Are

17   those two sets of documents duplicates of one another?

18     A    Yes.

19     Q    Okay.

20        MR. THREADCRAFT:  He is asking about -- which

21     ones did you say?

22        MR. CHAPMAN:  35 to 38.

23        MR. THREADCRAFT:  All right.

24   BY MR. CHAPMAN:

25     Q    And then 39 to 42?

1    A    Uh-huh.

2    Q    I'm pretty sure they are but -- and then 43 through

3    46 and 47 to 50, are those two sets duplicates of one another?

4    A    Yes, they are.

5    Q    And let's look at 51 to 54 and 55 to 58.  Are those

6    two sets of documents duplicates of one another?

7    A    Yes.

8    Q    And let's look at 59 to 62 and 63 to 66.  Are those

9    two sets of documents duplicates of one another?

10   A    Yes.

11   Q    And finally, Bates pages 68 to 73 and Bates 74 to

12   79, are those two sets of documents duplicates of one another?

13   A    Yes.

14   Q    Thank you.  Okay.  Let's take a look at this set of

15   documents that's 27 to 30.  Do you know what this document is?

16   A    Yes.

17   Q    What is this?

18   A    This is a notice to credit -- CITGO credit card

19   customers of the merger of Associates National Bank (Delaware)

20   with Citibank (South Dakota), N.A.

21              MR. KOVAL:  I'm sorry.  What page are we

22              looking at?

23              MR. CHAPMAN:  We've looking at the batch

24              that's 27 to 30.

25              MR. KOVAL:  Got it.  Thank you.

1               THE WITNESS:  So this is one sample of the

2          merger notice.

3      BY MR. CHAPMAN:

4      Q    When you say sample, do you know whether this

5   particular document was ever mailed to Mr. Cox?

6      A    No, I don't know which one he would have gotten.

7      Q    If this was sent, and I'm referring to pages 27 to

8   30, would it be reflected in the account notes that we talked

9   about, which are Bates pages 80 through 97?

10               MR. THREADCRAFT:  Object to the form.

11               THE WITNESS:  No.

12      BY MR. CHAPMAN:

13      Q    No, it would not be reflected in those?

14      A    No.

15      Q    Where would it be reflected if this was sent?

16      A    The account notes for that time frame are no longer

17   available.

18      Q    Okay.  So what is the date of this document?  And

19   I'm referring to 27 to 30.

20               MR. THREADCRAFT:  Object to the form.

21               THE WITNESS:  March 2002.

22      BY MR. CHAPMAN:

23      Q    Okay.  2002.  And this document was originated by

24   Citibank?

25               MR. THREADCRAFT:  Object to the form.

1                    THE WITNESS:  Yes.

2                    MR. KOVAL:  Just to clarify, when you're

3        saying Citibank, Michael, my understanding is you're

4        talking about Citibank, N.A.

5                    MR. CHAPMAN:  Yep.

6                    MR. KOVAL:  Okay.  So if it's something else,

7        you'll make that clear, right?

8                    MR. CHAPMAN:  I mean, I don't know any

9        different so I'm assuming someone else will.

10                   MR. KOVAL:  I just want to make sure we're on

11       the same page.  We're talking about Citibank.

12                   MR. THREADCRAFT:  Do you want me to say

13       something?  I don't want to interject into this, but

14       she just provided testimony about Citibank (South

15       Dakota), N.A. and Citibank, N.A. so I want to make

16       sure we're clear -- I don't want to interject

17       anything.  I think that's what you're trying to

18       clarify now.

19                   MR. KOVAL:  It is.  When I'm hearing Citibank

20       without anything said afterwards, I'm assuming

21       that's Citibank, N.A.

22                   MR. CHAPMAN:  That's how I am stating it,

23       yes.

24                   MR. KOVAL:  Let's just be clear, if it's

25       something different, let it be stated differently.

1    BY MR. CHAPMAN:

2        Q    Okay.  Let's take a look at page 35 to 38.  What is

3    this document?  Did I just skip one?  I did.  Let me go back.

4    I'm sorry.  I think I missed one.  No, I didn't.  Okay.  So

5    let's take a look at 35 through 38.  Is this a Citibank

6    document?

7        A    This was -- these are Citibank (South Dakota), N.A.

8    merger notices.

9        Q    And can you tell me the approximate date that this

10   would have been sent out?

11                   MR. THREADCRAFT:  Object to the form.

12                   THE WITNESS:  It's dated March '02.

13       BY MR. CHAPMAN:

14       Q    Would the sending of this document, if it were

15   sent, be reflected in the account notes that we looked at as

16   pages 80 through 97?

17                   MR. THREADCRAFT:  Object to the form.

18                   THE WITNESS:  No.

19       BY MR. CHAPMAN:

20       Q    And what would the reason for that be?

21       A    The account notes for 2002 are no longer available.

22       Q    Let's take a look at page 43 to 46, and I'm going to

23   ask you the same series of questions here.  Is this a Citibank

24   document?

25       A    It's a Citibank (South Dakota) document.

1  Q And can you tell me the approximate date that -- if

2 this was sent, when it would have been sent?

3     MR. THREADCRAFT:  Object to the form.

4     THE WITNESS:  March 2002.

5 BY MR. CHAPMAN:

6  Q And if this was sent to Mr. Cox, would it be

7 reflected on the account notes we identified as pages 80

8 through 97?

9  A No.

10  Q And what would the reason for that be?

11  A The 2002 account notes are no longer available.

12  Q Let's take a look at 55 through 58.  Is that a

13 Citibank document?

14  A No, it's a Citibank (South Dakota) document.

15  Q What is this document?

16  A It's another sample of the merger notice between

17 Associates National Bank (Delaware) and Citibank (South

18 Dakota).

19  Q Are you able to tell from the face of this document,

20 if it were sent, when it would have been sent?

21     MR. THREADCRAFT:  Object to the form.

22     THE WITNESS:  The document was created in

23    February '02.

24 BY MR. CHAPMAN:

25  Q And if this document were sent to Mr. Cox, would it

1    be reflected on the account notes identified as pages 80 to

2    94?

3         A    No.

4              MR. THREADCRAFT:  Object to the form, asked

5              and answered.

6              MR. CHAPMAN:  Well, not this particular

7              document, it wasn't.

8              MR. THREADCRAFT:  Can we go off the record

9              for a second?

10             MR. CHAPMAN:  Yeah.  I mean, I have one more

11             of these.

12             MR. THREADCRAFT:  Okay.

13   BY MR. CHAPMAN:

14        Q    Or maybe -- yeah, one more.  What was the reason?

15        A    I'm sorry.  What was your question?

16        Q    Why would this, if it were sent to Mr. Cox, not be

17   reflected on the account notes we identified as pages 80 to

18   94?

19        A    The notes from 2002 are no longer available.

20        Q    And let's take a look at 63 to 66.  Is this a

21   Citibank document?

22        A    No, it's a Citibank (South Dakota) document.

23        Q    And can you tell from the face of this document, if

24   it were sent, when it would have been sent?

25             MR. KOVAL:  I object to the form of the

1    question.

2              MR. THREADCRAFT:  The same objection.

3              THE WITNESS:  February 2002.

4    BY MR. CHAPMAN:

5    Q    If this document had been sent to Mr. Cox, would it

6    be reflected in the account notes we've identified as pages

7    80 to 94?

8    A    No.

9    Q    And why would that be?

10   A    The account notes from 2002 are no longer available.

11   Q    Okay.  Let's take a look at Bates 74 through 79.  Do

12   you see that document?

13   A    Yes.

14   Q    Have you ever seen that document before?

15   A    Yes.

16   Q    What is this document?

17   A    It's a change in terms notice.

18   Q    Was this document sent to Glenn Cox?

19   A    Yes.

20   Q    Do you know whether it's reflected in the account

21   notes that we identified as 80 to 97?

22   A    Yes.

23   Q    And where would we find that?

24   A    On page 88, the first entry for May 2nd, 2008.

25   Q    Okay.  Would that be the entry that begins in bold

1    with FDR ARCHIV 061910?

2                   MR. THREADCRAFT:  Object to the form.

3                   THE WITNESS:  Yes.

4         BY MR. CHAPMAN:

5         Q    And that runs five lines or so, would that be

6    correct?

7         A    Yes.

8         Q    Do you see on page 88 where it references -- and we

9    talked about this earlier -- the form code, CTCIT508?

10        A    Yes.

11        Q    Does this document, the one that we have here as

12   Bates 74 to 79, is this CTCIT508?

13        A    Yes.

14        Q    I believe it was your testimony -- and I apologize

15   if I already asked this -- that these account notes do not

16   reflect any additional changes in terms and conditions of the

17   Glenn Cox account after this CTCIT508 change.  Would that be

18   correct?

19                  MR. THREADCRAFT:  Object to the form.

20                  THE WITNESS:  They do not.

21        BY MR. CHAPMAN:

22        Q    If a document such as a notice in change of terms

23   or a cardmember agreement was mailed to a consumer and it was

24   returned for whatever reason, would it be reflected in the

25   account notice that we identified?

1       A     Yes.

2       Q     Did the account notes that we identified here today,

3   pages 80 through 97, reflect that any mail was returned as

4   undelivered or returned for any other reason?

5       A     No.

6       Q     If a Citibank customer were to opt out of an

7   arbitration provision, would that be reflected in the account

8   notes that we identified as pages 80 to 94?

9                    MR. THREADCRAFT:  Object to the form.

10                   MR. KOVAL:  The same objection.

11                   MS. FRIEDMAN:  97 you mean.

12                   MR. CHAPMAN:  I'm sorry.  80 to 97.

13                   MR. THREADCRAFT:  Same objection.

14                   MR. KOVAL:  The same objection.

15                   THE WITNESS:  It may be.

16      BY MR. CHAPMAN:

17      Q     Can you tell from the account notes that we have

18  here, pages 80 through 97, whether Citibank received any

19  indication of Mr. Cox's opting out or desire or intent to opt

20  out of arbitration?

21      A     The account notes do not show any receipt of a opt

22  out for Mr. Cox.

23      Q     When modifications or changes to the terms and

24  conditions of a cardholder's account are sent, are they

25  typically sent with credit card -- the monthly credit card

1   statement?

2      A    Not always.

3      Q    Sometimes they're sent separately; would that be

4   correct?

5      A    Yes.

6      Q    What about cardmember agreements themselves, the

7   original cardmember agreement, is that typically sent

8   separately, or is that sent along with something, such as the

9   plastic card?

10              MR. THREADCRAFT:  Object to the form.

11              MR. KOVAL:  The same objection.

12              THE WITNESS:  The original card agreement

13         is -- would normally be sent with the plastic from

14         Citibank.

15      BY MR. CHAPMAN:

16      Q    When we look at Bates 74 through 79, do you see on

17   page 78 in the center column where it says arbitration in all

18   capital letters and bold?

19      A    Yes.

20      Q    Are you familiar with Citibank's policy as to

21   arbitration and its cardholder agreements?

22              MR. THREADCRAFT:  Well, I'm going to object

23         to the form of that question.

24              THE WITNESS:  Can you restate the question?

25      BY MR. CHAPMAN:

```
1        Q    Sure.  What is your understanding of arbitration
2   with respect to Citibank?
3                   MR. THREADCRAFT:  I'm going to object to the
4             form of the question too.
5                   MR. KOVAL:  Same objection.
6        BY MR. CHAPMAN:
7        Q    To the best of your knowledge, does Citibank
8   usually include arbitration provisions in its credit card
9   statements?
10                  MR. THREADCRAFT:  Object to the form.
11                  THE WITNESS:  No, they're not included with
12            the statements.
13       BY MR. CHAPMAN:
14       Q    Where would we find them?
15       A    In card agreements.
16       Q    Would we find them in modifications to card
17  agreements?
18       A    If that was the provision being modified.
19       Q    Do you know whether Citibank typically puts
20  arbitration provisions in its cardmember agreements?
21                  MR. THREADCRAFT:  Object to the form.
22                  THE WITNESS:  Yes.
23       BY MR. CHAPMAN:
24       Q    And do you recall, to the best of your knowledge,
25  for how long they've been doing that?
```

1     A    Citibank added the arbitration provisions to its

2   credit card agreements in late 2001.

3     Q    Do you know whether, beginning in late 2001, the

4   credit card or cardmember agreements contained class action

5   waivers?

6     A    I don't know that.

7     Q    Let's go back to Bates 189 for just a moment.  I

8   think we pulled those out earlier.  Do you see on page 189,

9   the language that says, please see the enclosed notice of

10  change in terms to your card agreement for important

11  information regarding changes to your card agreement?

12    A    Yes.

13    Q    To the best of your knowledge, are those changes in

14  terms -- have we looked at those today?  Have we looked at a

15  document that would indicate what those terms are?

16              MR. THREADCRAFT:  Object to the form.

17              THE WITNESS:  No.

18  BY MR. CHAPMAN:

19    Q    Let's take a look at Bates 220.

20              MR. KOVAL:  220?

21  BY MR. CHAPMAN:

22    Q    Yep.  On Bates 220, do you see where it says

23  closing date 02-01 --

24    A    Yes.

25    Q    And is this a credit card statement that would have

```
 1    been sent to Mr. Cox?
 2         A    Yes.
 3         Q    Does this statement reflect a change in terms?
 4         A    No.
 5         Q    Does this statement reflect any charges on the
 6    account?
 7         A    Yes.
 8         Q    Does this statement reflect any payments on the
 9    account?
10         A    Yes.
11         Q    Let's take a look at page 223.  Do you recognize
12    this document?
13         A    Yes.
14         Q    And is this a credit card statement that would have
15    been sent to Mr. Cox?
16         A    Yes.
17         Q    And do you see where it says closing date 05-01-08?
18         A    Yes.
19         Q    Okay.  This shows a payment; would that be correct?
20         A    Yes.
21         Q    And then above it, above where it says transaction,
22    location, description, do you see where it says, please see
23    the enclosed notice of change in terms for important
24    information?
25         A    Yes.
```

1      Q    Is the notice that would have been enclosed with

2   this document, is that something we've looked at today?

3      A    Yes.

4      Q    And what document would that be?

5      A    Pages 74 through 79.

6      Q    Let's take a look at Bates 307 through 310.

7      A    Okay.

8      Q    Have you ever seen this document before?

9      A    Yes.

10     Q    What is this document?

11     A    It's an account statement.

12     Q    Was this an account statement that would have been

13  sent to Glenn Cox?

14     A    Yes.

15     Q    And does this reflect a statement closing date of

16  7/5/2011?

17     A    Yes.

18     Q    And does it reflect a payment in the amount of

19  $135.53?

20     A    Yes.

21     Q    Does this statement reflect the last payment that

22  was received by Citibank from Mr. Cox?

23              MR. THREADCRAFT:   Object to the form.

24              THE WITNESS:   I don't understand the

25          question.

1  BY MR. CHAPMAN:

2      Q    Were any payments received from Mr. Cox on this

3  account after the one reflected in this statement?

4                  MR. THREADCRAFT:  Object to the form.

5                  THE WITNESS:  The statements don't reflect

6          any additional payments after that date.

7  BY MR. CHAPMAN:

8      Q    Let's turn to Bates 98 through 122.

9                  MR. THREADCRAFT:  98 and --

10                 MR. CHAPMAN:  98 through 122.  I have to find

11         them here in my pile as well.  I was doing so good

12         at keeping these organized for a while, but those

13         days are over.

14  BY MR. CHAPMAN:

15     Q    Have you found the documents that are identified as

16  Bates 98 through 122?

17     A    Yes.

18     Q    Have you ever seen those documents before?

19     A    Yes.

20     Q    And what are those documents?

21     A    These are copies of payments received on Mr. Cox's

22  account.

23     Q    Okay.  And these documents, pages 98 through 122,

24  are these records that are made and kept in the ordinary

25  course of Citibank's business?

1   A     Yeah.
2                   MR. THREADCRAFT:  Object to the form.
3                   THE WITNESS:  Okay.  These are copies of the
4            payments after Citibank received them.
5   BY MR. CHAPMAN:
6       Q    Right.  And you see above the picture of the check
7   there's some -- there's a box that contains various
8   information, such as bundle total?
9       A     Yes.
10      Q    Was that information placed on there by Citibank?
11      A     Yes.
12      Q    And was the box -- and we'll call it the payment
13  box.  Would that be adequate, where it says payment, in a
14  banner along the side?
15      A     Yes.
16      Q    Are the documents contained on pages 98 through 122,
17  is the banner box a component to that?  Is that a record that
18  was created by Citibank?
19      A     Yes.
20      Q    And was that record made and kept in the ordinary
21  course of Citibank's business?
22      A     Yes.
23      Q    And is that a document that's routinely made and
24  kept in the course of Citibank's business?
25      A     Yes.

1    Q    And do these documents, pages 98 through 122, do

2    they reflect entries contained therein that were made at or

3    near the time of the events they described?

4    A    Yes.

5    Q    And were these documents, pages 98 through 122, were

6    these made by or transmitted by someone with knowledge in the

7    regular course of Citibank's business?

8    A    Yes.

9    Q    For the sake of just speeding things along, let's

10   just take a look at page 98.  And all of these, pages 98

11   through 122 have this payment box; would that be fair to say?

12   And if you want to look through them, you're certainly welcome

13   to.

14   A    I did already.  They all have it.

15   Q    And it would appear that there's a number of

16   categories or things that are contained in this box.  Would

17   that be accurate?  Words, numbers in the boxes?

18   A    Yes.

19   Q    Do you know what bundle total refers to?

20   A    No.

21   Q    Do you know what virtual validate refers to?

22   A    No.

23   Q    Do you see where it says account number?

24   A    Yes.

25   Q    Do you recognize that account number, 634570600, as

1    the account number associated with the Glenn Cox account?

2         A    Yes.

3         Q    Now, I will direct your attention to document 67 and

4    123 through 163.

5                   MR. KOVAL:  Did you say 67?

6    BY MR. CHAPMAN:

7         Q    67, and then 123 to 163.

8         A    Okay.

9         Q    Have you ever seen these documents before?

10        A    Yes.

11        Q    So you know what they are?

12        A    Yes.

13        Q    What is document 67?

14        A    It's a copy of a bill of sale and assignment.

15        Q    And how would you describe the document that's

16   identified as 123 to 163?

17        A    This is a printout of the data provided to Midland

18   Funding when Citibank sold the account to Midland.

19        Q    And with respect to the document that's identified

20   as 67, is this a document that's made and kept in the ordinary

21   course of Citibank's regularly conducted business activity?

22        A    Yes.

23        Q    And is this a document that's routinely made and

24   kept in the course of Citibank's business?

25                  MR. THREADCRAFT:  Object to the form.

```
1                    THE WITNESS:  Yes.

2         BY MR. CHAPMAN:

3         Q    And does this document reflect entries or

4    transactions that were made at or near the time of the events

5    of those entries or transactions that are reflected in the

6    document?

7                    MR. THREADCRAFT:  Object to the form.

8                    THE WITNESS:  Yes.

9         BY MR. CHAPMAN:

10        Q    And was this document, document 67, made at or near

11   the time or from information transmitted by someone with

12   knowledge in the regular course of Citibank's business?

13                   MR. THREADCRAFT:  Object to the form.

14                   THE WITNESS:  Yes.

15        BY MR. CHAPMAN:

16        Q    And let's take a look at 123 through 163.  Is this

17   a record that is made and kept in the ordinary course of

18   Citibank's regularly conducted business activity?

19                   MR. THREADCRAFT:  Object to the form.

20                   THE WITNESS:  Yes.

21        BY MR. CHAPMAN:

22        Q    And is this a document that's routinely made and

23   kept in the course of Citibank's business?

24                   MR. THREADCRAFT:  Object to the form.

25                   THE WITNESS:  Yes.
```

```
 1           BY MR. CHAPMAN:

 2      Q    And does this document reflect entries that were

 3  made at or near the time of the events that they described

 4  therein?

 5      A    Yes.

 6      Q    And was this document made at or near the time of or

 7  transmitted by someone with knowledge in the regular course of

 8  Citibank's business?

 9      A    Yes.

10               MR. THREADCRAFT:  Object to the form.

11           BY MR. CHAPMAN:

12      Q    The account notes that we looked at that are

13  reflected on page 80 through 96, do you remember those?

14      A    Yes.

15      Q    Do these documents reflect any change in conditions

16  or terms to the Glenn Cox account prior to the May 2008

17  changes that we've talked about today?

18               MR. THREADCRAFT:  Object to the form.

19               MR. KOVAL:  Same objection.

20               THE WITNESS:  No.

21           BY MR. CHAPMAN:

22      Q    We talked a little bit just a few minutes ago about

23  Citibank implementing a late 2001 policy and placing

24  arbitration provisions in its credit card agreements.  Do you

25  remember that?
```

1                    MR. THREADCRAFT:  Object to the form.

2                    MR. KOVAL:  Same objection.

3                    MR. CHAPMAN:  Why?

4                    MR. THREADCRAFT:  Do you want me to explain

5          it?

6                    MR. CHAPMAN:  Yeah.

7                    MR. THREADCRAFT:  You said Citibank, and

8          Citibank, N.A. was not created until 2011, so that's

9          after 2001.

10     BY MR. CHAPMAN:

11          Q    So it would be safe to say that Citibank's

12     predecessor entity began placing arbitration provisions in

13     their credit card accounts prior -- or from late 2001

14     forward?

15                    MR. THREADCRAFT:  Are you asking me?

16                    MR. CHAPMAN:  Well, I'm asking the witness.

17                    MR. THREADCRAFT:  I thought you were looking

18          at me.

19                    MR. KOVAL:  The same objection.

20                    MR. CHAPMAN:  I'm going --

21                    MR. THREADCRAFT:  Objection to the form of

22          the question.

23                    MR. KOVAL:  I have the same objection.

24                    THE WITNESS:  Citibank (South Dakota), N.A.

25          added the arbitration provision to all of its

1     agreements for credit card accounts in late 2001.

2  BY MR. CHAPMAN:

3  Q Would it have added an arbitration provision to the

4 Glenn Cox account?

5     MR. THREADCRAFT:  Object to the form.

6     MR. KOVAL:  I object to the form of the

7    question as well.

8     THE WITNESS:  I don't know whether the

9    account already had an arbitration provision or

10    whether it was added by Citibank.

11  BY MR. CHAPMAN:

12  Q If it were added by Citibank, would it have been

13 added in 2001?

14     MR. THREADCRAFT:  I'm going to object to the

15    form of this just because you at one time designated

16    Citibank as Citibank, N.A., so I think we've

17    clarified that, but I'm objecting to the form on

18    that basis.

19  BY MR. CHAPMAN:

20  Q Do you know the answer?

21  A Can you restate the question?

22  Q If an arbitration provision had been added by

23 Citibank to the Glenn Cox account, would it have been in late

24 2001?

25     MR. THREADCRAFT:  Object to the form.

1           THE WITNESS:  I don't know that.

2           MR. CHAPMAN:  Okay.  Let me go off the record

3       for just a moment here just for a second.

4           (Discussion off the record.)

5   BY MR. CHAPMAN:

6   Q    To your knowledge, if Citigroup had added an

7   arbitration provision to the Glenn Cox credit card agreement,

8   would that have happened in 2001?

9   A    I don't know that.

10          MR. CHAPMAN:  That's it.  I don't have any

11      other questions.

12          MR. THREADCRAFT:  Do you want to go and then

13      if I need to redirect after both of you-all or how

14      do you want to do that, Steve?

15          MR. KOVAL:  Well, I know that Rachel wants to

16      get on a flight so I think --

17          MS. FRIEDMAN:  Can I just have a few minutes?

18          MR. CHAPMAN:  Yeah, before we --

19          MR. KOVAL:  That's fine with me.  We can go

20      off the record.

21          (Discussion off the record.)

22          MS. FRIEDMAN:  I guess I'm good.

23  BY MR. CHAPMAN:

24  Q    Is there anything else about the account --

25          MR. THREADCRAFT:  Is this on the record?

1           MR. CHAPMAN: Yeah, just kind of a catch-all

2        question.

3     BY MR. CHAPMAN:

4        Q    Is there anything else -- are there any other

5     documents that are associated with this account that would

6     describe or show when credit card agreements or modifications

7     to credit card agreements would have been sent to Mr. Cox,

8     other than what we looked at today?

9                  MR. THREADCRAFT: Object to the form.

10                 THE WITNESS: No.

11                 MR. CHAPMAN: Okay. That's it.

12                 MR. KOVAL: Let's take a five-minute break

13           and then we can --

14                 (A recess was taken.)

15                 MS. FRIEDMAN: Actually, I have a few

16           questions if I could. It won't take long.

17                 MR. KOVAL: You just want to see if they can

18           hear you. Can you say something?

19                 MS. FRIEDMAN: Can you hear me on the phone?

20           This is Rachel.

21                 MR. HUNT: Yes, I can hear you fine. This is

22           Jimmy.

23                       EXAMINATION

24     BY MS. FRIEDMAN:

25        Q    All right. Back on the record. My name is Rachel

1   Friedman.  I don't remember if we met this morning or not.  I
2   represent Midland Funding, the entity that purchased
3   Mr. Cox's account.  I just have a few questions for you.  You
4   testified that you weren't sure if class action waivers were
5   part of the arbitration provisions that were added in 2001 by
6   Citibank (South Dakota); is that correct?
7        A    Correct.
8        Q    Do you know when class action waivers were added by
9   Citibank (South Dakota)?
10                  MR. THREADCRAFT:  Object to the form.
11                  THE WITNESS:  No.
12                  MR. KOVAL:  Yes, same -- okay.
13       BY MS. FRIEDMAN:
14       Q    You also testified, I believe, that sometimes
15  modifications to terms and conditions are mailed with billing
16  statements and sometimes they're mailed separately; is that
17  correct?
18       A    Yes.
19       Q    Is it the normal practice and procedure that terms
20  and conditions or modifications to terms and conditions,
21  whether or not they were sent with the billing statements,
22  would have been sent to the same address that billing
23  statements were sent to?
24       A    Yes.
25       Q    Do you know when -- do you know whether this type of

1    account had a class action waiver, the CITGO card account --

2                    MR. THREADCRAFT:   Object to the form.

3                    MR. KOVAL:   Object --

4        BY MS. FRIEDMAN:

5        Q    -- at any point?

6                    MR. KOVAL:   The same objection.

7                    THE WITNESS:   I'm not familiar with a class

8             action waiver so I don't know.

9        BY MS. FRIEDMAN:

10       Q    Okay.   That helps.   Okay.   If I could direct your

11   attention to Bates stamp pages 68 through 71.

12       A    Okay.

13       Q    I'm sorry.   73 is the last page of that one.   68

14   through 73.

15                    MR. KOVAL:   Okay.   Just hold on one second.

16            I think we've been using 74 through 79, which is a

17            duplicate.

18                    MS. FRIEDMAN:   Okay.

19                    MR. KOVAL:   The record is going to be

20            convoluted enough.   If I'm right about that, could

21            we just refer to the same document numbers?

22       BY MS. FRIEDMAN:

23       Q    Look at Bates stamp 74 through 79.   I believe you

24   testified that this was a terms and conditions that was sent

25   to Mr. Cox around June 2008; is that correct?

1     A     No, it was May 2008.

2     Q     Okay.  May 2008.  On page 78, I'll direct your

3   attention to the middle column where it says, claims covered,

4   and at the bottom of that paragraph it says, claims and

5   remedies sought as part of a class action, private attorney

6   general or other representative action are subject to

7   arbitration on an individual (non-class, non-representative)

8   basis.

9          Are you familiar with that type of provision that

10  we've been referring to I believe as a class action waiver?

11                    MR. THREADCRAFT:  Object to the form.

12                    MR. KOVAL:  The same objection.

13                    THE WITNESS:  No, I wasn't really familiar

14              with it.

15     BY MS. FRIEDMAN:

16     Q     Okay.  So do you have any knowledge about how long

17  that type of provision has been in Citibank or Citibank

18  (South Dakota) N.A.'s terms and conditions?

19     A     No, I don't know how long that specific language has

20  been in the arbitration provision.

21     Q     You don't know how long any type of provision that

22  would have waived a cardholder's right to bring a class action

23  against Citibank (South Dakota) or Citibank, N.A. would have

24  been included in the terms and conditions?

25                    MR. THREADCRAFT:  And I assume these

```
 1                       questions are just to her individually; is that
 2              right?
 3                       MS. FRIEDMAN:  Yes.
 4                       THE WITNESS:  No.
 5                       MS. FRIEDMAN:  I have no further questions.
 6                       MR. KOVAL:  Do you want me to go?
 7                                 EXAMINATION
 8              BY MR. KOVAL:
 9              Q    All right.  So we're looking at -- I think the last
10      questions were directed to Bates stamp 74 through 79.  So if
11      you could refer to those documents.  And this is the notice
12      of change in terms and right to opt out agreement that at the
13      bottom of it on the -- actually, it's on page 18 of the
14      insert.  Do you see how they're numbered at the bottom?
15              A    Yes.
16              Q    And then it's the one that Michael referred to
17      earlier.  If I am reading correctly, it's CTCIT508 is the
18      reference number you've referred to.
19              A    Correct.
20              Q    And then there's a date after it which is 04/08,
21      correct?
22              A    Yes.
23              Q    Now, if I heard you correctly, you said that Mr. Cox
24      received this.
25                       MR. THREADCRAFT:  Object to the form.
```

1              THE WITNESS:  Citibank's records indicate

2          this notice was sent to him --

3      BY MR. KOVAL:

4      Q    Okay.

5      A    -- or this statement.

6      Q    They're two different things.  So you're saying that

7  the records that you have show that it was sent to Mr. Cox, I

8  think you said approximately May of '08.

9      A    Yes.

10     Q    So that is correct?

11     A    Uh-huh.

12     Q    But you don't know if it was received?

13             MR. THREADCRAFT:  Object to the form.

14             THE WITNESS:  No.

15     BY MR. KOVAL:

16     Q    And for all you know, it's possible that it was not

17  received?

18             MR. THREADCRAFT:  Object to the form.

19             THE WITNESS:  Yes.

20     BY MR. KOVAL:

21     Q    And you don't know the method that these inserts

22  were sent, do you?

23             MR. THREADCRAFT:  Object to the form.  Are

24          you asking her individually?

25             MR. KOVAL:  She's here on behalf of Citibank

1    so I'm not asking --

2              MR. THREADCRAFT:  What topic -- well, I

3    guess --

4              MR. KOVAL:  It is in there.

5              MR. THREADCRAFT:  Which one is it?

6              MR. KOVAL:  It is -- so the question that's

7    being asked is how does that fit under the subpoena

8    that was served, correct?

9              MR. THREADCRAFT:  Yeah, in the topics on

10   the --

11             MR. KOVAL:  Yeah, and it's number 10,

12   communications including correspondence between any

13   authorized user of the credit card account and

14   Citibank, N.A.  So that is topic number 10.

15             MR. THREADCRAFT:  Which is broad, and we have

16   objections to that.  I mean, that's a very broad

17   statement, communications, but --

18             MR. KOVAL:  Well, we can fight about this

19   later.  I'm asking the question.  I do believe it

20   falls under the --

21             MR. THREADCRAFT:  I guess -- I'm not

22   instructing her not to answer.  I'm just stating

23   that objection on the record and relying on the

24   objection asserted.  I'm not instructing her not to

25   answer.

1           MR. KOVAL:   I understand, and I appreciate

2       that.

3           THE WITNESS:   I'm sorry.   Could you restate

4       the question?

5           (The court reporter read back.)

6           THE WITNESS:   Yes, I do know how they're

7       sent.

8    BY MR. KOVAL:

9    Q    Can you tell me?

10   A    Yes.

11   Q    Would you?

12   A    The billing statements are printed with codes that

13   will indicate which inserts go into the billing statement so

14   when the statement comes through the statement processing

15   machine, it inserts the applicable state inserts, and so

16   that -- these inserts would have been a document that went in

17   with the billing statement and out in the U.S. mail.

18   Q    Right.   But you don't know for a fact that an insert

19   went in with Mr. Cox's statement, do you?

20   A    No.

21           MR. THREADCRAFT:   Object to the form.

22   BY MR. KOVAL:

23   Q    So, no, you do not know?

24           MR. THREADCRAFT:   Object to the form.

25   BY MR. KOVAL:

1      Q      I just want to make sure you were saying what I
2   thought you were saying.
3      A      Okay.
4      Q      So you do not know that an insert was put into the
5   statement that Mr. Cox received?
6                      MR. THREADCRAFT:   Object to the form.
7                      THE WITNESS:   No.
8   BY MR. KOVAL:
9      Q      Now, these statements that we looked at earlier --
10     A      Uh-huh.
11     Q      -- those were not photocopies of the statements that
12   were sent to Mr. Cox, are they?
13     A      No, they are reproductions.
14     Q      What's a reproduction?
15     A      It's not like we keep a physical copy of each
16   statement that goes out, and if we need another copy we take a
17   photocopy on a photo copier.   The data that's disclosed on the
18   statement is housed in a system, and when we need a copy of a
19   duplicate or a reproduction of a statement, we go in and
20   request that month's statement, and it's generated as a
21   reproduction.
22     Q      It's not really a reproduction though.   It's a
23   template, and your employer fills that with information that
24   is stored elsewhere, correct?
25                      MR. THREADCRAFT:   I'm going to object to the

1      form of the question and the way the questions are

2      being asked.  Go ahead.

3           THE WITNESS:  I don't know that.

4      BY MR. KOVAL:

5      Q    Okay.  So if you could tell me further -- I don't

6  understand what you mean by a reproduction.  So is the whole

7  form stored electronically or bits and pieces of the

8  information stored in separate parts, and then it's

9  integrated?

10     A    It's my understanding the latter would be true.

11     Q    And do you know where this information is stored?

12     A    No.

13     Q    And do you know who has access to it?

14     A    No.

15     Q    And do you know if anybody can go in and alter that

16  information?

17     A    No.

18          MR. THREADCRAFT:  Again, I'm going to let you

19      ask your questions.  If we could have a -- the

20      topics are clearly delineated.  We have objections

21      to those.  We -- I don't believe the topics are

22      described with reasonable particularly, which is a

23      requirement under the rules.  We produced a witness

24      in good faith.  This is not saying that Citibank

25      does not know how these things are done.  This

1    particular witness that we put up, subject to the

2    objections for these topics, with no idea that

3    you-all were going to go into this type of detail

4    and information, might not individually know it, but

5    with respect to the questions you asked and also Mr.

6    Chapman, that doesn't mean that Citibank doesn't

7    know the answer to these questions.  I'm not trying

8    to cut you off.  I just want to be clear on the

9    record that it's not that nobody at Citibank knows

10   how this stuff is done.

11          MR. KOVAL:  I understand what you're saying.

12   I ask that you not make talking objections.  You've

13   objected to the subpoena.  There's a record of it.

14   You've restated that you're objecting so let's let

15   the deponent answer the questions and -- or you can,

16   you know, if you choose to, I guess you can instruct

17   her not to.

18          MR. THREADCRAFT:  I'm not going to instruct

19   her not to answer, but what I want to make clear for

20   on the record -- I'm not trying to make a speaking

21   objection -- I want to be clear as to what we've

22   done in proffering this witness, and that you may be

23   asking questions that this individual witness

24   doesn't -- I'm not instructing her -- we can do it

25   off the record in private out in the parking lot if

1  you want to or downstairs, whatever, not in front of
2  the witness, but I just want to be clear about that.
3  We've made a good faith effort to produce a witness
4  to provide testimony in response to these questions
5  dealing with the issue of arbitration.  And so the
6  fact that this witness might not know the answer to
7  one question that you asked, doesn't mean that
8  nobody at Citibank knows the answer to that.  That's
9  all I'm saying.
10      MR. KOVAL:  And I appreciate that, and we're
11  having lovely weather up here in Sioux Falls, but I
12  really don't want to have to come back to Sioux
13  Falls for another deposition.  And I think you-all
14  were adequately put on notice as to what the topics
15  would be.  I understand you've made objections so I
16  think we understand each other's positions.  They're
17  just not quite the same.
18      MR. THREADCRAFT:  Well, what I'm saying is
19  certain answers she's giving are not answers of
20  Citibank (South Dakota), N.A.
21      MR. KOVAL:  Well, I disagree with you.  I'm
22  just saying that will be up to a court to determine
23  whether your objections were valid and everything
24  else.  So, you know, you and I don't need to --
25      MR. THREADCRAFT:  Let's go off the record for

1      a second.

2                    MR. KOVAL:  I don't want to go off the

3           record.  I really think that's an issue for another

4           day.

5                    MR. THREADCRAFT:  No, it's not.  The topics

6           are clearly delineated.  We've asserted objections

7           to them.  You're asking questions, and I want to

8           make clear for the record that just because this

9           witness doesn't know the answer to a certain

10          question doesn't mean that she's providing an answer

11          on behalf of Citibank.  That's all I'm doing.

12                   MR. KOVAL:  I didn't notice the deponent's

13          individual deposition.  As a matter of fact, I

14          didn't notice anybody's deposition.  The Defendant

15          Hanna noticed this deposition, and they did not ask

16          for a particular person.  So my understanding, and I

17          flew up to South Dakota to take the deposition or to

18          cross-examine the deponent for Citibank, and that's

19          what I'm doing.

20                   MR. THREADCRAFT:  I understand.

21      BY MR. KOVAL:

22      Q    Okay.  Now, on page Bates stamp 75 under the

23      paragraph on the left-hand side that says, right to opt

24      out --

25      A    Yes.

1        Q    -- you testified that you don't have a record of

2    Mr. Cox having opted out.

3        A    No, I believe I said that the records we have don't

4    show that he opted out.

5        Q    Right.  But you don't know -- it is possible that he

6    did opt out, and you just do not have a record of it; isn't

7    that correct?

8                    MR. THREADCRAFT:  Object to the form.

9                    THE WITNESS:  I suppose that's correct.

10        BY MR. KOVAL:

11        Q    And how many of these -- you know, what we're

12    referring to as the notice of change in terms, the CIT that

13    starts on page 74, how many of these were sent out to

14    Citibank customers?

15                    MR. THREADCRAFT:  And what topic is that?

16                    MR. CHAPMAN:  The same objection.

17                    MR. THREADCRAFT:  Again, I'm not trying to

18            make talking objections.  I'm just trying to make

19            sure the scope is covered.  I'm not saying the

20            witness can't answer the question either.  I'm just

21            trying to keep that delineation clear between

22            answers on behalf of Citibank and answers by this

23            witness right here so that's all I'm trying to do

24            here.  I'm not trying to impede your questions.  I'm

25            just trying to have clarity with respect to that

```
 1              issue.
 2                   MR. KOVAL:  Well, number three is testimony
 3              as to the documents produced by Citibank as Bates
 4              stamped 1 through 334 in response to the subpoena,
 5              not limited to authenticity, meaning origination and
 6              dates.
 7                   MR. THREADCRAFT:  Again, I'm not trying to
 8              prohibit you from asking the question.
 9                   MR. KOVAL:  I understand.
10         BY MR. KOVAL:
11         Q    So you could answer the question if you're able to.
12         A    I don't know.
13         Q    Do you know ballpark?  I mean, was it more than a
14    million, do you think?
15         A    No idea.
16                   MR. THREADCRAFT:  The same objection.
17         BY MR. KOVAL:
18         Q    Okay.  You don't know?  You have no idea?
19         A    No idea.
20         Q    You don't know if there's a written agreement
21    between Mr. Cox and Associates National Bank (Delaware), do
22    you?
23         A    No.
24                   MR. CHAPMAN:  I'm going to object as to the
25              form of that question.
```

```
 1                    MR. KOVAL:  I've got a document I want to
 2              introduce.  Do you-all have the Midland-Cox
 3              production docs 15 through 38?
 4                    MR. CHAPMAN:  15?
 5                    MR. KOVAL:  Yeah.
 6                    MR. CHAPMAN:  Isn't that just a --
 7                    MR. KOVAL:  Midland-Cox, not yours?
 8                    MR. CHAPMAN:  No, I don't have any of that.
 9         I guess -- can I look on with you?
10                    (Discussion off the record.)
11         BY MR. KOVAL:
12         Q    So I think I told you off the record -- I'm not
13    sure if we were on the record -- that this is a copy of a
14    document that plaintiff received from defendant, Midland
15    Funding.
16         A    Okay.
17         Q    Does this appear to be a true and correct copy --
18    let me get the question out.
19                    MR. THREADCRAFT:  Yeah.
20         BY MR. KOVAL:
21         Q    -- of the Midland Funding, LLC purchase and sale
22    agreement?
23                    MR. CHAPMAN:  I'm going to object to the form
24              of the question.  I'm going to object to the entry
25              of the document being outside the scope of the
```

1      subpoena.  Go ahead if you --

2              MR. KOVAL:  I actually wasn't -- I wanted to

3      identify it.  This could be anything.  I mean, if

4      you could just allow me to further identify, I said

5      the purchase and sale agreement, and then one line

6      below that it says, February 2013, oil and retail

7      private label accounts.

8              MR. THREADCRAFT:  And let me just say for the

9      record, not speaking objection but clarifying the

10     scope, I'm not instructing the witness not to answer

11     it.  I believe you said you believe this fits in one

12     of the categories, which are extremely broad, so I'm

13     not instructing her not to answer it, but I am

14     making a statement that this is not a statement on

15     behalf of Citibank that it wouldn't know answers

16     regarding this.  This witness that we have here,

17     despite our good faith efforts to produce a witness

18     to provide answers dealing with the issue of -- as I

19     understand it the scope of this deposition is

20     limited to arbitration and so -- pursuant to the

21     Court's order so with that statement made, I'm not

22     instructing this individual not to answer.  I'm

23     making that point clear.

24              THE WITNESS:  I don't know.

25     BY MR. KOVAL:

1     Q   So you don't know whether this is the purchase and

2  sale agreement?

3     A   No, I don't.

4     Q   Have you seen this document before?

5               MR. THREADCRAFT:  I'm going to object to the

6          extent that you're asking for information that would

7          be covered by the attorney-client privilege.

8  BY MR. KOVAL:

9     Q   Have you seen this document before?

10          MR. THREADCRAFT:  Outside -- just to clarify

11         the question, because I don't think you're trying to

12         invade that providence, outside of anything that you

13         and I may have talked about or seen.

14          MR. KOVAL:  Yeah, I don't -- yeah, I'm --

15         that isn't my question.

16  BY MR. KOVAL:

17     Q   My question is generally, have you seen this

18  document before?

19          MR. THREADCRAFT:  Well, then I'm going to

20         instruct the witness not to answer the question.

21  BY MR. KOVAL:

22     Q   Okay.  So I don't see how she would have seen it

23  any other way, but I'll ask it, have you seen the document

24  outside of through counsel?

25     A   I don't recall.

```
 1        Q    So you may have; you may not have?
 2                   MR. THREADCRAFT:  Object to the form.
 3                   THE WITNESS:  Yes.
 4        BY MR. KOVAL:
 5        Q    And you received a copy of the subpoena for the
 6   deposition today, correct?
 7        A    Uh-huh.
 8        Q    And if I could direct you -- this was Defendant's
 9   Exhibit Number 1, I believe.
10        A    Yes.
11        Q    And topic number 12 was sale of a credit card
12   account to Midland Funding, LLC.
13        A    Yes.
14        Q    Okay.  And a purchase agreement relates to the sale
15   of the credit card account to Midland Funding, LLC, doesn't
16   it?
17                   MR. THREADCRAFT:  Object to the form.
18                   THE WITNESS:  Yes.
19        BY MR. KOVAL:
20        Q    Now, are you aware that Citibank has the right to
21   repurchase accounts?
22                   MR. CHAPMAN:  Objection.
23                   MR. THREADCRAFT:  Are you asking her
24              individually?
25                   MR. KOVAL:  I'm not asking her anything
```

1    individually.  I'm asking her questions because she

2    is here because she is the corporate representative

3    of Citibank, N.A., and that's why I'm here in South

4    Dakota today.

5        MR. THREADCRAFT:  Well, and then to reiterate

6    for clarification purposes of the record, the

7    witness was produced in response to a subpoena that

8    was not -- did not describe topics with reasonable

9    particularly.  We have made a good faith effort to

10   produce a witness.  That does not mean that Citibank

11   does not know the answer to your question.

12       If this individual witness does not know the

13   answer, that's one thing.  We asserted objections to

14   the topics.  We've produced a witness.  I'm not

15   telling you you can't answer the question, but with

16   that clarification, with the statement made, go

17   ahead.

18       MR. KOVAL:  So even with John not insisting

19   upon me paying for half of the takedown, it's still

20   going to be a very expensive transcript.  I

21   understand your objection.  Can we agree to

22   abbreviate what it is and you can just say something

23   shorthand and we'll know what that is?

24       MR. THREADCRAFT:  Yeah, I just want to make

25   it clear for the record.  That's all I'm trying to

1     do.

2          MR. KOVAL:   I understand.  And I'm just

3     trying to keep the record concise.

4          MR. THREADCRAFT:   I understand.

5          MR. KOVAL:   So let's try to come up with

6     something --

7          MR. THREADCRAFT:   Scope?

8          MR. KOVAL:   Yeah.  Why don't we say that

9     objection you just made --

10          MR. THREADCRAFT:   Yeah.

11          MR. KOVAL:   -- in the future, if you just

12     want to say it's beyond the scope of the subpoena.

13          MR. THREADCRAFT:   Or scope and objection, how

14     about that, and then that includes the objections

15     that are set forth that we served in response to

16     subpoena?  I'm fine with that.

17          MR. KOVAL:   I think that's fair.

18          MR. THREADCRAFT:   Okay.  Fair enough.

19          MR. KOVAL:   And we may be able to get you on

20     your plane if we do it that way.

21          MR. THREADCRAFT:   I'm here as long as you

22     want to go.  I'm not trying to rush you.

23          MR. KOVAL:   Thank you.

24     BY MR. KOVAL:

25     Q    I believe the question I was asking you was, you're

1    aware that Citibank has the right to repurchase accounts that

2    it sold to Midland Funding?

3                   MR. THREADCRAFT:  I'm going to object to the

4              form of the question and scope of the objection.

5                   MS. FRIEDMAN:  I object based on relevance to

6              arbitration discovery.

7                   MR. CHAPMAN:  And I reiterate both

8              objections.

9                   MR. KOVAL:  Court reporter, do you have any

10             objections?  I'm kidding.

11                  MR. THREADCRAFT:  Can I ask a question?

12                  MR. KOVAL:  Sure.

13                  MR. THREADCRAFT:  And we don't have to do it

14             on the record, but I know you said that all

15             objections -- go ahead.  Never mind.  Go ahead.

16             Sorry.

17        BY MR. KOVAL:

18        Q    We were talking about Midland's ability or

19   Midland's right to repurchase accounts.

20                  MR. THREADCRAFT:  I'm going to object to the

21             form of the question as it's restated.  Reiterate my

22             same previous objections.

23                  THE WITNESS:  I don't know why Midland would

24             else.

25        BY MR. KOVAL:

1    Q    I understand your answer.  I'm asking you, are you

2    aware that Midland has the right to repurchase accounts from

3    Midland Funding?

4    A    No.

5    Q    Okay.  When Citibank sold Mr. Cox's account to

6    Midland Funding, Citibank did not warrant that there was an

7    arbitration agreement regarding the account, did it?

8                   MR. CHAPMAN:  Objection as to form.

9              Objection as to scope.

10                  MR. THREADCRAFT:  Objection as to form, scope

11             and objections set forth in the subpoena response.

12                  THE WITNESS:  I don't know.

13   BY MR. KOVAL:

14   Q    Do you know anything about the sale of this

15   account?

16                  MR. CHAPMAN:  Objection.

17   BY MR. KOVAL:

18   Q    And when I say this account, I mean Mr. Cox's

19   account.

20                  MR. CHAPMAN:  Objection, form.

21                  MR. THREADCRAFT:  Objection to scope and the

22             subpoena response.

23                  THE WITNESS:  Yes, I do know something about

24             the sale.

25   BY MR. KOVAL:

1     Q    Tell me what you know, please.

2            MR. THREADCRAFT:  The same objection.

3            THE WITNESS:  I know that it was sold to

4       Midland, and I know the date and the bill of sale

5       that we've provided.

6   BY MR. KOVAL:

7     Q    So you know about the bill of sale?

8     A    Uh-huh.

9     Q    Okay.  Let's find that document.  If anybody wants

10  to help me.

11           MS. FRIEDMAN:  67.

12           MR. KOVAL:  Thank you.

13           MS. FRIEDMAN:  Maybe.

14           MR. KOVAL:  I think that's right.

15           MR. CHAPMAN:  It is in the 60s.

16  BY MR. KOVAL:

17     Q    It is 67.  So if I could direct you to Bates stamp

18  67 of Plaintiff's -- I'm sorry -- Defendant's Exhibit 2.  Can

19  you tell me what you know about this document?

20     A    It's --

21           MR. THREADCRAFT:  Object to the form.

22           THE WITNESS:  It's a copy of the bill of sale

23       evidencing the sale of the Cox account to Midland

24       dated February 28, '13.

25  BY MR. KOVAL:

1     Q    Well, it actually doesn't evidence the sale.  It

2     just discusses the sale, does it not?

3                    MR. THREADCRAFT:  Object to the form of the

4                question.

5                    THE WITNESS:  Can you restate your question?

6                    (The court reporter read back.)

7                    MR. THREADCRAFT:  The same objection.

8                    THE WITNESS:  I don't understand the

9                question.

10    BY MR. KOVAL:

11    Q    Well, it doesn't have the terms and conditions of

12    the sale, does it?

13                    MR. THREADCRAFT:  I'm going to object to the

14                form of the question.

15                    THE WITNESS:  No.

16    BY MR. KOVAL:

17    Q    And it references an Exhibit 1, but there's no

18    Exhibit 1 attached to it, is there?

19    A    No, there's not.

20    Q    And there's no final electronic file attached to

21    this bill of sale and assignment either, is there?

22                    MR. THREADCRAFT:  Object to the form.  Do you

23                want me to help you on that?

24                    MR. KOVAL:  Sure.

25                    MR. THREADCRAFT:  Do you mean attached, like

1     following this in the Bates stamp production?

2       MR. KOVAL:  Well, this document says,

3     accounts described in Exhibit 1 and the final

4     electronic file.  And I don't see anything attached

5     to the bill of sale as Exhibit 1 or a final

6     electronic file.  Do you?

7       MR. THREADCRAFT:  You're talking about in the

8     production that was made, right?

9       MR. KOVAL:  Correct.

10      MR. THREADCRAFT:  Go ahead.

11      THE WITNESS:  That's correct.

12   BY MR. KOVAL:

13   Q If I could direct you to Bates stamp 88 of

14 Defendant's Exhibit 2.

15   A Okay.

16   Q Do you know where these documents or rather the

17 information contained in these documents is stored?

18   A Yes, it's stored on a Citibank system.

19   Q And where is that?

20   A I don't know where the server is located.

21   Q Do you know who has access to them?

22   A Yes.

23      MR. THREADCRAFT:  And for this line of

24     questions, the same objection as to scope and the

25     objection in response to the subpoena.  Go ahead.

1      BY MR. KOVAL:

2          Q    So you said you do know who has access?

3          A    I know some people who have access to them, yes.

4          Q    Do you know how many people have access to them?

5          A    No.

6          Q    Do you know if it's possible to alter the data?

7                     MR. THREADCRAFT:  Object to the form.

8                     THE WITNESS:  I wouldn't know how to alter

9              it, no.

10     BY MR. KOVAL:

11         Q    I'm not talking about you.  But do you know if it

12     is possible to alter the data?

13                    MR. THREADCRAFT:  The same objection.

14                    THE WITNESS:  No.

15     BY MR. KOVAL:

16         Q    And you don't know whether the data has been

17     altered or not, do you?

18                    MR. THREADCRAFT:  The same objection as to

19             form for the whole line of questions with respect to

20             scope of the subpoena and the objection response.

21                    THE WITNESS:  I'm not aware of any way to

22             alter these records.

23     BY MR. KOVAL:

24         Q    But you don't know whether the data has been

25     altered?

1        A    No.

2                    MR. THREADCRAFT:  Object to the form and

3               scope and subpoena response.

4        BY MR. KOVAL:

5        Q    And you don't know how many people have access to

6   the data?

7        A    No.

8        Q    And you don't know who those people are?

9                    MR. THREADCRAFT:  Object to the form of the

10              question.  Object to the scope and the subpoena

11              response.

12                   THE WITNESS:  I don't know all of the people

13              who have access to them, no.

14       BY MR. KOVAL:

15       Q    I was referring to the archive data that is

16   documents 88 through 93.  Does that change any of your

17   answers?  I just wanted to make sure I was clear about that.

18       A    No, it doesn't change my answer.

19       Q    Okay.  And then there's a set of what are called

20   account notes starting on page 94 that run through Bates

21   numbers 97, I believe.  If I understood you, you were saying

22   that the system that you use can only hold so many notes and

23   then they go to archive; is that --

24                   MR. THREADCRAFT:  Object to the form.

25       BY MR. KOVAL:

1        Q    Is that a fair statement?

2                   MR. THREADCRAFT:  Object to the form.

3                   THE WITNESS:  Yes.

4        BY MR. KOVAL:

5        Q    And you don't know who has access to this data, do

6    you?

7                   MR. THREADCRAFT:  I'm going to object to the

8              form of the question.

9                   MR. CHAPMAN:  The same objection.

10                   MR. THREADCRAFT:  I don't want to impede your

11              questions.  I don't want to stop you.  Can we do a

12              standing objection?  I'm happy to do it any way you

13              want to.  I don't want to ruin your rhythm.

14                   MR. KOVAL:  I thought what we had agreed you

15              can just say you object to the form and that it's

16              beyond the scope and we'll know that that --

17                   MR. THREADCRAFT:  You just want me to do that

18              for every question?

19                   MR. KOVAL:  Yeah, I think that would just --

20              won't take too long.

21        BY MR. KOVAL:

22        Q    So I'm looking at the account notes again, Bates

23    stamp number 94 through 97, and you don't know who has access

24    to this data, do you?

25                   MR. CHAPMAN:  Objection --

1           MR. THREADCRAFT:  I'm going to object to the

2      form.

3           MR. CHAPMAN:  -- form.

4           MR. THREADCRAFT:  And I'm going to object

5      based on the subpoena response and the scope.

6           THE WITNESS:  I don't know everybody who has

7      access to it.

8    BY MR. KOVAL:

9    Q    Okay.  Where is the data for 94 through 97 stored?

10          MR. THREADCRAFT:  The same objection.

11          MR. CHAPMAN:  The same objection as well.

12          THE WITNESS:  What years?  I'm sorry.

13   BY MR. KOVAL:

14   Q    The pages 94 through 97.

15   A    Oh, it's stored on our system called FDR.

16   Q    And where is that located?

17          MR. THREADCRAFT:  Object to the form.  The

18      same objection.

19          MR. CHAPMAN:  Same objection.

20          THE WITNESS:  I don't remember where the

21      servers are located.

22   BY MR. KOVAL:

23   Q    You don't have to be located where the server is to

24   have access to it, though, do you?

25   A    No, you don't have to be in the same location.

```
 1        Q    Do you know how many people have access to this

 2   data?

 3                    MR. THREADCRAFT:  Object to the form.  Object

 4            to the scope and the subpoena response.

 5                    THE WITNESS:  No.

 6       BY MR. KOVAL:

 7        Q    Do you know if the information that's stored -- do

 8   you know if this data can be changed?

 9                    MR. THREADCRAFT:  The same objection.

10                    THE WITNESS:  No.

11       BY MR. KOVAL:

12        Q    So you really don't know how accurate this data is,

13   do you?

14                    MR. THREADCRAFT:  I'm going to -- the same

15            objection.

16                    MR. CHAPMAN:  Yeah, same objection here as

17            well.

18                    THE WITNESS:  I have no reason to believe

19            it's not accurate.

20       BY MR. KOVAL:

21        Q    But you don't know how it can be altered, do you?

22                    MR. THREADCRAFT:  Object to the form, object

23            to the scope and the subpoena response.

24                    THE WITNESS:  No.

25       BY MR. KOVAL:
```

1      Q      And you don't know if it has been altered?

2                    MR. THREADCRAFT:  The same objection.

3                    MR. CHAPMAN:  Same objection.

4                    THE WITNESS:  No.

5      BY MR. KOVAL:

6      Q      When Citibank sells accounts to Midland Funding, it

7      understands that Midland Funding may and does initiate

8      litigation against cardholders, correct?

9                    MR. THREADCRAFT:  I'm going to object to the

10                   form of the question, the scope of the question and

11                   rely on the subpoena response.

12                   MS. FRIEDMAN:  I object to relevance.

13                   THE WITNESS:  I don't know.

14     BY MR. KOVAL:

15     Q      You don't know whether Citibank knows that Midland

16     sues people?

17                   MR. THREADCRAFT:  The same objection.

18                   THE WITNESS:  No.

19     BY MR. KOVAL:

20     Q      Do you individually know that Midland sues

21     consumers?

22     A      Yes.

23     Q      And do you individually know that Midland Funding

24     sues consumers who previously had Citibank accounts that were

25     sold to Midland?

```
1        A    I don't know that.

2        Q    Were you aware that Mr. Cox has been sued by Midland

3   Funding?

4                  MR. THREADCRAFT:  Object to the form, and I'm

5             going to object to the extent that that requires

6             testimony that is covered by the attorney-client

7             privilege or the work product doctrine.  So you're

8             asking outside of what she and I may have talked

9             about; is that right?

10                 MR. KOVAL:  No.

11                 MR. THREADCRAFT:  Well, then I'm going to --

12            I'm going to instruct you not to answer to the

13            extent that knowledge comes from something I or an

14            attorney told you in conjunction with preparation

15            for this deposition.

16                 MR. CHAPMAN:  On behalf of Hanna, I'm

17            objecting on the basis of it being outside the scope

18            of the subpoena.

19                 MR. KOVAL:  Do you need the court reporter to

20            read it back?

21                 THE WITNESS:  No, I --

22                 MR. THREADCRAFT:  I just want to be clear.  I

23            instructed the witness not to answer to the extent

24            that the information came from me.  So to be clear

25            and let -- if your information came from someone
```

```
 1              other than an attorney who was preparing you for
 2              this deposition or in conjunction with preparing a
 3              response to this subpoena, then provide him with an
 4              answer.  Otherwise, I'm instructing you not to
 5              answer.
 6                   THE WITNESS:  Yeah, I don't remember even
 7              being aware of that.
 8         BY MR. KOVAL:
 9         Q    Did you have any communications with attorneys for
10    Midland or attorneys for Hanna?
11                   MR. THREADCRAFT:  Are you talking about her
12              individually?
13                   MR. KOVAL:  No.
14                   MR. THREADCRAFT:  You're asking if Citibank
15              has ever had communications with attorneys for
16              Hanna --
17                   MR. KOVAL:  Thank you.
18         BY MR. KOVAL:
19         Q    Regarding this case.
20                   MR. THREADCRAFT:  Her individually or
21              Citibank?
22                   MR. KOVAL:  Citibank.
23                   MR. THREADCRAFT:  Well, where is that?
24                   MR. KOVAL:  It says communications.
25                   MR. THREADCRAFT:  Which topic?
```

1           MR. KOVAL:  Communications, including

2       correspondence, between any authorized user of the

3       credit card account and Citibank, and testimony as

4       to the documents produced by Citibank, which is

5       number 3.  So number 3, number 10.

6           MS. FRIEDMAN:  What was your question?

7           MR. KOVAL:  Could you read it back, please?

8           (The court reporter read back.)

9           MS. FRIEDMAN:  I don't think attorneys are

10      authorized users of the credit card account.

11          MR. KOVAL:  I don't know.

12          MR. THREADCRAFT:  I'm going to object to the

13      form of the question, and then also the scope and

14      rely on the responses and objections that we have in

15      the subpoena response.

16          MS. FRIEDMAN:  Object based on relevance and

17      outside the scope.

18          THE WITNESS:  Can you restate the question?

19          (The court reporter read back.)

20          MR. THREADCRAFT:  The same objection.

21  BY MR. KOVAL:

22  Q    And then I think I added regarding this account.

23          MR. THREADCRAFT:  The same objection.

24          THE WITNESS:  I don't know.

25  BY MR. KOVAL:

1    Q    And you're answering on behalf of Citibank?

2              MR. THREADCRAFT:  Well, subject to the

3         objections that I just made.

4    BY MR. KOVAL:

5    Q    Right.  So you don't know whether you've had any --

6    or Citibank has had any communications?

7              MR. THREADCRAFT:  I'm going to object to the

8         form.  It's been asked and answered, and I'm going

9         to rely upon the previous response that I provided

10        with the scope and then also relying on the

11        objections here.

12             THE WITNESS:  I don't recall being aware of

13        that, no.

14   BY MR. KOVAL:

15   Q    And so I take it that you individually have not had

16   any contact with Mr. Chapman or Ms. Friedman or anyone that

17   you know to be an attorney for Hanna or Midland Funding

18   regarding this account.

19             MR. THREADCRAFT:  Object to the form.

20   BY MR. KOVAL:

21   Q    And again, I'm asking you individually.

22             MR. THREADCRAFT:  Do you want me to help you?

23             MR. KOVAL:  Yeah, I would like it.

24             MR. THREADCRAFT:  You're talking about

25        besides just talking here today, right?

1              MR. KOVAL:  Yeah, of course, not any chitchat

2       we had.  I'm talking about --

3              THE WITNESS:  I don't recall.

4              MR. THREADCRAFT:  Before today.

5              THE WITNESS:  It's possible I had

6       conversations with attorneys about subpoenas we got

7       initially before we had filed any or sent any

8       objections, but I don't remember.  That would have

9       been --

10      BY MR. KOVAL:

11      Q    It was my understanding --

12      A    -- many months ago.

13      Q    Maybe this will help.  It was my understanding that

14      an affidavit was submitted to Citibank.  Now, I don't know if

15      it was submitted to you personally or if it was submitted to

16      legal counsel.  So I'm trying to determine whether there was

17      any discussion between you individually and counsel for Hanna

18      or Midland Funding regarding that affidavit.

19      A    No, there wasn't.

20      Q    Have you seen that affidavit?

21      A    I don't --

22             MR. THREADCRAFT:  Object to the form.

23             THE WITNESS:  -- know what affidavit you're

24      referring to.

25      BY MR. KOVAL:

1      Q    It was so we wouldn't have to do this today.

2    That's what the affidavit was about.  Can I direct you to

3    page 164 of Defendant's Exhibit 2.

4      A    Okay.

5      Q    You had discussed with Mr. Chapman that -- I believe

6    it says date last sale, and then there's 01-06-08.

7      A    Yes.

8      Q    I just want to make sure we've got that right.  That

9    means January 6th, '08, correct?

10     A    Yes.

11             MR. KOVAL:  If you just give me a moment and

12          I'll check with co-counsel and I may be done.

13             MR. THREADCRAFT:  Sure.

14             MR. KOVAL:  I don't have any more questions.

15             MR. CHAPMAN:  I just have a couple of real

16          quick follow-ups, and I think we're done.

17                          EXAMINATION

18     BY MR. CHAPMAN:

19     Q    This is Michael Chapman on behalf of Defendant

20   Hanna.  We spoke earlier about policies and procedures.  Do

21   you remember that discussion today about Citibank's policies

22   and procedures?

23     A    On what topic?

24     Q    On the topic of sending modifications to credit card

25   agreements and sending credit card agreements to customers.

1      A     Yes.

2      Q     And just to make sure my understanding is correct,

3   was it your testimony that it was Citibank (South Dakota's)

4   policy and procedure to include arbitration in credit card

5   agreements beginning in 2001?

6                    MR. THREADCRAFT:  Object to the form.

7                    THE WITNESS:  Yes.

8      BY MR. CHAPMAN:

9      Q     If Citibank (South Dakota) acquired an account that

10   was already existing in 2001, would it send an arbitration

11   agreement separately?

12                    MR. THREADCRAFT:  I'm going to object to the

13              form of the question, and I'll object as to scope.

14                    MR. KOVAL:  Objection as to form.

15                    MR. THREADCRAFT:  I'm allowing the response.

16                    THE WITNESS:  Can you repeat the question?

17      BY MR. CHAPMAN:

18      Q     Sure.  And maybe I didn't phrase it right.  If

19   there's a credit card account that existed prior to 2001, did

20   Citibank (South Dakota) modify the terms and conditions of

21   that credit card account at some point to include an

22   arbitration provision?

23                    MR. THREADCRAFT:  I'll object to the form.

24                    MR. KOVAL:  Same objection.

25                    THE WITNESS:  I'm really sorry.  Can you read

1            it back?

2                    (The court reporter read back.)

3                    MR. THREADCRAFT:  The same objection.

4                    THE WITNESS:  Okay.  If it -- if it was a

5            Citibank account and it didn't already have an

6            arbitration provision, then, yes, an arbitration

7            provision would have been implemented.

8       BY MR. CHAPMAN:

9       Q    And would that have been in writing?

10      A    Yes.

11      Q    And would that have been sent to the consumer?

12      A    Yes.

13      Q    Do you have any reason to believe that these

14      policies and procedures were not followed with respect to the

15      Cox account?

16                    MR. THREADCRAFT:  Object to the form.

17                    THE WITNESS:  No.

18      BY MR. CHAPMAN:

19      Q    Do you have any knowledge as to whether the

20      modifying agreements containing arbitration provisions would

21      include class action waivers?

22                    MR. THREADCRAFT:  Object to the form.

23                    MR. KOVAL:  Yeah, object to the form, and

24            that question has been asked and answered.

25                    THE WITNESS:  I don't recall.  I would have

1     to actually go look at them.

2              MR. CHAPMAN:  Okay.  Did you have anything?

3              MS. FRIEDMAN:  I just have a couple of

4         questions, really just a couple.

5                        EXAMINATION

6     BY MS. FRIEDMAN:

7     Q    I would turn your attention to the May 2008

8     document.  It starts on page 74, I believe at the -- the

9     heading says, notice of change in terms and right to opt out.

10    A    Okay.

11    Q    I believe you previously testified that this was

12    sent to Mr. Cox, correct, regarding the account?

13    A    Yes.

14    Q    Can you show me where on this document it shows what

15    the changes were that have been -- that are being notified

16    within this document?

17    A    They are listed on the page 1 through 18.

18              MR. KOVAL:  Do you mean 74 through 79?

19              MR. THREADCRAFT:  Well, I think she's

20         talking -- to clarify the record, she's talking

21         about the actual page numbers.  Why don't you give

22         them the Bates stamp numbers to help them with the

23         record.

24              THE WITNESS:  74 through 79.

25    BY MS. FRIEDMAN:

1     Q    So is it your testimony that -- I'm sorry.  Let me

2   rephrase.  Can you point to any individual page numbers -- I

3   see that, for instance, on page 74 of our Bates stamp it

4   shows 17, 18 and 1.  Are any pages changes to the terms and

5   conditions, whereas others would have been there in previous

6   card agreements, or is that not possible to tell from this

7   document?

8     A    I don't know that.  It says, we have identified

9   below some of the changes to your card agreement, and it

10  outlines some of the changes, and then it restates the entire

11  card agreement starting on page 3.

12    Q    So that's on Bates stamp 75, correct?

13    A    Yes, uh-huh.

14    Q    So do you know whether anything that's restated

15  within the card agreement was a change or would have already

16  been a part of the card agreement?

17    A    I don't know that.

18              MS. FRIEDMAN:  Okay.  No further questions.

19              MR. KOVAL:  Yeah, I have follow-up based on

20         one of the questions that was asked.

21                        EXAMINATION

22   BY MR. KOVAL:

23    Q    What year did you say that a Citibank entity

24   acquired Mr. Cox's account?

25              MR. THREADCRAFT:  Object to the form.  Go

1          ahead.

2                    THE WITNESS:  September of 2000.

3          BY MR. KOVAL:

4          Q     But you have no evidence to suggest that any

5     modification of terms was sent to Mr. Cox in 2001, do you?

6                    MR. THREADCRAFT:  Object to the form.

7                    MR. CHAPMAN:  The same objection.

8                    THE WITNESS:  No.

9          BY MR. KOVAL:

10         Q     So it's speculation on your part?

11                   MR. THREADCRAFT:  Objection to form.

12                   MR. CHAPMAN:  Objection.

13         BY MR. KOVAL:

14         Q     You don't know?

15         A     I said I didn't know.

16         Q     Okay.

17                   MR. KOVAL:  I'm done.

18                   MR. THREADCRAFT:  Finished?  Anybody else?

19                   MR. CHAPMAN:  Did you want to --

20                   MR. THREADCRAFT:  Let me ask a few questions

21         here.  This is mainly for clarification purposes.

22                              EXAMINATION

23         BY MR. THREADCRAFT:

24         Q     I'm Josh Threadcraft.  I represent Citibank in this

25     deposition, which goes to my first question.  At different

1    times you have used the word Citibank.  Do you recall that in

2    response to certain questions?

3         A    Yes.

4         Q    All right.  Citibank has meant what entities?

5         A    Citibank (South Dakota), N.A. and Citibank, N.A.

6         Q    And what about Citigroup?  Did Citigroup have an

7    ownership of some relation to this account at some period in

8    time?

9         A    Indirectly, yes.

10         Q    Okay.  And flip with me to the Bates stamp page 123.

11                    MR. KOVAL:  123?

12         BY MR. THREADCRAFT:

13         Q    Yes.

14         A    Okay.

15         Q    And then there are several pages following page 123

16    that look similar.  It looks kind of like an Excel

17    spreadsheet, and I believe that it goes through Bates stamp

18    number 163.

19         A    Yes.

20         Q    What information is contained in Bates stamp numbers

21    123 through 163?

22         A    This is the Cox account data that was provided to

23    Midland when the account was sold by Citibank to Midland.

24         Q    Would that be part of the final electronic file?

25         A    Yes.

```
 1                    MR. THREADCRAFT:  I don't think I
 2            have any other questions at this time.
 3                           EXAMINATION
 4       BY MR. KOVAL:
 5       Q    You said that would be part of the electronic file.
 6  That is not the entire electronic file, is it?
 7       A    It's not the entire file, no.
 8       Q    I was confused.  Not unusual.  I thought we had
 9  agreed at the beginning of the deposition that when Michael
10  was referring to Citibank that that just meant Citibank, N.A.
11                    MR. THREADCRAFT:  Do you want me to address
12            that?
13                    MR. KOVAL:  Please.
14                    MR. THREADCRAFT:  I think he was referring to
15            Citibank -- when he said, when I say Citibank I
16            mean -- the way I interpreted it -- Citibank, N.A.
17            but at different times the witness has provided
18            answers referring to Citibank so I'm getting
19            clarification on that.
20                    MR. KOVAL:  Okay.  Well, it just makes for a
21            very confusing reading of the transcript because I
22            thought that we had all agreed that for the purposes
23            of the deposition Citibank meant Citibank, N.A., and
24            that if we were talking about something other than
25            that, that we would specify it so --
```

1           MR. THREADCRAFT:  We can do this on the

2     record if you want to or off.  It doesn't matter to

3     me.

4           MR. KOVAL:  Well, I think we need to keep it

5     on because it's --

6           MR. THREADCRAFT:  There's been -- go ahead.

7           MR. KOVAL:  It may make for -- I would have

8     to read it, but I'm just afraid there are going to

9     be some responses where he's saying Citibank and he

10    means Citibank, N.A. and I mean Citibank, N.A. and

11    then she's responding, and Citibank said or Citibank

12    did such and such, and she's meaning a broader

13    Citibank.

14          MR. THREADCRAFT:  I understand what you're

15    saying, and I guess there's been testimony today

16    about the history of the ownership relating to the

17    account.

18          MR. KOVAL:  Uh-huh.

19          MR. THREADCRAFT:  And so that -- that

20    testimony is what it is in terms of, you know, when

21    Citibank (South Dakota) had the account, when

22    Citibank, N.A. came into existence.  So for example,

23    there were some questions about things that happened

24    in 2001.  Well, Citibank, N.A. was not in existence

25    so that couldn't happen.

1              MR. KOVAL:  Exactly.

2              MR. THREADCRAFT:  And so that's what I was

3       trying to -- she may have given a response not

4       necessarily responsive to a question that he asked

5       where she said Citibank, and so her testimony is

6       what it is in terms of the time period.  So that's

7       what I was trying to clarify with that.  I think

8       that's clear on the record, and so I just wanted to

9       be clear that it -- with respect to some of the

10      questions like that or responses she gave to certain

11      questions.  I'm not trying to change what his

12      question was.

13             MR. KOVAL:  I understand.  I guess we'll have

14      to look at the context.  Yeah, I don't have any more

15      questions.

16             MR. CHAPMAN:  I have no more questions.

17             MR. THREADCRAFT:  We'll read and sign.

18             MR. CHAPMAN:  I believe this deposition is

19      dismissed.

20      (3:11 p.m.)

21

22

23

24

25

1          C E R T I F I C A T E

2     STATE OF SOUTH DAKOTA   )

3                          :SS

4     COUNTY OF MINNEHAHA     )

5                I, STACY L. WIEBESIEK, RPR, Notary Public in and

6     for the State of South Dakota, do hereby certify that the

7     deposition of CATHRINE REINECKE was by me reduced to machine

8     shorthand in the presence of the witness, afterwards

9     transcribed by me by means of computer, and that to the best

10    of my ability the foregoing is a true and correct transcript

11    of the deposition so given by her as aforesaid.

12                I further certify that this deposition was taken

13    at the time and place specified in the foregoing caption.

14                I further certify that I am not a relative,

15    counsel or attorney for either party, or otherwise interested

16    in the outcome of this action.

17                IN WITNESS WHEREOF, I have hereunto set my hand

18    at Sioux Falls, South Dakota, on the 26th day of January,

19    2015.

20

21

22

23          STACY L. WIEBESIEK, RPR
            NOTARY PUBLIC
24

      My Commission expires December 21, 2019.
25

```
 1                        ERRATA SHEET

 2             DEPOSITION OF:  CATHRINE REINECKE

 3            DATE:  JANUARY 23, 2015

 4
          I have read the foregoing deposition and wish to make the
 5      following changes:

 6      PAGE    LINE                        CHANGE

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21
                                   _____
22                                 SIGN & DATE

23

24

25
```

1                          PRAIRIE REPORTING

2                            P.O. BOX 2008

3                        SIOUX FALLS, SD 57101

4
       January 26, 2015
5
       Dear Ms. Reinecke,
6

7          At the time your deposition was taken it was indicated

8    that you would like to exercise your right to read and sign

9    the deposition transcript.  Please do so at this time and make

10   any changes or clarifications you deem appropriate.  However,

11   do NOT write on the transcript from which you are reading.

12   Simply write the page and line number on the enclosed Errata

13   sheet along with any corrections.

14          Upon completion, sign the Errata sheet and return it to

15   your attorney.  It is important that you take care of this

16   matter at your earliest convenience.

17          If you have any questions, call me at the number

18   indicated below.  Thank you for following these instructions.

19
       Sincerely,
20

21

22
       Stacy L. Wiebesiek, RPR
23     Court Reporter

24

25

ERRATA SHEET

DEPOSITION OF: CATHRINE REINECKE

DATE: JANUARY 23, 2015

I have read the foregoing deposition and wish to make the following changes:

PAGE LINE CHANGE

SIGN & DATE

145

PRAIRIE REPORTING
P.O. BOX 2008
SIOUX FALLS, SD 57101

January 26, 2015

Dear Ms. Reinecke,

At the time your deposition was taken it was indicated that you would like to exercise your right to read and sign the deposition transcript. Please do so at this time and make any changes or clarifications you deem appropriate. However, do NOT write on the transcript from which you are reading. Simply write the page and line number on the enclosed Errata sheet along with any corrections.

Upon completion, sign the Errata sheet and return it to your attorney. It is important that you take care of this matter at your earliest convenience.

If you have any questions, call me at the number indicated below. Thank you for following these instructions.

Sincerely,

Stacy L. Wiebesiek, RPR
Court Reporter

146

< Dates >
01-06-08 50:15
01-06-08. 134:6
05-01-08 86:17
05-06-08. 50:3
1-6-2012. 33:23
11-1-2003 55:17
2008/05/02 36:11
5-1-08 56:5
5-2-08 44:17
6-08-11. 51:15
7-1-06 32:17, 33:23
7-1-06. 32:11
7-1-2006 32:14
7/5/2011 87:16
8-22-14. 40:15
August 22nd, 2014 40:20
December 1st, 2006 51:2
December 21, 2019. 144:29
December 23rd, 1986 20:21
February '02. 78:23
February 2002. 80:3
February 2013 113:6
February 28, '13. 120:24
JANUARY 23, 2015 1:23, 145:5
January 26, 2015 146:7
January 5th, 2012. 56:17
January 6, 2012 33:14, 33:17
January 6, 2012. 51:7
January 6th, '08 134:9
January 6th, 2012 42:1
January 7, '02 69:12
January, 2015 3:3
January, 2015. 144:18
July 1, 2011. 71:5
July 1st, 2006 33:17, 40:20, 41:25
July 1st, 2011 69:14
July 28, '08. 40:12
June 2008 36:23, 37:5, 99:25
June 2010 35:9
June 30, 2011 20:21
June 8th, 2011 51:17
March '02. 77:12
March 2002. 75:21, 78:4
May '01 66:23
May 1992 49:13
May 2008 93:16, 100:2, 137:7
May 2008. 100:1
May 2010 45:2
May 29, '65. 7:14
May 2nd, '08 34:20
May 2nd, 2008 45:21
May 2nd, 2008. 80:24
September 2000 64:15
September 2000. 63:2
September 2002 64:4
$135.53 87:19
'08 44:21
'08. 102:8
(3:11 143:20
-vs- 1:10
.O. 146:2

< 0 >
000001 22:19, 23:15
0001 35:9
000334. 22:19, 23:15
02-01 85:23
04/08 101:20
05-92. 49:12
051510 44:24
0546 44:25
061910 35:20, 81:1
061910. 36:3

< 1 >
1-334 2:38
1. 12:22, 13:11, 61:21, 138:4
10 103:11
10. 103:14, 131:5
101 2:25
10:03 3:4
11:00. 41:6
12 15:15, 15:19, 67:13, 68:11, 115:11
122 88:16, 88:23, 89:16, 90:1, 90:5, 90:11
122. 88:8, 88:10
123 91:4, 91:7, 91:16, 92:16, 140:11, 140:15, 140:21
123. 140:10
13 57:12, 62:6, 62:10, 67:13
134 2:26
137 2:27
137. 47:21, 47:22
138 2:28
139 2:29
14-cv-1576-lmm-jsa 1:9
141 2:30
15 10:17, 112:3, 112:4
16 67:12, 67:13, 68:21
160 28:20
163 91:16, 140:21
163. 91:4, 91:7, 92:16, 140:18
164 47:25, 48:4, 48:9, 48:13, 48:17, 48:25, 49:11, 49:15, 49:21, 50:2, 51:10, 51:14, 51:19, 134:3
164. 50:6
166 50:20
166. 47:23, 50:24
167 51:19
168 48:5, 48:9, 48:13, 48:17, 48:25, 49:16, 51:10
168. 47:25, 49:21
169 38:7, 51:25, 52:19, 52:22, 53:5, 54:18, 54:21, 54:25, 55:4, 55:9, 55:15, 55:25, 56:13, 56:15, 56:25, 60:12
17 138:4
18 101:13, 138:4
18. 137:17
189 57:11, 57:22, 85:7, 85:8
189. 56:19, 57:10
1990 10:23
1992 16:12
1995. 11:10
1: 1:9

< 2 >
2 2:38, 4:1, 22:18, 23:12, 52:20, 56:24
2. 28:22, 51:24, 120:18, 122:14, 134:3
20 10:19, 17:25, 18:2
2000 69:8
2000. 64:5, 139:2
2001 68:1, 85:3, 93:23, 94:13, 95:13, 95:24, 96:8, 98:5, 135:5, 135:10, 135:19, 139:5
2001. 85:2, 94:9, 95:1, 142:24
2002 59:6, 63:3, 63:20, 64:22, 77:21, 78:11, 79:19, 80:10
2002. 75:23
2008 46:5, 146:2
2011 19:18, 94:8
2015 7:6
220 85:20, 85:22
220. 85:19
223. 56:3, 56:4, 56:21, 86:11
23rd 3:3
25 10:21, 18:4
26 61:9, 65:10, 66:4, 66:11
26. 61:8, 61:19
26th 144:18
27 71:6, 71:9, 71:10, 71:15, 71:20, 72:2, 72:7, 72:11, 72:16, 72:17, 72:22, 72:25, 73:12, 74:15, 74:24, 75:7, 75:19
2994 46:20

< 3 >
3 50:21, 131:5
3. 131:5, 138:11

147

30 72:25, 73:12, 75:8
30. 72:22, 74:15, 74:24, 75:19
307 87:6
31 72:24, 72:25, 73:13
310. 87:6
334 23:19, 47:16, 52:19, 52:22, 53:6, 54:21, 54:25, 55:4, 55:9, 55:15, 55:25, 56:13, 56:15, 56:25, 60:12, 111:4
334. 38:7, 47:18, 51:25, 54:18
34 72:25, 73:13
34. 72:24
35 73:16, 73:22, 77:2, 77:5
38 73:16, 112:3
38. 73:22, 77:2, 77:5
39 73:16, 73:25

< 4 >
4 2:37, 2:39, 2:40, 67:4, 67:8, 67:24
42 73:25
42. 73:16
43 74:2, 77:22
45 5:11
46 74:3, 77:22
47 74:3

< 5 >
5 2:23, 61:25, 62:10, 67:1, 67:4, 67:7, 67:8
5/01 66:17, 67:1
50 74:3
51 74:5
54 74:5
55 74:5, 78:12
5509 7:16
57101 146:4
58. 74:5, 78:12
59 74:8

< 6 >
60s 120:15
60th 8:13
62 74:8
63 74:8, 79:20
634570600 16:8, 90:25
66 57:16, 57:24, 58:3, 60:15, 60:21, 71:20, 72:3, 72:7, 72:12, 72:17
66. 57:13, 71:6, 71:9, 71:10, 71:15, 74:8, 79:20
67 91:3, 91:5, 91:7, 91:13, 91:20, 92:10, 120:18
67. 120:11, 120:17
68 57:17, 57:19, 57:24, 58:3, 60:15, 60:21, 71:11, 71:17, 71:20, 72:3, 72:8, 72:12, 72:17, 74:11, 99:11, 99:13
69 58:3
69. 57:24

< 7 >
7 67:5
701 8:13
7099634570600 30:21
71. 99:11
73 74:11, 99:13
73. 99:14
74 74:11, 80:11, 81:12, 83:16, 87:5, 99:16, 99:23, 101:10, 110:13, 137:8, 137:18, 137:24, 138:3
75 109:22, 138:12
78 83:17, 100:2
79 58:1, 60:15, 60:22, 72:3, 72:8, 72:12, 72:18, 74:12, 81:12, 83:16, 99:16, 137:18
79. 57:17, 57:19, 58:4, 71:11, 71:17, 71:20, 80:11, 87:5, 99:23, 101:10, 137:24

< 8 >
8 67:1, 67:8
8. 67:7
83 33:15, 33:22, 40:16, 40:25
88 35:20, 42:3, 43:9, 44:6, 44:15, 44:23, 45:17, 55:22, 80:24, 81:8, 122:13, 124:16
88. 34:20, 35:12, 35:24

< 9 >
9 62:3, 62:10, 67:12, 67:13, 67:16, 68:11
9/01 67:16
9/01. 67:23
90s 17:23
93 28:22, 30:24, 32:9, 32:13, 33:1, 33:12, 33:15, 33:22, 34:2, 34:8, 37:9, 37:15, 37:20, 39:10, 39:16, 40:16, 40:25
93. 29:2, 29:6, 32:2, 124:16
94 38:5, 38:8, 38:16, 38:20, 38:24, 39:4, 39:14, 40:2, 40:6, 40:14, 40:17, 41:1, 46:11, 46:21, 47:10, 79:2, 79:18, 80:7, 82:8, 124:20, 125:23, 126:9, 126:14
96 93:13
96. 46:16
97 2:24, 38:5, 38:17, 38:20, 38:24, 39:4, 39:14, 40:2, 40:6, 40:14, 40:17, 41:1, 41:21, 41:23, 45:15, 45:23, 46:7, 46:11, 46:21, 47:10, 75:9, 77:16, 78:8, 80:21, 82:3, 82:11, 82:18, 124:21, 125:23, 126:9
97. 38:9, 82:12, 126:14
98 88:8, 88:9, 88:10, 88:16, 88:23, 89:16, 90:1, 90:5, 90:10
98. 90:10

< A >
a.m. 3:4
abbreviate 116:22
ability 69:4, 118:18, 144:10
able 8:20, 16:18, 21:4, 32:12, 37:19, 40:6, 43:7, 43:10, 45:14, 45:23, 53:5, 54:5, 55:11, 66:10, 72:24, 78:19, 111:11, 117:19
above 36:12, 50:21, 86:21, 89:6
access 106:13, 122:21, 123:2, 123:3, 123:4, 124:5, 124:13, 125:5, 125:23, 126:7, 126:24, 127:1
accounts 25:9, 25:12, 25:20, 27:18, 63:4, 69:21, 69:24, 70:2, 70:10, 70:15, 70:22, 94:13, 95:1, 113:7, 115:21, 118:1, 118:19, 119:2, 122:3, 128:6, 128:24
accreditations 11:3
accurate 27:18, 36:9, 36:16, 37:22, 39:10, 50:17, 62:11, 90:17, 127:12, 127:19
achieve 11:9
acquire 63:3
acquired 62:17, 62:18, 62:22, 64:3, 64:16, 64:22, 64:24, 65:19, 65:21, 69:9, 69:24, 70:2, 70:22, 71:1, 135:9, 138:24
acquisition 65:2, 65:8, 66:2
Action 1:8, 5:11, 85:4, 98:4, 98:8, 99:1,

148

99:8, 100:5, 100:6, 100:10, 100:22, 136:21, 144:16
activities 33:21, 49:20
activity 23:21, 32:2, 32:5, 32:19, 33:2, 33:16, 38:18, 40:9, 40:13, 46:11, 54:19, 60:23, 61:2, 72:5, 91:21, 92:18
actual 24:10, 65:12, 137:21
Actually 24:15, 36:10, 57:12, 87:15, 101:13, 113:2, 121:1, 137:1
ADD 36:11, 36:18, 45:4, 45:7, 46:11
added 65:1, 94:25, 95:3, 95:10, 95:12, 95:13, 95:22, 96:6, 98:5, 98:8, 131:22
addition 11:3, 12:1
additional 37:12, 81:16, 88:6
ADDLETON 1:13, 1:35
address 7:15, 7:24, 8:12, 16:15, 18:19, 17:2, 31:3, 46:13, 46:16, 49:18, 57:7, 57:8, 99:22, 141:11
adequate 89:13
adequately 108:14
administrative 20:25
advise 23:5
affidavit 133:14, 133:16, 133:20, 133:23, 134:2
affiliates 8:19
affiliation 8:20
aforesaid 144:11
afraid 142:5
afterwards 76:20, 144:8
ago 11:12, 18:19, 51:8, 59:24, 88:3, 93:22, 133:12
agree 116:21
agreed 125:14, 141:9

141:22
ahead 14:17, 21:15, 21:19, 24:4, 59:3, 63:18, 64:1, 65:17, 73:10, 108:2, 113:1, 116:17, 118:15, 122:10, 122:25, 139:1, 142:6
allow 30:16, 113:4
allowing 125:15
already 11:24, 13:8, 27:10, 56:21, 58:23, 81:15, 90:14, 95:9, 135:10, 138:5, 138:15
alter 108:15, 123:6, 123:12, 123:22
altered 123:17, 123:25, 127:21, 128:1
amount 87:18
Andrew 16:6, 18:13
answered 33:6, 33:8, 79:5, 132:8, 136:24
answering 132:1
answers 5:2, 12:7, 12:11, 108:19, 110:22, 113:15, 113:18, 124:17, 141:18
Anybody 108:15, 109:14, 120:9, 139:18
apart 17:19, 64:9
apologize 81:14
appear 14:14, 90:15, 112:17
APPEARANCES 1:27, 2:2
applicable 104:15
applied 68:10
Appreciate 104:1, 108:10
appropriate 146:14
approximate 77:9, 78:1
approximately 108:28
April 44:21
arbitration 8:27, 82:20, 83:17, 83:21, 84:1, 84:8, 84:20, 85:1,

93:24, 94:12, 94:25, 95:3, 95:9, 95:22, 98:5, 100:7, 100:20, 105:5, 118:6, 119:7, 135:4, 135:22, 136:6, 136:20
ARCHIV 26:20, 36:3, 44:24, 81:1
archive 124:15, 124:23
archived 23:12, 31:13, 35:9, 35:17, 40:4
Around 10:23, 10:24, 11:10, 99:25
aside 5:4, 57:22
asserted 5:4, 103:24, 106:6, 118:19
assignment 91:14, 121:21
assistant 11:7, 20:25
Assistants 11:8
associate 10:6, 10:11, 10:25, 11:3
associated 30:16, 33:16, 44:7, 57:1, 57:4, 57:7, 66:12, 68:12, 70:16, 97:5
Associates 1:49
Association 11:8
assume 11:19, 100:25
assuming 76:9, 76:20
Athens 7:38
Atlanta 1:30, 2:5, 2:11, 4:3, 4:4
attached 121:18, 121:20, 121:25, 122:4
attention 28:19, 51:23, 68:22, 91:3, 96:11, 100:3, 137:7
attorney 4:3, 12:5, 24:4, 100:5, 123:14, 130:1, 132:17, 144:15, 146:19
attorney-client 12:3, 12:22, 22:9, 114:7, 129:6
attorneys 130:9

130:10, 130:15, 131:9, 133:6
authenticity 111:5
authorized 103:13, 131:2, 131:10
available 75:17, 77:21, 76:11, 79:19, 80:10
aware 59:12, 60:4, 115:20, 119:1, 119:2, 123:21, 129:2, 130:7, 132:12

<B>
Back 8:8, 12:12, 13:19, 14:25, 15:11, 23:1, 24:19, 27:9, 32:8, 32:11, 33:10, 40:8, 47:24, 64:22, 67:24, 68:22, 73:12, 77:3, 85:7, 97:25, 108:12, 129:20, 131:7, 136:1
based 24:5, 118:5, 126:5, 131:16, 138:19
basis 67:25, 95:18, 100:8, 129:17
batch 23:14, 48:4, 51:24, 57:23, 74:23
became 21:3, 21:6, 66:10, 69:21
become 66:4
becoming 21:2
BEDARD 1:43, 1:46, 4:3, 4:9
began 94:12
beginning 85:3, 135:5, 141:9
begins 80:25
behalf 1:41, 1:48, 2:8, 2:14, 3:4, 9:11, 10:1, 13:9, 102:25,

149

believed 17:23, 67:22, 68:8
believing 67:25
below 15:23, 35:19, 35:5, 62:9, 62:11, 113:6, 138:9, 146:22
besides 24:17, 132:25
best 13:19, 22:10, 25:11, 25:16, 53:10, 55:6, 59:10, 69:4, 84:7, 84:24, 85:13, 144:9
better 6:16, 26:24, 32:25, 63:11
beyond 36:24, 117:12, 125:16
bill 91:14, 120:4, 120:7, 120:22, 121:21, 122:5
billing 17:1, 38:6, 44:12, 60:9, 60:10, 99:15, 99:22, 104:12, 104:13, 104:17
birth 7:13
bit 26:21, 42:15, 93:22
bits 109:7
bold 24:24, 35:13, 35:15, 44:24, 80:25, 80:18
bolded 15:24, 36:2
boss 19:5
bottom 34:15, 50:3, 50:20, 100:4, 101:13, 101:14
BOX 69:9, 89:7, 89:12, 89:13, 89:17, 90:11, 90:16, 146:2
boxes 90:17
break 11:22, 41:8, 97:12
bring 100:22
broad 5:3, 103:15, 103:16, 113:12
broader 142:12
broke 69:20
bundle 88:8, 90:19
BURR 2:4, 2:10
business 29:21, 29:24, 39:18, 38:22, 39:6,

48:11, 48:15, 48:23, 54:2, 54:5, 54:19, 54:23, 55:6, 60:17, 60:23, 61:1, 72:9, 72:19, 88:25, 89:21, 90:7, 91:21, 91:24, 92:12, 92:18, 92:23, 93:8
businesses 18:10, 19:25

<C>
call 21:9, 28:2, 28:7, 34:4, 48:4, 146:21
called 3:9, 65:3, 124:19, 126:15
calls 9:1
capacity 49:2
Capital 62:22, 64:16, 64:24, 65:22, 65:24, 91:21, 91:24, 92:12, 92:18, 92:23, 93:8, 83:18
caption 144:13
cardholder 25:24, 26:6, 62:24, 63:21, 100:22
cardholders 128:8
cardmember 25:24, 26:7, 59:11, 62:11, 64:23, 66:11, 68:1, 68:9, 81:23, 83:6, 83:7, 84:20, 85:4
care 6:2, 146:19
careful 21:20
case 7:21, 100:19
catch-all 97:1
categories 5:2, 90:16, 113:12
category 9:7
CATHRINE 1:21, 3:1, 3:8, 5:21, 7:12, 144:7, 145:3
caveat 11:23
Center 30:7, 63:17
certain 16:24, 40:3, 53:6, 60:25, 108:19, 109:9, 140:2, 143:10
certainly 23:2, 73:9,

90:12
certificates 11:2
certified 11:7
certify 144:6, 144:12, 144:14
changed 21:10, 58:19, 127:8
changes 26:14, 36:17, 37:21, 38:3, 41:1, 41:24, 42:9, 45:19, 45:25, 46:4, 55:12, 58:12, 81:16, 82:23, 85:11, 85:13, 93:17, 137:15, 138:4, 138:9, 138:10, 146:5, 146:14
Chapman 2:44
change 50:18
charge-off 49:23, 50:19, 50:21, 51:2
charged 47:1, 47:5
charges 52:21, 33:25, 85:5
check 88:6, 134:12
chitchat 133:1
choose 107:16
chronological 55:9, 55:12
circumstances 21:7
CIT 38:11, 39:23, 110:12
CITGO 53:4, 74:18, 82:19
Civil 1:16, 8:11, 5:12, 5:14
claims 100:3, 100:4
clarification 50:15, 116:8, 116:18, 116:21, 146:19, 146:24
clarifications 146:14
clarified 65:17

clarify 24:20, 53:17, 76:2, 76:18, 114:10, 137:20, 143:7
clarifying 113:9
clarify 24:13, 110:25
Class 16:6, 86:4, 98:4, 98:6, 98:11, 99:7, 100:5, 100:10, 100:22, 136:21
clean 41:19, 42:15
clear 9:17, 9:23, 20:12, 22:23, 41:17, 41:22, 50:16, 59:14, 73:1, 76:7, 76:18, 76:24, 107:9, 107:19, 107:21, 109:2, 109:8, 110:21, 113:23, 116:25, 124:17, 129:22, 129:24, 143:8, 143:9
clearly 105:20, 103:6
closing 55:16, 55:17, 59:5, 85:23, 86:17, 87:15
CM-819 35:6, 36:5
CMS 35:11, 36:20
co-counsel 134:12
CO. 1:33
code 37:6, 42:17, 42:18, 42:20, 44:3, 81:9
codes 104:12
College 10:8
column 50:20, 51:14, 83:17, 100:3
combined 40:18
comes 104:14, 129:13
commencing 3:4
Commission 144:29
communicated 49:1
communication 22:1
Communications 103:12, 103:17, 130:9, 130:15, 133:24, 131:1, 131:26
Community 10:8
company 20:6
completion 146:18
compliance 17:9, 17:15, 17:20, 17:25,

150

18:7, 19:24, 20:4
comply 6:13
component 89:17
computer 59:22, 144:9
concede 6:12
concise 117:3
conclusion 9:1
conducted 29:21, 39:18, 49:11, 54:19, 60:17, 60:23, 61:1, 72:4, 91:21, 92:18
confused 141:8
confusing 141:21
confusion 41:18, 69:3
conjunction 44:12, 60:8, 129:14, 130:2
connected 30:24
consumer 18:10, 18:25, 28:11, 27:21, 81:23, 139:11
consumers 26:18, 26:25, 27:10, 68:12, 50:25, 58:8, 59:8, 128:21, 128:24
contact 7:24, 132:16
contain 30:15, 37:9, 43:11, 43:12, 43:21, 46:12, 60:4, 72:12
contained 15:19, 16:22, 30:1, 34:2, 42:9, 43:15, 44:5, 49:4, 85:4, 89:16, 90:2, 90:16, 122:17, 140:20
containing 42:22, 42:23, 69:23, 136:20
contains 23:12, 42:9, 48:25, 59:12, 89:7
content 22:1
contents 49:22
context 143:14
contract 17:2
convenience 146:20
conversations 133:6
convoluted 90:20
copier 105:17
copies 25:19, 88:21, 89:3
copy 91:14, 105:15, 105:16, 105:18,

112:13, 112:17, 115:5, 121:22
corner 35:7
Corp. 8:16, 8:17, 8:23, 21:4
corporate 118:2
Corporation 17:6
corrections 146:17
correctly 101:17, 101:23
correspondence 103:12, 131:2
Counsel 1:41, 1:48, 2:8, 2:14, 12:1, 14:19, 14:20, 18:12, 21:21, 22:2, 22:6, 114:24, 133:16, 133:17, 144:15
COUNTY 144:4
couple 7:7, 12:22, 18:2, 76:23, 134:19, 137:3, 137:14
course 29:20, 29:24, 38:17, 38:21, 39:6, 48:10, 48:14, 49:23, 54:19, 54:22, 66:6, 72:4, 72:9, 72:19, 88:25, 89:21, 89:24, 90:7, 91:21, 91:24, 92:12, 92:17, 92:23, 93:7, 133:1
Court 1:1, 5:15, 8:10, 46:20, 104:5, 108:22, 115:21, 118:9, 121:6, 129:19, 131:8, 131:19, 131:22, 138:2, 146:31
courtesy 12:18
covered 21:21, 22:7, 100:3, 110:18, 114:7, 129:6
create 61:15, 61:18
created 30:15, 39:19, 61:20, 78:22, 89:18, 94:8
cross-examine 100:18
crossover 39:12
CTC1508 37:7, 42:24,

42:15, 42:23, 43:7, 43:11, 43:15, 43:16, 44:2, 44:7, 44:16, 44:20, 55:22, 81:9, 81:12, 81:17, 101:17
current 17:6, 20:16, 21:4, 31:11, 33:13, 33:14, 40:1, 40:13, 55:14, 70:9
Currently 19:21, 19:23
customer 18:3, 44:22, 82:6
customers 25:19, 25:25, 28:17, 74:19, 110:14, 134:25
cut 107:6

<D>
D-E 29:16, 29:17, 29:19
data 91:17, 105:17, 123:6, 123:12, 123:18, 123:24, 124:6, 124:15, 125:5, 125:24, 126:9, 127:2, 127:8, 127:12, 140:22
dated 44:17, 77:12, 123:9
date 111:6
dates 111:6
DAVID 1:35
day 3:3, 51:4, 109:4, 144:18
days 88:13
de 23:16
de-archive 40:5
De-archived 29:9, 29:13, 29:14, 30:9, 31:9
dealing 108:5, 113:18
Dear 146:9
deem 146:14
Defendant 109:14, 112:14, 115:8, 120:18, 122:14, 134:3, 134:19
Defendants 1:15, 4:5
defending 4:15
define 32:18
degree 10:6, 10:7,

10:11, 10:25, 11:4
degrees 11:3
Delaware 61:23, 62:1, 62:4, 62:7, 62:10, 62:13, 62:23, 64:25, 65:24, 65:25, 67:23, 68:9, 68:24, 69:10, 69:11, 70:10, 70:17, 70:23, 74:19, 78:17, 111:21
delineated 108:20, 109:6
delineation 110:21
department 2:18
depends 5:25
deponent 22:2, 107:15, 108:12, 108:18
deposed 3:9
describe 8:22, 34:1, 91:15, 97:6, 116:8
described 5:3, 72:13, 92:3, 93:3, 108:22, 122:3
DESCRIPTION 2:35, 65:22
designated 18:21, 91:6
desire 82:19
despite 113:17
destroy 41:14
detail 107:3
determine 52:15, 108:22, 133:16
days 88:13

151

efforts 113:17
either 20:5, 30:5, 44:21, 110:20, 121:21, 144:15
electronic 121:20, 122:4, 122:6, 140:24, 141:5, 141:6
electronically 108:7
elsewhere 105:24
employed 7:20, 8:16, 17:5, 20:15, 21:3, 21:4
employer 8:15, 21:10, 105:23
enable 31:2, 31:5, 46:12
enclosed 44:19, 56:10, 85:9, 86:23, 87:1, 146:18
endeavored 5:1
enough 99:20, 117:18
entire 37:8, 139:10, 141:6, 141:17
entities 13:22, 140:4
entitled 19:4
entries 30:1, 34:1, 37:9, 38:25, 46:18, 48:19, 55:1, 52:12, 90:2, 92:3, 92:5, 93:23
entry 33:3, 34:20, 34:23, 35:2, 35:6, 35:8, 40:7, 40:8, 43:4, 42:21, 80:25, 118:8
Errata 145:1, 146:16, 146:18
ESQ 1:31, 1:35, 1:39, 1:45, 1:46, 2:6, 2:12
establish 9:6, 27:10
established 103:8, 27:9, 33:23
events 30:2, 39:1, 55:1, 72:13, 90:3, 92:4, 93:3

everybody 4:7, 6:15, 23:14, 54:10, 63:22, 126:6
everything 108:23
evidence 121:1, 139:4
evidencing 120:23
exact 44:19
Exactly 7:8, 12:14, 46:18, 143:1
EXAMINATION 2:21, 5:17, 97:23, 101:7, 134:17, 137:5, 138:21, 139:22, 141:3
example 142:22
examples 33:24
Excel 140:16
except 5:23
exception 6:5
exemplar 68:8
exercise 146:12
Exhibit 4:18, 4:24, 12:22, 13:10, 13:16, 13:17, 14:3, 15:11, 15:13, 16:22, 16:23, 16:17, 22:18, 23:11, 23:12, 24:19, 24:22, 28:22, 51:24, 52:20, 115:9, 120:18, 121:17, 121:18, 121:19, 122:3, 122:5, 140:24, 141:5, 141:9, 141:17
Exhibits 2:43, 4:1
existed 135:19
existence 142:22
Exist 12:25
existing 135:10
expect 12:5
expensive 116:20
expires 144:29
explain 58:10, 69:4, 94:4
extend 12:17
extent 9:1, 58:22, 58:23, 114:6, 129:5, 129:13, 129:23
extremely 5:3, 113:12

<F>
F. 1:35
face 78:19, 79:23
fact 9:19, 54:17, 104:18, 108:6, 109:13
Fair 103:9, 69:20, 90:11, 117:17, 117:18, 125:1
faith 5:6, 108:24, 108:3, 113:17, 118:9
FALLS 3:3, 8:13, 10:10, 103:20, 109:11, 108:13, 144:18
familiar 31:15, 83:20, 99:7, 103:9, 100:13
far 32:8
farther 4:14
farthest 40:8
fault 6:22
FDR 35:20, 35:2, 44:24, 81:1, 135:15
Federal 5:11, 5:13
feel 12:23
fees 33:21
few 11:12, 18:19, 41:19, 44:23, 51:8, 93:22, 96:17, 97:15, 98:3, 135:9, 137:8
field 51:14, 121:20, 121:24, 122:6, 140:24, 141:5, 141:6, 141:17
filed 13:5, 14:5, 121:20, 122:6, 140:24, 141:5, 141:6, 141:17
fills 105:23
final 121:20, 122:3, 122:5, 140:24
finally 74:11
find 34:11, 39:2, 44:10, 47:7, 47:10, 47:13, 47:20, 47:21, 49:9, 50:1, 50:18, 51:20, 55:2, 55:7, 60:20, 80:23, 84:14, 84:16, 88:10, 120:9
fine 4:10, 4:21, 8:4, 14:17, 19:6, 23:8, 41:11, 99:19, 117:16,

Discussion 8:7, 13:1, 14:24, 21:13, 23:9, 64:13, 96:4, 98:21, 112:10, 133:17, 134:21
dismissed 143:19
District 1:1, 1:2, 5:15, 5:16
docs 112:3
doctrine 21:23, 129:7
documentation 60:3
dog 29:15
doing 5:22, 11:14, 84:25, 68:11, 109:11, 109:19
done 22:21, 106:25, 107:10, 107:22, 134:12, 134:16, 138:17
down 12:9, 36:10, 44:23, 49:11, 50:10
downstairs 100:1
drafts 43:24
draw 68:21
DT 50:3, 50:15, 51:15
due 89:2
Duluth 1:44
duly 3:9
duplicate 39:12, 99:17, 105:19
duplicates 67:5, 67:7, 67:9, 67:14, 72:25, 73:5, 73:8, 73:13, 73:17, 74:3, 74:6, 74:9, 74:12
duties 18:6, 18:19, 20:23

<E>
earlier 17:4, 81:9, 85:8, 101:17, 105:9, 134:20
earliest 40:7, 55:12, 146:20
easier 51:5
East 8:13
education 10:5

152

finish 12:15, 12:16
Finished 13:3, 29:3,
 139:18
FIRM 1:29
First 3:9, 33:3, 34:20,
 36:2, 56:9, 62:22,
 64:16, 64:24, 65:9,
 65:22, 65:24, 66:1,
 68:2, 69:9, 69:20,
 69:21, 69:25, 80:24,
 139:25
fit 103:7
fits 113:11
five 7:9, 10:13, 41:7,
 81:5
five-minute 97:12
flew 109:17
flight 98:16
flip 15:11, 24:19, 24:21,
 140:10
follow-up 139:16
follow-ups 134:16
followed 139:14
following 122:1,
 140:15, 145:9,
 146:22
follows 3:10
foregoing 144:10,
 144:13, 145:6
FORMAN 2:4, 2:10
forth 117:15, 119:11
forward 94:14
found 46:15, 88:15
foundation 54:3
frame 39:12, 75:16
Frederick 1:13, 1:48,
 4:6
free 12:23
front 13:5, 23:15,
 29:12, 43:15, 47:15,
 57:11, 108:1
full 7:11, 40:3, 58:21
function 21:9
Funding 1:12, 2:8,
 91:18, 98:2, 112:15,
 112:21, 115:12,
 115:15, 118:2, 119:3,
 119:6, 128:6, 128:7,
 128:23, 129:3,
 132:17, 133:18

future 117:11

< G >
gave 14:7, 143:10
general 10:6
generally 55:11, 58:17,
 114:17
generated 53:13,
 105:20
Georgia 1:2, 1:30,
 1:34, 1:39, 1:44, 2:5,
 2:11, 4:4, 5:16,
 46:20
gets 40:3
getting 141:18
give 53:10, 134:11,
 137:21
given 143:3, 144:11
giving 108:19
global 21:9
globally 55:25
gotten 9:20, 75:6
governed 25:12
governs 27:22
ground 11:13
Group 1:43, 4:3
guess 6:5, 53:21,
 53:25, 99:22, 100:3,
 103:21, 107:16,
 112:9, 142:15,
 143:13

< H >
H 1:46, 2:12
half 116:19
hand 22:17, 144:17
handing 122:1
hands 69:4
Hanna 1:13, 1:48, 4:6,
 108:15, 123:16,
 130:10, 130:16,
 132:17, 133:17,
 134:20
happen 142:25
happened 98:8, 142:23
happy 125:12
heading 137:9

heads 12:9
hear 47:4, 10, 33:7,
 97:18, 97:19, 97:24
heard 101:23
hearing 78:19
held 17:12, 23:5
help 23:5, 52:14, 59:2,
 63:10, 63:22,
 120:10, 121:23,
 122:22, 133:13,
 137:22
helpful 20:10, 54:10,
 64:11
helps 3:13, 53:10,
 59:10
hereby 144:6
hereunto 144:17
hesitate 11:21
highest 10:5
history 69:5, 142:16
Hold 7:17, 34:22, 73:9,
 99:15, 124:22
home 7:15, 7:23
hour 41:7, 41:10
housed 105:18
houses 40:1, 48:6
HOWARD 1:31
huh-uh 12:8
HUNT 4:10, 97:21
HURT 1:37, 1:39

< I >
idea 107:2, 111:15,
 111:18, 111:19
identification 41:4, 24:16
identified 12:21, 13:10,
 14:3, 22:18, 23:11,
 29:6, 30:6, 31:8,
 36:15, 42:4, 49:17,
 45:6, 47:15, 54:1,
 55:21, 65:10, 66:11,
 68:23, 78:7, 79:1,
 79:17, 80:6, 90:21,
 81:25, 82:2, 82:8,
 88:15, 91:16, 91:19,
 138:8
identifier 44:5
identifiers 24:25, 30:15
identifies 42:20

identify 30:16, 31:2,
 31:5, 43:7, 46:12,
 61:7, 113:3, 113:4
identity 14:20
immediate 18:15
impede 110:24, 125:10
implemented 130:7
implementing 93:23
import 55:10
important 7:18, 7:19,
 12:7, 12:11, 18:16,
 18:18, 55:11, 65:10,
 80:23, 146:19
in-house 14:18, 18:12
inadvertently 12:4
include 84:8, 135:4,
 135:21, 136:21
included 88:11, 100:24
includes 117:14
including 49:7, 103:12,
 131:1
indicate 37:10, 44:6,
 44:16, 46:22, 85:15,
 102:1, 104:13
indicated 11:12, 18:16,
 18:18, 118:23,
 118:2, 119:3, 119:6,
 120:4, 120:23,
 126:5, 128:7,
 128:15, 128:20,
 129:3, 133:8, 133:19,
 133:24
indicates 36:8
indication 35:17, 82:19
indirectly 149:9
individual 15:3, 59:15,
 61:20, 65:15, 66:6,
 100:7, 107:23,
 109:13, 113:22,
 116:12, 138:2
individually 1:5, 27:3,
 27:6, 27:18, 31:23,
 58:14, 65:5, 101:1,
 102:24, 107:4,
 115:24, 118:1,
 128:20, 128:23,
 130:12, 130:20,
 132:15, 132:21,
 133:17
information 9:2, 16:24,
 45:12, 47:13, 47:20,
 48:7, 49:1, 49:4,
 49:6, 49:23, 59:11,
 60:5, 85:11, 86:24,
 89:8, 89:10, 92:11,

means 8:24, 31:10,
 34:16, 36:20, 37:2,
 45:7, 65:19, 134:9,
 142:10, 144:9
meant 57:7, 140:4,
 141:19, 141:23
memo 35:9
memory 11:13
merged 69:11, 69:13,
 71:4
merger 74:19, 75:2,
 77:8, 78:16
met 98:1
method 26:24, 102:21
Michael 1:46, 4:2, 6:14,
 9:16, 57:14, 71:7,
 78:3, 101:16,
 104:19, 141:9
middle 49:12, 50:20,
 51:14, 100:3
Midland 1:12, 2:8,
 91:17, 91:18, 98:2,
 112:14, 112:21,
 115:12, 115:15,
 118:2, 118:18,
 118:19, 118:23,
 119:2, 123:3,
 126:5, 128:7,
 128:15, 128:20,
 129:2, 130:10,
 132:17, 133:18,
 142:25
Midland-cox 112:2,
 112:7
migrated 21:9
million 111:14
mind 50:22, 73:9,
 118:15
MINNEHAHA 144:4
minute 66:22
minutes 11:12, 122:22
 93:19, 41:19, 51:8,
 93:22, 98:17
missed 77:4
modification 26:12,
 36:9, 37:10, 43:8,
 55:20, 139:5
modifications 26:14,

271, 37:13, 45:15,
 45:25, 51:20, 60:1,
 82:23, 84:16, 97:6,
 98:15, 98:20, 134:24
modified 94:18
modify 135:20
modifying 135:20
moment 22:20, 57:22,
 85:7, 95:3, 134:11
month 36:18, 53:14,
 105:20
monthly 92:25
monthlies 103:12
Moritz 16:5, 16:13
morning 26:5, 98:1
moved 55:10
Ms 22:3, 22:4, 86:1,
 82:11, 95:17, 95:22,
 97:15, 97:19, 97:24,
 98:13, 99:4, 99:9,
 99:16, 99:22
multiple 17:17

< N >
N.A. 100:18
name 42:5, 19:7:11,
 14:8, 15:3, 15:5,
 25:23, 30:20, 42:7,
 42:8, 46:17, 49:7,
 59:11, 64:18, 70:7,
 97:25
nature 66:3, 22:25
near 30:2, 38:25, 48:18,
 55:1, 72:13, 93:3,
 92:4, 92:10, 93:3,
 93:6
necessarily 149:4
necessary 6:17
need 7:21, 9:5, 11:18,
 11:19, 11:22, 18:13,
 16:20, 16:23, 16:25,

22:16, 62:12, 53:24,
 57:16, 68:16, 93:13,
 105:18, 105:18,
 106:24, 129:19,
 142:4
neglected 24:20
New 21:3
Next 23:4, 46:2, 50:10
nobody 107:9, 108:8
nod 12:9
non-class 100:7
non-representative
 100:7
normal 98:19
normally 83:13
North 8:13
Northern 1:2, 5:15
NOTARY 3:5, 144:5,
 144:27
note 15:24, 31:14, 40:3,
 44:17
noted 42:21
notice 34:12, 59:10,
 59:19, 74:18, 75:2,
 78:16, 80:17, 81:22,
 81:25, 85:9, 86:23,
 87:1, 101:11, 102:2,
 108:14, 109:12,
 109:14, 110:12,
 137:9
noticed 109:15
notices 34:10, 77:8
notified 137:15
notify 21:11
Number 2:5, 4:19,
 16:8, 18:10, 17:2,
 18:18, 23:12, 30:16,
 36:13, 35:15, 49:7,
 57:4, 90:15, 90:23,
 90:25, 91:1, 101:18,
 103:11, 103:14,
 111:2, 115:9, 115:11,
 125:23, 131:5,
 140:18, 146:18,
 146:21
numbered 101:14
numbers 4:23, 23:13,
 26:25, 34:15, 34:17,
 47:17, 71:14, 90:17,
 99:21, 124:21,

137:21, 137:22,
 138:2, 140:20

< O >
objected 70:19, 107:13
objecting 28:4, 95:17,
 107:14, 129:17
objections 4:17, 5:5,
 5:23, 103:18,
 103:20, 107:2,
 107:12, 109:15,
 108:23, 109:6,
 110:18, 119:13,
 117:14, 118:9,
 118:10, 118:15,
 118:22, 119:11,
 131:14, 132:3,
 133:13
obtain 10:7, 70:11
obviously 13:22
occasion 59:20
occurred 45:20, 46:2,
 62:24
office 14:12, 19:9,
 19:12
offices 3:2
Oil 37:5, 113:6
older 40:3, 40:4
one 47:24, 77:4, 99:13
ones 4:22, 53:9, 61:7,
 73:21
open 49:9, 49:12,
 49:13
opened 31:6, 46:23,
 52:18
opening 49:8
OPL 36:11, 36:23
opt 62:6, 62:19, 92:21,
 101:12, 109:23,
 110:6, 137:9
opted 110:2, 110:4
option 82:19
order 32:21, 31:12,
 55:9, 55:10, 113:21
orders 17:10, 18:9,
 19:25
ordinary 29:20, 48:10,
 60:16, 61:1, 88:24,
 89:20, 91:20, 92:17

1:14:7, 129:7
privileges 124
probably 6:16, 7:10,
 12:6, 25:4, 32:25,
 52:14, 55:23
Procedure 10:12, 5:14,
 98:19, 139:4
procedures 134:20,
 134:22, 135:14
produced 10:7, 23:13
proceeding 28:5
process 12:19, 18:9,
 58:11, 58:24, 59:7,
 59:11, 59:13, 59:21
processing 104:14
produce 24:1, 24:15,
 108:3, 113:17,
 116:10
produced 9:10, 16:9,
 18:14, 16:21, 24:2,
 24:10, 24:13, 24:14,
 68:4, 108:23, 111:3,
 116:7, 116:14, 133:4
product 21:22, 129:7
Production 2:39,
 112:3, 132:1, 122:8
proffering 107:22
prohibit 111:8
proof 13:7
property 60:11, 66:4
protected 12:3
provide 5:1, 5:9, 9:11,
 18:21, 25:19, 25:25,
 27:24, 128:4,
 113:14, 133:2
provided 24:6, 22:6,
 76:14, 91:17, 120:5,
 132:9, 140:22,
 141:17
providence 114:12
providing 109:10
provision 62:7, 84:16,
 94:23, 95:6, 95:9,
 95:22, 96:7, 103:9,
 100:17, 100:22,
 100:24, 109:22,
 109:6, 136:7
provisions 84:8, 84:20,
 85:1, 93:24, 94:12,
 99:5, 136:20

< J >

105:23, 108:8,
 108:11, 108:16,
 107:4, 114:6,
 122:17, 127:7,
 129:24, 129:25,
 140:20
initially 133:7
initiate 128:7
inquiries 32:21
insert 36:23, 37:6,
 44:18, 101:14,
 104:18, 105:4
inserts 102:21, 104:13,
 104:15, 104:16
insisting 116:10
instance 23:14, 23:18,
 36:12, 43:14, 66:16,
 108:3
instead 12:6, 12:9
instruct 107:16,
 107:18, 114:20,
 129:12
instructed 129:23
instructing 7:25,
 103:22, 103:24,
 107:24, 113:10,
 113:13, 113:22,
 130:4
instructions 146:22
intake 18:8
integrated 108:9
intent 62:19
intention 12:2, 21:25
interest 33:24
interested 144:15
interject 70:13, 76:16
interpreted 141:16
interrupt 41:16
introduce 112:2
introduced 9:17
invade 114:12
involve 30:25
involved 76:7
issue 26:9, 59:4, 69:3,
 106:5, 106:3, 111:1,
 113:18
issued 43:17, 70:23

J 1:13, 1:48, 4:6
JAMES 1:39
Jimmy 4:11, 4:12,
 97:22
John 1:46, 19:7, 116:18
Josh 139:24
Joshua 2:12, 4:14
JR 1:39, 1:46

< K >
K 1:45
keep 53:13, 105:15,
 110:21, 117:3, 142:4
keeping 58:24, 59:8,
 88:12
Kelly 14:6, 14:8
kept 29:20, 29:24,
 38:17, 38:21, 48:10,
 48:14, 54:16, 54:22,
 60:16, 60:22, 60:25,
 72:3, 72:9, 88:24,
 89:20, 89:24, 91:20,
 91:24, 92:17, 92:20
kidding 118:10
Kilian 10:6
kind 49:4, 97:1, 140:16
kinds 34:3
known 12:4, 18:15,
 16:19, 31:3, 46:13,
 46:18, 57:8
knows 27:5, 31:20,
 39:23, 66:5, 107:9,
 108:8, 128:15
Kodiak 46:20

< L >
L 3:5, 144:5, 144:26,
 146:30
label 37:5, 113:7
labeled 68:21
language 36:24, 85:9,
 100:19
larger 7:10, 31:11,
 75:16, 77:21, 78:11,
 79:19, 80:10
large 22:17, 23:11,
 51:23, 68:23,
 93:23, 94:13, 95:1,

< M >
MOR 15:1
MOR-I-TZ 15:9
M 16:2
Ma'am 51:9, 7:1, 10:1,
 13:5, 21:15
machine 104:15, 144:7
Macon 1:34
mail 26:20, 27:7, 28:16,
 82:3, 104:17
mailed 75:5, 81:23,
 98:15, 98:16
mainly 139:21
maintained 19:17
manage 76:8, 169,
 19:24
Management 8:16,
 8:17, 8:23, 17:6,
 21:11
manager 17:9, 17:15,
 17:20, 17:24, 18:6,
 20:4, 21:2
marathon 11:22
Marietta 46:20
mark 4:17
marked 4:1, 4:24,
 13:15, 39:6
Maryland 19:15
match 44:9
matter 4:5, 19:6, 6:4,
 109:15, 142:2,
 146:20
meaning 111:5, 142:12

paying 118:19
payment 45:22, 55:11,
 51:19, 86:19, 87:18,
 87:21, 89:12, 89:13,
 90:11
payments 33:24, 86:8,
 86:2, 88:6, 88:21,
 89:4
pending 11:24
people 123:3, 123:4,
 124:5, 124:8,
 124:12, 127:1,
 128:16
period 33:10, 33:17,
 33:22, 40:19, 41:25,
 59:4, 60:2, 140:7,
 143:6
permitted 5:13
person 146:6, 43:15,
 109:16
personal 7:22
personally 39:21,
 129:3
phone 48:5, 97:19
photo 105:17
photocopies 105:11
photocopy 105:17
phrase 32:24, 34:6,
 135:18
physical 26:20, 105:15
picture 88:6
piece 64:9, 64:10, 73:2,
 73:8
pieces 108:7
pile 88:11
place 3:2, 67:23,
 144:13
placed 26:14, 89:19
places 47:23
placing 93:23, 94:12
Plaintiff 1:8, 1:41,
 112:14, 120:18
plane 117:20
plastic 58:16, 83:9,
 83:13
Please 5:19, 11:21,
 14:8, 34:22, 69:6,
 71:8, 89:9, 89:22,
 120:1, 131:7,
 141:13, 146:13

PMT 51:15
point 7:21, 21:3, 28:9,
 40:3, 47:1, 50:22,
 59:22, 99:5, 113:23,
 135:21, 138:2
pointing 50:11
policies 134:20,
 134:21, 136:14
policy 25:19, 26:11,
 27:21, 31:16, 83:20,
 83:23, 135:4
position 14:10, 17:8,
 17:12, 19:16, 19:17
positions 20:6, 109:16
possession 69:21
possible 18:3, 53:11,
 102:16, 110:5,
 123:6, 123:12,
 133:6, 138:6
practice 5:14, 27:21,
 99:19
PRAIRIE 3:2, 146:1
predecessor 20:11,
 94:12
preliminaries 9:20
preliminary 9:2
preparation 23:23,
 123:14
preparing 120:1, 130:2
presence 144:8
present 8:15, 59:7
president 17:10, 17:16,
 19:16, 19:19, 20:1,
 20:5
Preston 19:7
pretty 74:2
previous 118:22,
 132:9, 138:5
previously 39:13,
 128:24, 137:11
printed 104:12
printing 109:10
prints 17:1, 48:6
prior 52:13, 52:17,
 33:3, 33:16, 94:13,
 94:19

< P >
p.m. 143:20
paper 73:3, 73:8
paragraph 100:4,
 106:23
paragraphs 15:15,
 15:19
Paralegal 11:1, 21:1
parentheses 61:22,
 62:1, 62:4
parking 107:25
part 58:13, 62:23,
 84:25, 69:10, 99:5,
 100:5, 136:16,
 139:10, 140:24,
 141:5
particular 37:20, 43:8,
 75:5, 79:6, 107:1,
 108:16
particularly 5:4,
 103:22, 116:9
parts 108:8
party 144:15

**157**

PUBLIC 3:5, 144:5, 144:27
pull 31:13
pulled 85:8
purchase 49:25, 112:21, 113:5, 114:1, 115:14
purchased 98:2
purchases 33:24
purport 31:12
purging 31:15
purported 24:25
purposes 5:13, 14:14, 116:6, 138:21, 141:22
pursuant 5:9, 5:11, 113:20
put 106:4, 107:1, 108:14
puts 84:19
putting 5:4

<Q>
quick 11:13, 13:20, 24:19, 136:8
quicker 53:12
quickly 6:14, 52:15
quite 106:17

<R>
R-I-T-Z 15:8
R. 2:8
Rachel 2:6, 96:15, 97:20, 97:25
range 53:11
rather 48:18, 54:9, 73:5, 122:16
reach 7:21
read 12:12, 73:2, 73:6, 104:5, 121:6, 129:20, 131:7, 131:8, 131:19, 135:25, 136:2, 142:8, 143:17, 145:8, 146:12
reading 101:17, 141:21, 146:15
reads 30:21, 36:23

ready 12:24, 71:13
real 13:20, 24:19, 134:15
really 4:18, 100:13, 105:22, 108:12, 109:3, 127:12, 136:23, 137:4
reason 33:18, 68:12, 77:20, 78:10, 79:14, 81:24, 82:4, 127:18, 138:13
reasonable 5:3, 106:22, 116:8
reasons 18:19
recall 14:20, 16:3, 84:24, 114:25, 132:12, 133:3, 136:25, 140:1
receipt 82:21
receive 14:5, 27:11
received 4:15, 82:18, 87:22, 88:2, 88:21, 89:4, 101:24, 102:12, 102:17, 105:5, 112:14, 115:11, 137:12
regular 39:6, 48:23, 75:6, 72:19, 90:7, 92:12, 93:7
recess 41:15, 68:16, 97:14
recognize 57:1, 57:4, 57:7, 89:11, 90:25
record 8:7, 13:1, 14:24, 21:13, 23:9, 64:13, 99:4, 95:21, 112:10
records 16:2, 18:7, 16:9, 16:11, 16:13, 16:18, 16:20, 16:24, 16:25, 54:2, 54:6, 88:24, 102:1, 102:7, 110:3, 123:22
redirect 98:13
reduced 14:7
refer 23:18, 25:4, 99:21, 101:11
reference 56:8, 60:4, 101:18
referenced 39:1
references 81:8, 121:17

referred 101:16, 101:18
refers 90:19, 90:21
reflected 30:3, 33:11, 33:21, 37:14, 40:14, 46:6, 46:10, 48:9, 49:19, 65:2, 59:13, 59:21, 60:2, 65:3, 75:8, 75:13, 75:15, 77:15, 79:7, 79:1, 79:17, 80:6, 80:20, 81:24, 82:7, 89:3, 92:5, 93:13
reflection 34:12, 55:24, 55:16
reflects 34:10, 50:16, 51:2, 51:6
refresh 11:13
regard 10:2
Regarding 65:11, 113:16, 119:7, 130:19, 131:22, 132:18, 133:18, 137:12
regulate 39:8, 48:23, 56:6, 72:19, 90:7, 92:12, 93:7
regularly 29:20, 38:18, 48:11, 54:19, 60:17, 60:23, 61:1, 72:4, 91:21, 92:18
Reineke 12:1, 2:23, 3:1, 3:8, 5:21, 7:12, 144:7, 149:3, 149:9
Reineke 116:5, 118:7, 118:21
related 8:17, 32:2, 32:5, 32:19, 48:7
relates 115:14
relating 142:16
relation 140:7
relationship 62:23
relative 144:14
relevance 119:5, 128:12, 131:16
rely 37:25, 38:2, 128:11, 131:14, 132:9
relying 103:23, 132:10
remedies 100:5

remember 7:5, 7:7, 10:12, 17:22, 69:2, 39:13, 93:25, 99:1, 126:20, 130:6, 133:8, 136:2
repeat 60:18, 135:16
rephrase 11:20, 23:24, 28:2, 90:9, 92:11, 138:2
report 18:11, 18:12, 20:2, 31:13
Reporter 8:10, 104:5, 118:9, 121:6, 123:19, 131:8, 131:19, 136:2, 146:31
REPORTING 3:2, 146:1
represent 4:5, 98:2, 139:24
Representative 1:6, 5:9, 100:6, 116:2
represented 12:1
reproduction 105:14, 105:19, 105:21, 105:22, 105:6
reproductions 105:13
repurchase 115:21, 118:1, 118:19, 119:2
request 105:20
requirement 108:23
requires 123:5
requiring 11:16
reserved 5:24, 6:8
reset 67:2
Response 2:40, 4:16, 5:6, 13:13, 16:23, 24:10, 24:14, 108:4, 111:4, 117:15, 119:11, 119:22, 122:25, 123:20, 124:3, 124:11, 125:5, 127:4, 127:23, 128:1, 130:3, 131:15

supervisor 18:15
support 14:11
suppose 116:19
surrounding 21:7
sworn 3:9
system 31:12, 39:15, 40:1, 40:4, 40:5, 43:6, 59:21, 99:22, 60:3, 105:18, 122:18, 124:22, 126:15
systems 39:19

<T>
takedown 116:19
taken 41:15, 68:18, 97:14
talked 24:24, 42:3, 55:20, 55:21, 58:22, 59:24, 75:8, 81:9, 93:17, 93:22, 114:13, 139:8
telephone 1:35, 1:39, 1:46
template 105:23
ten 10:15
ten-minute 41:8
tendency 12:6
term 34:12
testified 27:17, 98:4, 98:14, 99:24, 110:1, 137:11
testify 5:5, 5:10, 10:1, 13:9, 15:12, 15:18, 15:22, 18:17, 24:21, 54:5
testifying 63:15
testimony 3:11, 8:11, 17:4, 39:21, 22:4, 55:15, 64:15, 76:14, 81:14, 108:4, 111:2, 129:6, 131:3, 138:1, 142:20, 143:5
THANKS 50:25
themselves 83:6

therein 90:2, 93:4
they've 84:25
third 49:11
though 105:22, 126:24
three 15:16, 111:2
Throughout 13:20, 25:3, 20:5
title 17:16
titles 17:17, 17:18, 17:19
today 9:21, 10:1, 11:14, 12:2, 12:19, 13:6, 13:9, 14:14, 15:18, 21:18, 23:21, 44:16, 68:5, 82:2, 85:14, 87:2, 93:17, 97:6, 115:6, 116:4, 123:1, 134:21, 142:15
together 40:17, 40:24, 41:25
took 40:24
top 15:12, 30:20, 34:25, 35:1, 49:11, 51:14, 56:9, 61:21, 61:25, 66:17, 67:2, 67:16, 68:24
topic 98:8, 103:2, 103:14, 100:15, 113:11, 116:23, 116:24
topics 99:9, 91:2, 15:19, 15:23, 103:6
topology 100:8, 106:21, 107:2, 108:14, 109:5, 116:18, 116:14
total 89:8, 90:19
towards 50:3
track 59:24, 59:8
transaction 33:11, 69:21
transactions 30:2, 30:6, 32:9, 32:13, 32:16, 32:18, 39:1, 40:19, 55:2, 92:4, 92:5
transcribed 12:10, 144:9
transcript 2:43, 12:12

116:20, 141:21, 144:10, 146:13, 146:15
transmitted 30:5, 39:5, 65:25, 72:18, 50:6, 92:11, 93:7
trick 55:9
true 61:13, 100:10, 112:17, 144:10
try 12:17, 41:20, 42:14, 54:2, 54:6, 54:17, 117:5
trying 4:6, 20:9, 21:24, 54:8, 54:9, 64:19, 76:17, 107:7, 107:20, 110:17, 110:18, 110:21, 110:23, 110:24, 110:25, 111:7, 114:11, 118:25, 117:3, 117:22, 133:16, 143:3, 143:7, 143:11
turn 88:6, 137:7
Turner 19:7, 19:9, 20:2
Two 17:18, 17:19, 39:19, 40:19, 41:6, 47:21, 73:13, 73:17, 74:3, 74:6, 74:9, 74:12, 102:6
type 49:20, 98:25
typically 28:12, 28:2, 32:14, 28:17, 82:25, 83:7, 84:19

<U>
U-M-S-T-O-T-T 14:9
Umstott 14:6
undelivered 32:4
underneath 92:22
understanding 42:18, 54:3, 76:3, 84:1, 106:10, 109:16, 133:11, 133:13, 135:2
understands 17:17

**158**

13:29, 13:15, 14:02, 14:0:3
responses 131:14, 14:29, 143:10
responsive 14:0:4
restate 32:23, 45:18, 54:15, 63:24, 93:24, 95:21, 104:3, 121:5, 131:18
restated 107:14, 118:21, 138:14
restates 138:10
restraining 17:10, 18:9, 19:24
retail 113:6
retrieve 31:12, 40:4
return 146:18
returned 81:24, 82:3, 82:4
review 16:25, 21:15, 23:23, 24:5
reviewing 29:3
rhythm 125:13
role 20:1
routinely 29:23, 38:21, 48:14, 54:22, 72:8, 89:23, 91:23, 92:22
RPR 3:5, 144:5, 144:26, 146:30
ruin 125:13
Rule 6:11
Rules 5:12, 5:13, 5:14, 6:13, 11:13, 106:23
run 31:13, 124:20
runs 67:1, 81:5
rush 117:22

<S>
safe 94:11
sake 13:23, 90:9
sale 49:23, 49:24, 50:3, 50:15, 91:14, 112:21, 113:5, 114:2, 113:6, 114:2, 115:11, 115:14, 119:14, 118:24, 120:4, 120:7, 120:22, 120:23, 121:1, 121:2, 121:12

12:1:21, 12:2:5, 13:4:6, 15:4, 78:16
saw 43:7
saying 65:14, 76:3, 102:5, 105:1, 105:2, 102:24, 107:11, 108:9, 108:18, 108:22, 110:19, 124:21, 142:9, 142:15
Scope 110:19, 112:25, 113:10, 113:19, 117:7, 117:12, 117:13, 118:4, 119:9, 119:10, 119:21, 122:24, 123:20, 124:3, 124:9, 125:16, 126:5, 127:4, 127:23, 128:10, 129:17, 131:13, 131:17, 132:10, 136:13
scratch 52:9
screen 17:1, 48:6
SD 146:4
second 7:17, 14:23, 21:12, 34:22, 50:2, 53:18, 64:12, 71:14, 73:9, 79:9, 98:3, 99:15, 103:1
secretary 21:1
section 49:11, 50:2, 50:10
seeing 50:4
seen 13:5, 23:21, 29:5, 38:11, 48:2, 52:22, 55:12, 59:4, 71:18, 80:14, 87:8, 88:18, 91:9, 114:6, 114:9, 114:17, 114:22, 114:23, 133:20
segment 37:6
selected 14:14, 14:21
sells 128:6
send 24:4, 135:10
sending 58:11, 118:2, 119:5, 120:3, 128:25, 140:23
sense 6:20
separate 15:15, 57:12

57:13, 57:16, 109:8
separated 57:24, 60:15
separately 83:3, 83:8, 99:16, 135:11
September 63:3, 63:19, 64:22, 99:8, 139:2
series 11:15, 77:23
served 4:16, 10:2, 13:14, 14:2, 14:7, 103:6, 117:15
server 122:20, 126:23
servers 128:21
service 5:10, 13:7
services 18:9
set 57:22, 71:14, 74:14, 117:15, 119:11, 124:19, 144:17
sets 72:13, 73:17, 74:3, 74:6, 74:9, 74:12
several 140:15
SHEET 146:1, 146:17, 146:18
shorthand 116:23, 144:8
show 34:11, 40:18, 49:22, 60:1, 82:21, 97:6, 102:7, 110:4, 137:14
showing 41:5, 48:7
shown 40:2
shows 34:21, 83:5, 86:19, 137:14, 138:4
side 89:14, 109:23
SIGN 143:17, 145:8, 146:12, 146:18
similar 140:16
Simply 11:22, 146:16
Sincerely 146:24
single 22:23
SIOUX 3:3, 8:13, 10:10, 108:11, 108:12, 144:18, 149:4
situation 22:11
skip 77:3
slowly 52:15
somebody 18:24, 70:2

12:18
someone 30:6, 39:5, 49:22, 55:5, 76:9, 90:6, 92:11, 93:7, 129:25
sometime 19:18
Sometimes 83:3, 98:14, 98:16
somewhere 47:14
source 39:24, 23:11, 30:10, 34:6, 34:23, 35:14, 35:22, 45:18, 46:16, 50:4, 50:12, 55:11, 59:3, 60:18, 67:13, 71:7, 74:21, 77:4, 79:15, 82:12, 99:13, 104:3, 118:13, 120:18, 128:12, 136:25, 138:1
sought 100:5
space 40:2
speaking 56:25, 107:20, 113:9
specialist 14:11
specific 16:23, 44:7, 44:16, 60:2, 100:19
specifically 40:25, 44:14, 72:22
specified 144:13
specify 141:25
speculation 139:10
speeding 90:9
spell 14:8
spoke 104:20
spokesperson 31:23
spread 15:16
spreadsheet 140:17
SS 144:3
stack 47:14, 53:25, 57:11
Stacy 3:4, 144:5, 144:26, 146:30
staff 18:9
stamp 34:16, 99:11, 99:23, 101:10, 122:2, 120:17, 122:1, 122:13, 125:23, 137:22, 138:3, 138:12

understood 11:19, 124:21
unit 17:10, 17:16, 17:21, 17:25, 18:7, 18:8, 19:25, 20:4
United 1:1, 5:15
unless 13:20, 43:23
until 12:16, 94:8
unusual 141:8
upper 35:7
user 103:13, 131:2
users 131:10
uses 59:7
using 99:16
usual 5:22

<V>
valid 108:23
validate 90:21
various 71:25, 89:7
verbalize 12:7, 12:11
verify 16:10, 16:14, 16:21, 18:24, 17:22, 44:19, 44:20, 51:7
version 58:24, 59:8
vice 10:10, 17:16, 19:16, 19:19, 20:1, 20:5
Volation 22:9
virtual 90:21

<W>
W. 1:39
wade 12:4
Wait 12:15, 84:6
waived 100:22
waiver 99:1, 99:6, 100:10
waivers 86:5, 98:4, 98:6, 130:21
wanted 103:2, 124:17, 143:8
venting 73:2
verbatim 21:23,9, 95:15, 120:9
warrant 119:6
watch 41:6

waters 12:5
weather 108:11
welcome 92:12
Whatever 81:24, 108:1
whereas 138:5
WHEREOF 144:17
whole 105:6, 123:19
Webeseick 3:5, 144:5, 144:26, 146:30
Will 4:22, 42:23, 5:19, 42:5, 23:6, 23:16, 49:22, 58:21, 76:9, 91:3, 104:13, 108:22, 133:13
wish 5:25, 12:22, 145:8
Withdraw 73:10
within 15:19, 21:8, 30:7, 39:1, 51:24, 55:2, 72:13, 137:16, 138:15
without 76:20
word 16:24, 23:12, 36:22, 42:23, 54:11, 140:1
Words 35:13, 40:8, 68:23, 90:17
work 4:23, 8:12, 14:12, 21:22, 132:7
worked 20:25, 21:1, 21:8
working 5:6
works 14:6
write 67:19, 67:21, 145:15, 146:16
writing 20:15, 109:9
written 26:12, 25:15, 111:20
wrote 66:21, 66:22, 68:2

<Y>
year 10:12, 35:18, 51:4, 138:23
years 7:7, 7:9, 10:13, 10:15, 10:17, 10:19, 10:21, 17:25, 18:2, 18:4, 89:2, 128:12
Yep 8:9, 66:19, 71:16, 76:5, 86:22

**159**

140:10, 140:17, 140:20
Stamped 2:38, 22:19, 24:14, 36:5, 39:9, 111:4
standing 125:12
start 52:9
starting 124:20, 138:11
starts 35:6, 66:25, 110:13, 137:8
State 3:5, 5:19, 6:17, 13:23, 104:15, 144:2, 144:6
stated 6:18, 76:25
statements 17:2, 38:6, 44:18, 53:3, 63:13, 54:1, 56:16, 60:9, 60:10, 84:9, 84:12, 88:5, 98:16, 98:21, 98:23, 104:12, 105:9, 105:11
States 1:1, 5:15
stating 50:21
Steve 6:11, 63:13, 98:14
STEVEN 1:31
stipulations 5:23
STOLZ 1:37
stop 11:23, 11:25, 68:19, 125:11
stored 105:24, 108:7, 108:8, 108:11, 122:17, 122:18, 128:9, 128:15, 127:7
Street 8:13
string 37:1
stuff 107:10
Subject 13:13, 100:6, 107:1, 132:2
submitted 133:14, 133:15
subpoenas 18:9, 133:6
subsequent 15:16, 38:3
subsidiary 8:23, 65:25
suggest 32:2
sues 128:18, 128:20, 128:24
suggest 139:4

you-all 96:13, 107:3, 108:13, 112:2

<Z>
zeroes 23:13

**160**