**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| GLENN COX, individually and as Class Representative for all others similarly situated, | ) <br> ) <br> ) <br> ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION FILE NO. <br> ) 1:14-CV-01576-LMM-JSA |
| MIDLAND FUNDING, LLC and FREDERICK J. HANNA & ASSOCIATES, P.C. | ) <br> ) <br> ) |
| Defendants. | ) <br> ) <br> ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

COMES NOW, Plaintiff Glenn Cox, and files this, his Response in Opposition to Defendants' motion to compel arbitration. Defendants' motion should be denied because Defendants have failed to prove that an arbitration agreement exists. Even if Defendant Midland Funding, LLC ("Midland") could prove that an arbitration agreement existed between Plaintiff and Plaintiff's original creditor, Defendants have failed to prove that Midland is an assignee.

## I. *STATEMENT OF FACTS*

Defendants demanded and collected from Plaintiff and thousands of other Georgia consumers inflated amounts for alleged court costs to which Defendants

were not entitled.  Specifically, in verified collection lawsuits Defendants inflated the amounts that Defendants were charged by their process servers, and then sought and obtained judgments that included the inflated amount.  [*Doc. 1, ¶ 34*]. Plaintiff inadvertently uncovered this scam when Plaintiff opened the default of a lawsuit Defendants filed against Plaintiff, described more fully below.

Plaintiff applied for and received a Citgo credit card account with Associates National Bank (Delaware) ("ANB") sometime in 1992.  [*Doc. 67-11, ¶ 1; Doc. 64, 47:11-12*][1].  Defendants assert that in January 2002, ANB merged into and subsequently operated as part of Citibank (South Dakota), N.A. ("Citi") and began servicing the Citgo account.  In August of 2011, Plaintiff defaulted on the account. Subsequently, Midland asserts that it purchased Plaintiff's account along with numerous other defaulted accounts in a large portfolio from Citi on or about February 25, 2013.  [*Doc. 64-2, p.* 21][2].  Midland is a Delaware limited liability company in the business of taking title or claiming to take title to charged-off debts allegedly owed by consumers and originally owed to others.  [*Doc. 1, ¶¶ 3, 5*].

---

[1] All references to the Reinecke Deposition, Doc. 64, have been excerpted and attached to Plaintiff's Response as Exhibit A, pursuant to Local Rule 5.4 B (1).

[2] References to Exhibits to the Reinecke Deposition, Docs. 64-1, 64-2, and 64-4 have been excerpted and attached to Plaintiff's Response as Exhibit B-1, pursuant to Local Rule 5.4 B (1).

After allegedly purchasing Plaintiff's account, Midland hired Defendant Frederick J. Hanna & Associates, P.C. ("Hanna"), a debt collection law firm, to sue Plaintiff in an attempt to collect on the defaulted account. [*Doc.67-1, p. 8*]. Hanna filed suit on February 21, 2014, in Cobb County Magistrate Court. [*Doc. 1, ¶ 21*]. Defendants' private process server served Plaintiff with the lawsuit on March 12, 2014. [*Doc. 1, ¶ 23*]. Plaintiff did not respond to the lawsuit within the required time, and opened the default as a matter of right pursuant to OCGA § 15-10-43(d) by filing Plaintiff's defenses within fifteen (15) days of the day of default and paying the costs. [*Doc. 1, ¶ 24*].

Plaintiff filed his Answer and Counterclaims on April 14, 2014, and paid $102.50 into the Court to open his default as a matter of right. [*Doc. 1, ¶ 25*]. Plaintiff paid the sum of $102.50 because Defendants in their verified Complaint demanded court costs of $102.50. [*Doc. 1, ¶ 26*]. As the filing fee for a civil action in Cobb County Magistrate Court is $52.50, the remaining cost of $50.00 could only be attributable to the expense of a private process server. [*Doc. 1, ¶ 27*]; see http://magistrate.cobbcountyga.gov/v6/fees.htm.

The Cobb County Sheriff's Department charges $50.00 to serve process.[3] However, Defendants used Darryl Brooks, an agent and/or employee of JJL Process Corporation, a national, private processing company. [*Doc. 1, ¶ 28*]. Defendants only paid JJL Process Corporation $30.00 or $35.00 for serving Plaintiff. [*Doc. 1, ¶ 29*]. Nevertheless, Defendants sought or collected $50.00 from each consumer Defendants sued. [*Doc. 1, ¶ 35*].

As a defense to Plaintiff's lawsuit against Defendants for violations of the Fair Debt Collection Practices Act, Defendants claim that arbitration is compelled due to a clause in a cardmember agreement allegedly provided to Plaintiff at some point while Plaintiff was using the account. [*See Doc. 8, p. 2, Hanna's Third Defense; Doc. 13, p. 11, Midland's First Defense*]. Defendants requested that they be allowed to conduct limited discovery on the issue of arbitration to allow the Defendants to seek documents from Midland's assignor, Citi, to prove the existence of an arbitration agreement and the enforceability thereof.

Discovery on the issue of arbitration has been completed, including the deposition of Citi's Fed. R. Civ P. 30(b)(6) witness, and several purported cardmember agreements from both ANB and Citi have been produced. However,

---

[3] OCGA § 15-16-21(b)(1) sets the fee for serving a copy of process and returning the original, per copy, at $50.00.

neither Defendants nor Citi have produced a credit application signed by Plaintiff or the cardmember agreement that Plaintiff should have received upon the opening of the account in 1992.

The last time Plaintiff used his credit card was January 3, 2008, according to Defendants' records and according to Defendants' own brief.  [*Doc. 67-1, p. 7; Doc. 64-4, p. 55*].  From that point forward, Plaintiff only made payments towards the balance on the account.  Defendants cannot authenticate a purported 2005 amendment to a cardholder agreement.  *[Doc. 64-2, pp. 28-33]*.  Plaintiff never used his credit card after a purported May 1, 2008 amendment to a cardholder agreement was allegedly mailed to him. *[Doc. 67-1, p. 7]*.

## II. ARGUMENT AND CITATION OF AUTHORITY

### A. STANDARD FOR COMPELLING ARBITRATION

The U.S. Supreme Court in <u>Granite Rock</u> reconfirmed that where a party challenges the very existence of the contract containing an arbitration clause, a court cannot compel arbitration without first resolving the issue of the contract's existence.   <u>Granite Rock Co. v. Int'l Broth. of Teamsters</u>, 130 S. Ct. 2847, 2856 (2010).  The Court held: "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." <u>Id.</u>

"Arbitration is simply a matter of contract."  Dascher v. RBC Bank (USA), 745 F.3d 1111, 1116 (11th Cir. 2014), cert. denied, 135 S. Ct. 144 (2014) (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995).  Due to the contractual nature of arbitration, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."  Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 626 (1985); see also Chastain v. Robinson–Humphrey Co., Inc., 957 F.2d 851, 854 (11th Cir.1992).

While "the validity of an arbitration agreement is generally governed by the Federal Arbitration Act," "state law generally governs whether an enforceable contract or agreement to arbitrate exists" at all.  Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1367–68 (11th Cir. 2005).  A genuine dispute of fact concerning contract formation precludes a court from deciding as a matter of law that the parties did or did not enter into an agreement to arbitrate.  Granite Rock at 297–99; Solymar Investments, Ltd. v. Banco Santander S.A., 672 F.3d 981, 989–90 (11th Cir. 2012); Magnolia Capital Advisors, Inc. v. Bear Stearns & Co., 272 F. App'x 782, 785–86 (11th Cir. 2008).

Defendants bear the burden of proving a valid arbitration provision.  "[A] district court considering the making of an agreement to arbitrate should give to the

party denying the agreement the benefit of all reasonable doubts and inferences that may arise." Id. at 786 (internal quotation marks omitted). "The party seeking arbitration 'bears the burden of proving the existence of a valid and enforceable agreement to arbitrate.'" Gentry v. Beverly Enterprises-Georgia, Inc., 714 F.Supp.2d 1225, 1229 (S.D. Ga. 2009) (citing Ashburn Health Care Ctr., Inc. v. Poole, 286 Ga.App. 24 (2007)).

Where a party is seeking to enforce an arbitration clause in a contract obtained by assignment, it must include proof of a full chain of assignment of that right in the specific account at issue. Webb v. Midland Credit Mgmt., Inc., 2012 WL 2022013 (N.D. Ill. 2012) ("without Exhibits A through F, defendants cannot show an unbroken chain of assignment entitling them to stand in Citibank's shoes and enforce the arbitration provision contained in Webb's credit card agreement").

### B. DEFENDANTS HAVE FAILED TO PROVE THE FORMATION OF AN AGREEMENT.

#### 1. Citi's Testimony Does Not Establish The Formation Of An Agreement.

Defendants pled the defense of an existing cardmember agreement with Plaintiff that allegedly contains an arbitration clause and class action waiver. However, Defendants do not possess such an agreement. Defendants sought and

failed to prove its existence through the deposition of a corporate representative of Midland's predecessor of title of the alleged agreement, Citi.

On January 23, 2015, counsel for Hanna deposed Cathrine Reinecke ("Reinecke"), an employee of Citigroup Management Corporation, which is an affiliate of Citibank, N.A. [*Doc. 64, 8:17-19*]. Reinecke described the way that the Plaintiff's Citgo account made its way to Citi as follows:

> A: In September of 2000 Citigroup acquired Associates First Capital, of which Associates National Bank (Delaware) was a part of that. Associates National Bank (Delaware) merged with Citibank (South Dakota) in January 7, '02. And then Citibank (South Dakota) merged into Citibank, N.A. July 1st, 2011 so the account -- when Citibank got it, it came from Associates National Bank to Citibank.

[*Doc. 64, 69:8-16*]. Thus, Midland allegedly purchased a Citibank, N.A. account that was acquired through its predecessor's predecessor, Citigroup, who acquired Associates First Capital, of which ANB was an apparent subsidiary, which merged with Citibank (South Dakota), then merged into Citibank, N.A. This mind-boggling series of acquisitions, mergers, transfers, and assignment can only be described as the financial equivalent of the "Who's On First?" Abbott and Costello stand-up comedy routine.[4]

---

[4] https://www.youtube.com/watch?v=kTcRRaXV-fg

Reinecke testified that she was only able to review the account notes related to Plaintiff's account back to July 1, 2006, as all previous account notes had been purged.  [*Doc. 64, 32:12-15*].  The account originated in 1992 with ANB.  [*Doc. 67-11, ¶ 1; Doc. 64, 47:11-12*].  The last time Plaintiff used the account was January 3, 2008.  [Doc. 67-3; *Doc. 64, 50:15-18*][5].  From that point forward, Plaintiff only made payments towards the balance on the account.  [*Doc. 67-1, p. 7*].  Defendants have produced credit card statements from May 1, 2008 through March 3, 2011, which reveal that Plaintiff has not used the card in any way, other than making payments on the balance.  [*Doc. 64-4, pp.58-66; Doc. 64-5, pp. 1-61*].[6]

Defendants point to two amendments to a purported cardmember agreement – one in July 2005 and another in May 2008 – to support their contention that this matter should be compelled to arbitration.  Account statements purportedly sent to Plaintiff on July 1, 2005 and May 1, 2008 that state "PLEASE SEE THE NOTICE OF CHANGE IN TERMS FOR IMPORTANT INFORMATION" for the

---

[5] Although Reinecke testified that the date of last use of the card was January 8, 2008 [*Doc. 64, 50:15-18*], the card statement reflects that the last transaction was January 3, 2008, [*Doc. 67-3*].

[6] References to Exhibit to the Reinecke Deposition Doc. 64-5 have been excerpted and attached to Plaintiff's Response as Exhibit B-2, pursuant to Local Rule 5.4 B (1).

proposition that Plaintiff actually received the amendments to the cardmember agreement.   [*Doc. 64-4, p. 24; Doc. 67-7, p. 2*].   However, when specifically questioned about Citi's knowledge of whether Plaintiff actually received the May 2008 amendment, Reinecke stated that she did not know if Plaintiff had received it or by what method the amendment was sent to Plaintiff.   [*Doc. 64, 102:12-19; 104:18-20*].

Reinecke could not identify the July 1, 2005 amendment, but was able to identify a May 1, 2008 amendment.   [*Doc. 64-2, pp. 28-33*].   However, as Defendants have conceded, Plaintiff had not used the account since January 3, 2008.   Therefore, the May 1, 2008 amendment does not apply to Plaintiff.   [*Doc. 67-1, p. 7*].   Assuming *arguendo* that the purported May 1, 2008 cardmember agreement is admissible, it a*ffirmatively demonstrates* that the tendered credit card agreement cannot be the one governing Plaintiff's account.   This is because the records Defendants tendered show the proferred cardmember agreement post-dates Plaintiff's use of the card.

It is black-letter law that an arbitration agreement cannot be enforced against a party who has not assented to the agreement.   "The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct

that he assents."  Restatement (Second) of Contracts § 19 (1981).  Georgia law requires the assent of both parties in order to form a contract.  OCGA §§ 13-3-1, 13-3-2.[7]  Plaintiff's assent is absent here.

It is true that sometimes a party's mere *use* of a product may constitute assent to terms attached to that product.  See Hill v. American Express, 289 Ga.App. 576 (2008).  But where, as here, there is no evidence that a party used the product after receiving the arbitration agreement, that party cannot be said to have agreed to arbitrate solely by making payments on the balance of the account.

The mailing of the cardmember agreement amendment may constitute an offer, and the use of a credit card after receipt of an amendment may constitute the acceptance of an amended agreement.   However, the May 2008 amendment agreement tendered could not be the controlling agreement.   The controlling cardmember agreement would need to have been created and mailed to Plaintiff sometime between when he was alleged to have opened the account in May 1992, and the date of last use, January 3, 2008.  In order to be bound by an arbitration

---

[7] OCGA § 13-3-1 provides:  "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."  OCGA § 13-3-2 provides:  "The consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract; until assented to, each party may withdraw his bid or proposition."

provision inserted into a cardmember agreement, Plaintiff must have received the amended agreement and accepted its terms by using the card.  Plaintiff did not.

In Kulig v. Midland Funding, LLC, 2013 WL 6017444 (S.D.N.Y. 2013), Midland unsuccessfuly tried to make the same argument it makes here that a consumer could somehow be bound by an amendment sent to a consumer after the consumer stopped using the account.   The district court rejected Midland's argument:

> Although the use of a credit card constitutes acceptance of an offer of credit, see Feder v. Fortunoff, 114 A.D.2d 399, 494 N.Y.S.2d 42 (2d Dep't 1985), merely continuing to owe money on a credit card account cannot reasonably be understood to be an "objective manifestation of intent" that binds the parties to a change in terms.  See Zheng v. City of New York, 93 A.D.3d 510, 511, 940 N.Y.S.2d 582 (1st Dep't 2012).   An outstanding balance on a credit card, without more, is simply a debt attributable to past uses of the card rather than a use in and of itself.

Id. at *5.  This Court should similarly reject Defendants' novel legal theory that merely carrying a balance on a card, without more, somehow authorizes a creditor to retroactively impose arbitration and class waiver provisions on an unsuspecting consumer.

Defendants' reliance on Athon v. Direct Merchants Bank, 2007 WL 1100477 (N.D. Ga. Apr. 11, 2007) is unavailing.  The plaintiffs in Athon are no

different than the cardholder in Hill, cited *supra*.  As held by the Athon court, "Here, Plaintiff and his wife assented to the Arbitration Agreement through their continued use of the credit card and continued payments on the account for over three years after receiving the addendum."  Athon at *4.  Thus, Defendants' assertion that the Athon court found that *payments alone* constituted continued use of the account is simply untrue.

### 2. Defendants' Attempt To Bootstrap Their Way Into The 2005 Amendment Fails.

Defendants argue that although they cannot produce the 2005 amendment, their failure to produce it should not be an impediment to the enforcement of an arbitration clause they contend was included in the 2005 amendment.  The May 2008 amendment states:  "We are changing your Card Agreement and replacing it with a new one. . . .  We have identified below ***some*** of the changes to your Card Agreement[.]"  [*Doc. 67-5, p. 2 (emphasis added)*].  There has been no evidence presented to this Court regarding the content of the 2005 amendment other than Defendants' bare assertion that because the May 2008 amendment does not specifically state that the alleged arbitration clause supposedly contained in 2005 amendment has not changed, then the Court is to "assume" that:  a) there was an arbitration clause in the 2005 amendment; and b) it remained unchanged.  This

complete lack of evidence of the 2005 amendment is fatal to Defendants' argument.

Moreover, the May 2008 amendment, the alleged 2005 amendment, and any other amendments Defendants may point to, are exactly that: *amendments*. These documents are purportedly amending an alleged, original cardmember agreement with ANB **which has not been produced.** Further, the ANB amendments have not been authenticated as a business record of Citi:

> Q:  Sure.  Documents 1 through 66 and pages 68 through 79, are these documents that are made and kept in the course of Citibank's regularly conducted business activity?
>
> A:  Not all of them.
>
> Q:   Are certain of these documents not kept in the ordinary course of Citibank's regularly conducted business activity?
>
> . . .
>
> A: Some of them are not Citibank documents.
>
> Q;  Okay. Can you identify which ones those are?
>
> A: Yes. Pages 1 through 26.
>
> Q:   So pages 1 through 26 are not Citibank documents, correct?
>
> A:  Citibank didn't create these documents.

*[Doc. 64, 60:21-61:16]*.[8]

But all of Defendants' arguments miss the main point.  Defendants have not proven that a contract existed between Plaintiff and Plaintiff's original creditor, ANB.  Without proof of the original contract, no alleged amendments can carry the day.

### 3. Georgia Law, Not South Dakota Law, Applies Because Defendants Have Not Proven a Contract Containi*n*g a South Dakota Choice-of-Law Clause.

Defendants' reliance on the provisions of South Dakota law, specifically S.D. Codified Laws § 54-11-9, should be dismissed out of hand.  A court cannot enforce a choice of law clause in a contract that has not been shown by competent evidence to be a valid contract.  "… [A] court cannot sensibly apply a contractual choice-of-law provision before the court determines that the parties have a valid contract."  Williams v. Gen. Elec., 13 F.Supp.3d 1176, 1880 n. 5 (N.D. Ala 2014) (internal citations omitted).  "A federal district Court is bound to apply the conflict of laws rules prevailing in the forum state."  Judge v. Am. Motors Corp., 908 F.2d 1565, 1577 (11th Cir. 1990).  This Court should therefore apply Georgia law.

---

[8] Documents 1 through 26 refer to *Doc. 64-1, pp. 18-43* which are alleged to be ANB amendments to the original card agreement.

Defendants cite <u>Daniel v. Chase Bank USA, N.A.</u>, 650 F.Supp.2d 1275 (N.D. Ga. 2009) to support their proposition that the purported credit card agreement, which Plaintiff never entered, dictates that South Dakota law applies. [*Doc. 67-1, p. 10, fn. 36*].   However, the <u>Daniel</u> court found that the consumer had acknowledged that the creditor was in possession of the original cardmember agreement and that there was no genuine issue regarding the authenticity of it. <u>Daniel</u> at 1288.  In the case at bar, there is no acknowledgment by the consumer of an original agreement.   In fact, Defendants have failed to produce an original agreement.  Plaintiff fiercely contests the formation of any agreement or amended agreement, and any purported assignment to Midland.  Plaintiff never agreed and does not agree that South Dakota law applies.

### 4.  ANB's And Citi's Purported Cardmember Agreements Are Illusory.

Defendants have failed to produce an authenticated, original agreement entered into between Plaintiff and ANB.   The purported ANB amendment suspected by Reinecke to be from around May 2001 [*see Doc. 64-1, 66:21-24*] Defendants produced is prefaced by the following statement:

> **Modifications.**   Subject to applicable law, we may change the terms of this Agreement from time to time. We have the right to apply the new terms to the outstanding balance of your Account as of the effective date of the change.  If we make a change, we will give you notice as required by applicable law.

[*Doc. 64-1, p. 31*].  This remarkable and unlimited statement by ANB that it has the power to unilaterally re-write the Agreement without notice[9] means that Plaintiff and other members of the putative class never agreed to ANB's arbitration clause.

The same is true for Citi's purported cardmember agreement, which provides:  **"Changes To This Agreement**.  We may change the rates, fees, and terms of this agreement at any time for any reason. . . .  These changes are binding on you unless you have the right to opt-out and you choose to opt out by following our instructions"  [*Doc 64-2, pp. 25-26*].  Again, Citi reserved the right to re-write, change or revise the cardmember agreement without any notice to the cardholder, and brazenly states that the re-writes "are binding on you."  With the unilateral ability to re-write the contract at any time and for any reason, there has been no meeting of the minds, and therefore no contract was ever formed.

A longstanding rule of contract law, which has general application to all contracts, is that if one party to a purported agreement makes its obligations contingent upon an unlimited power to decide later what it will actually do, this is

---

[9] Except as required by applicable law, and Plaintiff's counsel has been unable to locate any Georgia law that would require such a notice.

an "illusory" obligation – not a promise at all – and no agreement is reached and no contract is formed.

> The Restatement (Second) of Contracts § 2 comment e states:

>> Words of promise which by their terms make performance entirely optional with the "promisor" whatever may happen or whatever course of conduct in other respects he may pursue, do not constitute a promise.

Similarly, Willison states:

>> [T]he promise is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his performance. The unlimited choice in effect destroys the promise and makes it merely illusory.

1 Samuel Williston, Contracts Section 4:24 (4th Ed. 1990).

Because Citi never promised to do anything, its purported arbitration clause thus never forms an agreement to arbitrate.  A number of courts faced with nearly identically overly broad language have refused to enforce arbitration clauses indistinguishable from Citi's clause, where the defendant had the power to unilaterally re-write the arbitration clause, on the grounds that the clauses were illusory.  See, e.g., Salazar v. Citadel Communications Corp., 90 P.3d 466, 469 (N.M. 2004) (refusing to enforce an arbitration clause embedded in an employee handbook where "The Company simultaneously reserved the right to modify, unilaterally and at the same time, any of the Handbook's provisions save the

employee's at will status," on grounds that the arbitration clause was illusory). The <u>Salazar</u> court followed the rationale of the Restatement set forth above: "The party that reserves the right to change the agreement unilaterally, and at any time, has not really promised anything at all . . ." <u>Id.</u>  Where there is no real promise, there can be no real agreement.

Simply put, Citi's arbitration clause suffers from a fatal drafting error.  Citi was apparently so eager to reserve essentially unlimited power to itself that it has failed to actually promise anything.  Because Citi could rescind any term in the agreement, or add any other new term which strikes its unilateral fancy, all without even being required to notify its customers of the solely imposed changes, it has promised nothing whatsoever.  Where one side refuses to promise anything, there is no agreement to do anything.  Because no agreement was ever formed in the first instance, this Court cannot "re-write" or "blue pencil" Citi's document so as to create an enforceable agreement.

## C. DEFENDANTS HAVE FAILED TO PROVE A PROPER ASSIGNMENT OF THE CITGO ACCOUNT.

Under Georgia law, "[a]n assignment is a contract and, in order to be valid, must possess the same requisites (parties, subject matter, mutual assent, consideration) as any other contract."  <u>Bank of Cave Spring v. Gold Kist, Inc.</u>, 173 Ga.App. 679, 680 (1985).  An assignment must be in writing, identify both the

assignor and assignee, and identify the specific accounts transferred in order for the contractual right to be enforceable by the assignee.  Nyankojo v. North Star Capital Acquisition, 298 Ga.App. 6 (2009).  A party may not rely on an affidavit alone without providing the written agreements which could complete the chain of assignments between the assignor and the purported assignee.  Wirth v. CACH, 300 Ga.App. 488 (2009).

In the last five years, Georgia courts have repeatedly refused to allow purported assignees to enforce contracts against consumers without providing complete written assignment contracts.  See Nyankojo supra; Wirth supra; Arrow Financial Services, LLC v. Wright, 311 Ga.App. 319, 321-22 (2011); Benson v. Asset Acceptance, LLC, 310 Ga.App. 1 (2011);  Green v. Cavalry Portfolio Services, LLC, 305 Ga.App. 843 (2010);  Hutto v. CACV of Colorado, 308 Ga.App. 469 (2011).  See also Phillips v. Selecto Scientific, 308 Ga.App. 412, 413-14 (2011) (refusing to enforce assignment not in writing).

In Green v. Cavalry Portfolio Services, LLC, the Georgia Court of Appeals held that Cavalry could not enforce a retail installment sales contract for the purchase of an automobile against a consumer because Cavalry failed to show it "received a valid assignment of contract rights[.]"  305 Ga.App. 843 (2010).  In Wirth, Nyankojo, and Hutto, the Georgia Court of Appeals refused to allow

purported assignees to rely on affidavit testimony to enforce contractual rights against a consumer without proving valid written assignment contracts which identified the consumer's specific account number as part of the assignment.  In Benson, the Georgia Court of Appeals reversed the denial of summary judgment in favor of the consumer because the purported assignor failed to prove a valid chain of written assignments.

Defendants have failed to produce the proper assignments.  Defendants cannot enforce ANB's or Citi's alleged contractual rights without submitting the written assignment contracts in compliance with the standards set forth in Nyankojo *supra* and its progeny.  Having failed to prove the existence of an agreement or the assignment of the account in the Reinecke deposition, Defendants have attempted to prove the assignment by way of a footnote.  [*Doc. 67-1, p. 8, fn. 29*].

The Declaration of Kyle Hannan ("Hannan"), an apparent employee of a Midland-related company, should not be considered because Hannan was not identified during discovery and his Declaration [*Doc. 67-10*] was not produced during the period this Court permitted for discovery[10].  In Plaintiff's separate

---

[10] The limited period for discovery on the issue of whether an arbitration agreement applied expired on January 27, 2015.  [*Doc. 58*].  Hannan's

Interrogatories to Midland and Hanna, Plaintiff requested Defendants to identify all persons known "to have personal knowledge of any facts or issues regarding . . . (b) any assignments or sales of the alleged debt, . . ."[11]  Plaintiff also requested Defendants to identify "all witnesses that Defendant intends to call or may call to testify at trial, or may supply an affidavit or testimony to be used in this case regarding . . . (b) any assignments or sales of the alleged debt, . . . "[12]

Neither Hanna nor Midland identified Hannan as a person with knowledge or as a witness who might supply an affidavit.  Hanna did not identify Hannan.[13] Midland vaguely responded that with "Representative(s) from Midland Funding LLC and/or Midland Credit Management Inc."[14]

---

Declaration was not provided until February 6, 2015, when it was filed with this Court in support of Defendants' motion to compel arbitration.

[11] Excerpts of Plaintiff's First Interrogatories to Defendant Hanna and excerpts of Plaintiff's First Interrogatories to Defendant Midland are attached hereto as Exhibit C and D respectively, pursuant to Local Rule 5.4 B (1).

[12] Id.

[13] Excerpts of Defendant Hanna's responses to Plaintiff's First Interrogatories are attached hereto as Exhibit E, pursuant to Local Rule 5.4 B (1).

[14] Excerpts of Defendant Midland's responses to Plaintiff's First Interrogatories are attached hereto as Exhibit F, pursuant to Local Rule 5.4 B (1).

Plaintiff's counsel expressed his concern during a telephone conference with the Honorable Justin S. Anand and counsel for Defendants that Midland would employ exactly this type of sandbagging tactic.  By not identifying who would be providing an affidavit in support of its motion to compel arbitration, Midland deprived Plaintiff from having an opportunity to depose its affiant. This Court should not permit Defendants to benefit from failing to identify witnesses it could have easily identified.  This Court should not consider Hannan's Declaration.

 In the event Hannan's Declaration is considered, this Court should give it no weight because it does not comply with the requirements of an assignment as set out above.  Hannan's Declaration is redacted and fails to include "Exhibit 1 and the final electronic file" referenced in the purported Bill of Sale and Assignment. [*Doc. 67-10, p. 4*].  The Bill of Sale and Assignment states that it is "subject to the terms and conditions of the Purchase and Sale Agreement dated February 25, 2013, . . ."  However, without explanation, Defendants have failed to provide the Purchase and Sale Agreement.

The basis for Defendants' collection action is that Midland claims to have purchased Plaintiff's account from Citi.   Where is the Purchase and Sale Agreement that would prove that Midland purchased the account?  Absent filing collection actions against Plaintiff and other consumers, Defendants have the right

to keep purchase and sale agreements private.  However, if Defendants want to file collection actions against consumers alleging that consumers are indebted to Midland, Defendants must prove that Midland actually owns the debt and is entitled to bring suit.  If there are terms and conditions in the Purchase and Sale Agreement stating that the information provided by Citi to Midland is unreliable and unwarranted, Plaintiff is entitled to know that.  Furthermore, if Defendants want to invoke arbitration and class waiver provisions by assignment, Defendants need to prove the underlying agreements and subsequent assignments.

### III.    *CONCLUSION*

Plaintiff has raised a genuine issue of material fact regarding whether the parties have agreed to arbitrate their dispute.  Therefore, this Court must DENY the Defendants' motion to compel arbitration.

Respectfully submitted, this 9th day of March, 2015.

**HURT STOLZ, P.C.**

 s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.  380104

345 West Hancock Avenue
Athens, Georgia 30601
(706) 395-2750
Facsimile:  (866) 766-9245
jhurt@hurtstolz.com

**THE KOVAL FIRM, LLC**

s/  Steven H. Koval
By:  Steven H. Koval
Georgia Bar No. 428905

3575 Piedmont Road
Building 15, Suite 120
Atlanta, GA  30305
Telephone:  (404) 513-6651
Facsimile: (404) 549-4654
steve@kovalfirm.com


**ADDLETON LTD CO.**

s/  David F. Addleton
By:  David F. Addleton
Georgia Bar No.:  005050

355 Cotton Avenue
Macon, Georgia 31201
Telephone: (404) 797-7166
Facsimile: (888) 398-0898
dfaddleton@gmail.com

**ATTORNEYS FOR PLAINTIFF
AND THE PUTATIVE CLASS**